# **EXHIBIT F**

Page 1

1

UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

3

4   IN RE:  C.R. BARD, INC.,  ) Master File No. 2:10-MD-02187
PELVIC REPAIR SYSTEM       ) MDL 2187
5   PRODUCTS LIABILITY         )
LITIGATION                 )
6                              )
CHRISTINE WHEELER, et al.,)
7                              )
Plaintiffs,     )
8                              )
vs.                  ) Case No. 2:12-CV-01339
9                              )
C.R. BARD, INC., et al.,   )
10                              )
Defendants.     )
11

12          The videotaped deposition of CHARLES
13  FEINSTEIN, M.D., called for examination, taken pursuant
14  to the Federal Rules of Civil Procedure of the United
15  States District Courts pertaining to the taking of
16  depositions, taken before KELLY A. BRICHETTO, CSR No.
17  84-3252, Certified Shorthand Reporter of the State of
18  Illinois, taken at 2535 Greenview Road, Northbrook,
19  Illinois, on the 7th day of August, 2019, at 9:30 a.m.
20
21
22
23
24
25

Page 2

```
 1  APPEARANCES:
 2
        On behalf of the Plaintiffs:
 3
        WAGSTAFF & CARTMELL, LLP, by
 4      MR. JONATHAN P. KIEFFER
        4740 Grand Avenue
 5      Suite 300
        Kansas City, Missouri 64112
 6      (816) 701-1100
        jpkieffer@wcllp.com
 7
 8
        On behalf of the Defendants:
 9
        GREENBERG TRAURIG, by
10      MR. C. WADE BOWDEN
        777 South Flager Drive
11      Suite 300 East
        West Palm Beach, Florida 33401
12      (561) 650-7922
        bowdenw@gtlaw.com
13
14      - - - - - - -
15
     ALSO PRESENT:
16
        Peter Prezzano, Videographer
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                INDEX OF EXHIBITS
 2  NUMBER                       IDENTIFIED
 3  Exhibit No. 1                 9
    Exhibit No. 2                 10
 4  Exhibit No. 3                 11
    Exhibit No. 4                 11
 5  Exhibit No. 5                 51
    Exhibit No. 6                 52
 6  Exhibit No. 7                 53
    Exhibit No. 8                 54
 7  Exhibit No. 9                 56
    Exhibit No. 10                57
 8  Exhibit No. 11                61
    Exhibit No. 12                63
 9  Exhibit No. 13                89
    Exhibit No. 14                90
10  Exhibit No. 15                98
    Exhibit No. 16                99
11  Exhibit No. 17                109
    Exhibit No. 18                117
12  Exhibit No. 19                122
    Exhibit No. 20                127
13  Exhibit No. 21                128
    Exhibit No. 22                129
14  Exhibit No. 23                130
    Exhibit No. 24                133
15  Exhibit No. 25                135
    Exhibit No. 26                137
16  Exhibit No. 27                142
    Exhibit No. 28                143
17  Exhibit No. 29                146
    Exhibit No. 30                146
18  Exhibit No. 31                172
    Exhibit No. 32                175
19  Exhibit No. 33                188
    Exhibit No. 34                191
20
21
22
23
24
25
```

Page 3

```
 1            TRANSCRIPT INDEX
 2  APPEARANCES . . . . . . . . . . . . . . . . . . . . .  2
 3
 4  INDEX OF EXHIBITS . . . . . . . . . . . . . . . .  4
 5
 6  EXAMINATION OF CHARLES FEINSTEIN, M.D.
 7  BY MR. KIEFFER . . . . . . . . . . . . . . . . . . . .  6
 8  BY MR. BOWDEN . . . . . . . . . . . . . . . . . .  66
 9  BY MR. KIEFFER . . . . . . . . . . . . . . . . . .  169
10  BY MR. BOWDEN . . . . . . . . . . . . . . . . .  201
11  BY MR. KIEFFER . . . . . . . . . . . . . . . . . .  207
12  BY MR. BOWDEN . . . . . . . . . . . . . . . . . .  209
13
14
15
16  REPORTER'S CERTIFICATE . . . . . . . . . . . . . .  212
17
18
19  EXHIBIT CUSTODY
20  COURT REPORTER
21
22
23
24
25
```

Page 5

```
 1            THE VIDEOGRAPHER:  Good morning.  We are now
 2  on the record at 9:30 a.m. according to the video monitor
 3  on August 7th, 2019.
 4            Audio and video recording will continue to
 5  take place unless all parties agree to go off the record.
 6  This is media unit one of the video recorded deposition
 7  of Dr. Charles Feinstein taken in the matter of Christine
 8  Wheeler, et al., versus C.R. Bard, Incorporated, et al.,
 9  filed in the United States District Court, Southern
10  District of West Virginia.  This deposition is being
11  held at 2535 Greenview Road in Northbrook, Illinois.
12            My name is Peter Prezzano from the firm
13  Veritext, and I am the videographer.  The court reporter
14  is Kelly Brichetto from the firm Veritext.
15            I'm not authorized to administer the oath.
16  I'm not related to any party in this action nor am I
17  financially interested in the outcome.
18            Counsel and all present in the room, will
19  you please state your appearances and affiliations for
20  the record.
21            MR. KIEFFER:  Jon Kieffer on behalf of the
22  Plaintiffs.
23            MR. BOWDEN:  My name is Wade Bowden.  I'm from
24  the law firm of Greenberg Traurig, P.A., West Palm Beach
25  office.  I represent the Defendants, C.R. Bard, Inc.
```

2 (Pages 2 - 5)

Page 6

1   THE VIDEOGRAPHER: Sir, do you have a
2 microphone in front of you?
3   MR. BOWDEN: I'm sure I'll find it in the next
4 few minutes. Yes.
5   THE VIDEOGRAPHER: Will the court reporter
6 please administer the oath and you may proceed?
7   MR. KIEFFER: Are we off the record?
8   THE VIDEOGRAPHER: Now going off the record at
9 9:31 a.m.
10   (Discussion had off the
11   record.)
12   Back on the record at 9:32 a.m.
13   (Witness sworn.)
14 WHEREUPON:
15   CHARLES FEINSTEIN, M.D.,
16 called as a witness herein, having been first duly sworn,
17 was examined and testified as follows:
18   DIRECT EXAMINATION
19 BY MR. KIEFFER:
20   Q.   Good morning, sir.
21   A.   Good morning.
22   Q.   Would you state your full name for the
23 record, please.
24   A.   Charles Feinstein.
25   Q.   Sir, you're a medical doctor; is that

Page 7

1 correct?
2   A.   Yes.
3   Q.   I represent the Plaintiffs in a lawsuit,
4 Christine and Doug Wheeler, in a lawsuit against C.R.
5 Bard, and we are here today to take your deposition as a
6 treating physician in that matter. Is that generally
7 your understanding of why you're here as well?
8   A.   Yes.
9   Q.   Do you understand, Doctor, you are not a
10 party to this lawsuit?
11   A.   Yes.
12   Q.   You understand that the Plaintiffs nor any
13 lawyer on their behalf including me have sued you in this
14 matter?
15   A.   Yes.
16   Q.   Do you understand that the Plaintiffs and
17 their counsel are not alleging medical negligence or that
18 you did anything wrong?
19   A.   Yes.
20   Q.   All right. I can't speak for what positions
21 the Defendants may take on that, but you understand at
22 least insofar as the lawsuit is structured no one on
23 behalf of the Plaintiff is making allegations of any
24 medical negligence against you?
25   A.   Yes.

Page 8

1   MR. BOWDEN: Neither is the defense if
2 that's --
3 BY MR. KIEFFER:
4   Q.   Do you understand generally, sir, that this
5 case involves allegations about a Bard transvaginal mesh
6 device?
7   A.   Yes.
8   Q.   You -- you brought some records here with you
9 today, and I will ask you about them here in just the
10 next few minutes, but just to get us started, the records
11 indicate that in ▮▮▮ 2009 you implanted a Bard
12 transvaginal mesh device in Christine Wheeler. Is that
13 consistent with your recollection?
14   A.   Yes.
15   Q.   And I'm asking these questions at a high
16 level to start with, and then we'll get into detail here
17 in a bit, but the records also indicate that you saw
18 Mrs. Wheeler a few times after the implant surgery. At
19 least one of those visits had to do with some
20 complications that she was experiencing, and you
21 performed a subsequent procedure that one might call a
22 revision procedure. Is that also consistent with your
23 records?
24   A.   Yes.
25   MR. BOWDEN: Form. Sorry, guys. Doctor, just

Page 9

1 leave a little bit of a space if I want to object just
2 like a half of one Mississippi. I apologize.
3 BY MR. KIEFFER:
4   Q.   Doctor, the records also indicate that I
5 believe the last time you saw Mrs. Wheeler was in 2010.
6 Is that consistent with your records?
7   A.   Yes.
8   Q.   All right. Insofar as any care that
9 Mrs. Wheeler had since 2010 related in any way to her
10 vaginal mesh device or complications from that device or
11 any follow-up surgeries, do you have any information
12 about those things?
13   MR. BOWDEN: Form.
14 BY THE WITNESS:
15   A.   I do not.
16 BY MR. KIEFFER:
17   Q.   All right. Okay. As a matter of house
18 keeping, sir, we have marked as Deposition Exhibit Number
19 1 a notice to take your deposition today. I'll just show
20 it to you and ask did you receive that and is that you
21 identified there in the first paragraph?
22   A.   Yes.
23   Q.   Thank you.
24   You were kind enough, sir, to provide us with
25 your curriculum vitae also known in layman's terms as a

3 (Pages 6 - 9)

Page 10

1 resume. That's been marked as Exhibit Number 2; is that
2 correct?
3    A.   Yes.
4    Q.   Is that current and up to date as far as
5 you're concerned?
6    A.   Yes.
7    Q.   All right. This indicates that you graduated
8 medical school in 1979; true?
9    A.   Yes.
10    Q.   Thereafter you performed an internship,
11 completing that in 1980; is that also correct?
12    A.   Yes.
13    Q.   You completed a surgical residency in 1982;
14 also correct?
15    A.   Yes.
16    Q.   And a residency in the subspecialty of
17 urology that you completed at Cook County Hospital here
18 in Chicago in 1985; is that also correct?
19    A.   Yes.
20    Q.   All right. You -- what is your subspecialty
21 training, sir, your area of practice?
22    A.   Urology.
23    Q.   All right. And this indicates you retired
24 from practice in 2015?
25    A.   Yes.

Page 11

1    Q.   Have you practiced as a urologist in any
2 manner since you retired in 2015?
3    A.   No.
4    Q.   You live here in the greater Chicago area; is
5 that right?
6    A.   Yes.
7    Q.   Okay. And you are -- you were gracious
8 enough to host us for the deposition here today at your
9 home here in Northbrook, Illinois; is that also correct?
10    A.   Yes.
11    Q.   Sir, we have marked as Exhibit 3 a set of
12 records that you brought with you today. I understand
13 these are records that you had in your possession
14 pertaining to Ms. Christine Wheeler?
15    A.   Yes.
16    Q.   All right. I'm going to -- we will include
17 those in the record, and I thank you for bringing them.
18 I'm going to mark as Exhibit Number 4 what may well be an
19 exact redundant copy but it was collected --
20        MR. BOWDEN:  I've got that, counsel.
21        MR. KIEFFER:  Marker?
22        MR. BOWDEN:  Yeah. Thank you.
23 BY MR. KIEFFER:
24    Q.   It was collected through a third-party
25 records collection company. It's numbered in the way

Page 12

1 that we lawyers like things numbered, and I think the
2 copies are in color, so I'm going to refer to that, if I
3 may.
4        MR. BOWDEN:  This is the CFEIN stuff 1 through
5 40 -- 51?
6        MR. KIEFFER:  Correct.
7        MR. BOWDEN:  Okay. I've got it.
8        MR. KIEFFER:  Recently collected and updated
9 by the Marker Group, I believe. Yeah.
10        Ma'am, can you mark that for me?
11        (Exhibit No. 4 marked as
12        requested.)
13 BY MR. KIEFFER:
14    Q.   All right, sir. Our reporter just marked as
15 Exhibit Number 4 the packet of records to which I just
16 referred. Let me just ask you as a threshold matter --
17 bear with me here.
18        MR. BOWDEN:  Counsel, do you want to go off
19 the record for just one second?
20        MR. KIEFFER:  Sure.
21        THE VIDEOGRAPHER:  Now going off the record at
22 9:38 a.m.
23        (Discussion had off the
24        record.)
25        Now going back on the record at 9:42 a.m.

Page 13

1 BY MR. KIEFFER:
2    Q.   All right, Doctor. We took a quick break.
3 Counsel for the Defendant has compared Exhibit 3 which is
4 records you brought with you today to Exhibit 4 which is
5 a copy of some of your office records that the parties
6 obtained through an outside service, and he indicates it
7 appears that they are identical. The lawyers certainly
8 after the fact can compare the two sets if we like, but
9 I'll put that on the record for the moment.
10        I'm going to -- I am going to ask you some
11 questions from Exhibit 4 for the moment only because it's
12 got convenient page numbers in the lower right-hand
13 corner if I can.
14        On Exhibit 4, sir, if you would turn to the
15 page -- it's Page number 19. There's a lot of preceding
16 leading 0s but page 1-9. Sir, is that entitled
17 "Operative Report"?
18    A.   It is.
19    Q.   All right. Is that an operative report in a
20 format that you would have customarily prepared yours
21 back in 2009?
22    A.   It is.
23    Q.   It's dated Monday, ██████████ 2009; is
24 that correct?
25    A.   Yes.

4 (Pages 10 - 13)

Page 14

1    Q.   And the location of the surgery is FayCor
2  Surgical Facility.  Was that your facility?
3    A.   Yes.
4    Q.   All right.  The diagnosis that you have
5  listed for Ms. Wheeler is first urinary incontinence;
6  correct?
7    A.   Yes.
8    Q.   Second, incompetent mid-urethral sphincter;
9  correct?
10    A.   Yes.
11    Q.   And anterior prolapse/cystocele, severe;
12  true?
13    A.   Yes.
14    Q.   All right.  And then you indicate under
15  procedure several things that you did; right?
16    A.   Yes.
17    Q.   The first thing you list is a mid-urethral
18  sling bladder using Coloplast Mentor Aries Tape?
19    A.   Yes.
20    Q.   The second procedure was an anterior prolapse
21  cystocele repair using the Avaulta Repair System from
22  Bard?
23    A.   Yes.
24    Q.   The third thing that you did was a cystoscopy
25  and dilation?

Page 15

1    A.   Yes.
2    Q.   Fourth was a mesh insertion?
3    A.   Um-hum.
4    Q.   And the fifth was urethrolysis; correct?
5    A.   Yes.
6    Q.   All right.  Now, the diagnoses that you list
7  there, were those the preoperative diagnoses?
8    A.   Yes.
9    Q.   All right.  Those would have been conditions
10  that Ms. Wheeler was experiencing or suffering from prior
11  to your procedure on ▓▓▓▓▓▓ ▓▓▓▓ 2009; is that right?
12    A.   Yes.
13    Q.   Now, the -- her -- I want to ask you some
14  questions about things that Ms. Wheeler did not appear to
15  report prior to surgery.  All right?
16    A.   Yes.
17    Q.   Okay.  And I should have asked you prior to
18  today's deposition did you review any of these records?
19    A.   Yes.
20    Q.   Okay.  Did the preoperative diagnosis that
21  you arrived at include chronic dyspareunia?
22    MR. BOWDEN:  Form.  Go ahead.
23
24  BY THE WITNESS:
25    A.   I do not think so.

Page 16

1  BY MR. KIEFFER:
2    Q.   All right.  Did the preoperative diagnosis
3  that you arrived at include chronic vaginal pain?
4    MR. BOWDEN:  Form objection.
5  BY THE WITNESS:
6    A.   I do not think so.
7  BY MR. KIEFFER:
8    Q.   Prior to the Bard device being implanted in
9  Christine in ▓▓▓▓▓▓ of 2009 did she report to you that
10  she suffered from any chronic vaginal pain?
11    MR. BOWDEN:  Form objection.
12  BY THE WITNESS:
13    A.   No.
14  BY MR. KIEFFER:
15    Q.   All right.  And you are referring to your
16  records, sir.  Were you looking at the section that says
17  "Indications for Procedure"?
18    A.   I was not.
19    Q.   All right.  Okay.  Prior to the implantation
20  of the Bard mesh device in Christine in ▓▓▓▓▓▓ 2009 did
21  she report that she suffered from any chronic groin pain?
22    MR. BOWDEN:  Form.
23
24  BY THE WITNESS:
25    A.   She had endometriosis.

Page 17

1  BY MR. KIEFFER:
2    Q.   Okay.  Did she describe it as chronic pain?
3    MR. BOWDEN:  Form.
4  BY THE WITNESS:
5    A.   I don't know that she described it at all
6  except to say that since age 20 she had been documented
7  with endometriosis.
8  BY MR. KIEFFER:
9    Q.   Okay.  But no specific reference to chronic
10  groin pain?
11    MR. BOWDEN:  Form objection.
12  BY THE WITNESS:
13    A.   Just that she mentioned that she had
14  endometriosis.
15  BY MR. KIEFFER:
16    Q.   Same question as it would relate to chronic
17  pelvic pain.  That was not specifically mentioned as a
18  preoperative condition; is that correct?
19    MR. BOWDEN:  Form.
20  BY THE WITNESS:
21    A.   It wasn't specifically mentioned.  Although
22  it goes along with endometriosis.
23
24  BY MR. KIEFFER:
25    Q.   Okay.  No mention in the preoperative

5 (Pages 14 - 17)

Page 18

1 diagnosis of chronic dyspareunia or a complete inability
2 to have intercourse in ▮▮▮▮▮ of 2009 before the
3 implantation?
4        MR. BOWDEN:  Form objection.
5 BY THE WITNESS:
6     A.   Correct.
7 BY MR. KIEFFER:
8     Q.   The evaluation that you did on Christine
9 preoperatively, was that a thorough and customary
10 preoperative evaluation for you?
11    A.   Yes.
12    Q.   Okay.  Was there anything that you felt like
13 you were limited in your ability to evaluate on Christine
14 preoperatively that would have been relevant to your
15 decision as to the procedure or procedures to recommend?
16    A.   I don't understand the question.
17    Q.   Well, was there anything -- were -- did you
18 feel like you were lacking information in any way,
19 whether the patient being not forthcoming about her
20 symptoms?  That's a hypothetical.  Was there anything
21 that you felt like impeded your ability to properly
22 assess Christine and arrive at a recommendation for a
23 course of treatment?
24        MR. BOWDEN:  Form objection.
25 BY THE WITNESS:

Page 19

1     A.   The only thing that impeded us in the
2 treatment of Christine was her husband.
3 BY MR. KIEFFER:
4     Q.   Okay.  Preoperatively?
5     A.   Preoperatively.
6     Q.   Okay.  Did Christine's husband in any way
7 dictate the type of procedure that you performed on her?
8     A.   No.
9     Q.   Did he in any way dictate the type of devices
10 you selected for implantation?
11    A.   No.
12    Q.   Okay.  In your judgment, was Christine an
13 appropriate candidate for the Bard transvaginal mesh
14 device that you implanted in 2009?
15    A.   Yes.
16    Q.   Okay.  If she did not appear to be an
17 appropriate candidate, is it safe to assume you would not
18 have recommended the device that you did?
19    A.   Yes.
20    Q.   Okay.  In your judgment, Doctor,
21 prospectively presurgically was there anything about
22 Christine's medical history that you believed would
23 likely prevent the Bard transvaginal mesh device from
24 functioning as intended in her body?
25        MR. BOWDEN:  Form.

Page 20

1 BY THE WITNESS:
2     A.   No.
3 BY MR. KIEFFER:
4     Q.   Prior to the Bard transvaginal mesh device
5 being implanted in Christine in 2009 her primary
6 complaint was urinary incontinence; is that correct?
7     A.   Yes.
8     Q.   Those are -- let me shift gears a little bit.
9 I'll ask you some more questions about your surgery here
10 in a bit, but let me shift gears a little bit to orient
11 us in time to the kind of device issues and postsurgical
12 issues.
13        The Bard transvaginal mesh device that you
14 implanted in Christine, that was intended to be a
15 permanent implant; is that right?
16    A.   Yes.
17    Q.   Okay.  It was designed to treat urinary
18 incontinence?
19        MR. BOWDEN:  Form.
20 BY THE WITNESS:
21    A.   No.
22 BY MR. KIEFFER:
23    Q.   What was it designed to treat?
24    A.   Prolapse and anterior cystocele.
25    Q.   But regardless, it was intended to be

Page 21

1 permanent?
2     A.   Yes.
3     Q.   Was it your hope that implantation of the
4 Bard transvaginal mesh device would help alleviate some
5 of Christine's symptoms?
6     A.   Yes.
7     Q.   Doctor, the surgery that you performed on
8 Christine Wheeler on ▮▮▮▮▮ 2009, as far as you
9 were concerned, did the surgery essentially go without
10 incident?
11    A.   Yes, it did.
12    Q.   Okay.  You didn't -- did you encounter any
13 unexpected or untoward complications?
14    A.   I did not.
15    Q.   All right.  As far as you were concerned,
16 sir, when you completed the surgery on Christine in 2009,
17 insofar as your surgical work went, did you have every
18 reason to believe that Christine would have an optimal
19 result?
20    A.   Yes.
21    Q.   Christine did come back and see you with --
22 reporting certain complications; correct?
23    A.   Yes.
24    Q.   All right.  If you would be so kind, sir,
25 turn to Page 46 of the -- this exhibit here.  All right.

6 (Pages 18 - 21)

Page 22

1 There is -- is that a record of yours, sir?
2  A.  Yes.
3  Q.  It states patient name, Christine Wheeler,
4 and the date of surgery is ███ ███ 2010; correct?
5  A.  Yes.
6  Q.  And then under preop diagnosis the first
7 thing you state is: "S/P --" that's status post; right?
8  A.  Yes.
9  Q.  "-- TOT"?
10  A.  Yes.
11  Q.  And would you tell the jury what TOT stands
12 for?
13  A.  Transobturator tape.
14  Q.  All right. "And status post Bard Avaulta
15 cystocele on ███ 2009;" correct?
16  A.  Yes.
17  Q.  That's the procedure we've just been talking
18 about?
19  A.  Yes.
20  Q.  And then item number 2 you state:
21 "Continuous right-sided pain"?
22  A.  Yes.
23  Q.  Preop diagnosis 3:  "Failure of multiple
24 courses of different antibiotics"?
25  A.  Yes.

Page 23

1  Q.  Preop diagnosis number 4 states:  "Point
2 tenderness continuous very deep in right -- very deep in
3 right lateral deep recess of the vagina, constant.
4 Number 8 on 1 to 10 scale with very easily palpable cord
5 structure corresponding exactly to her pain, spot being
6 the tail of the Bard Avaulta cystocele tape on the deep
7 right side."  Did I read that correctly?
8  A.  Yes.
9  Q.  Then you go on, preoperative diagnosis number
10 5 is:  "Mild discomfort, number 3 on the 1 to 10 scale,
11 on the right side by the bladder neck"?
12  A.  Yes.
13  Q.  And then preop diagnosis 6 you say:
14 "Completely dry, totally resolved SUI, no cystocele;"
15 correct?
16  A.  Right.
17  Q.  Okay.  Turn, if you would, to the next page,
18 Doctor, which is Page 47 of the exhibit.  You describe
19 the procedure on that page, do you not?
20  A.  Yes.
21  Q.  About midway down in the large paragraph
22 there is a sentence that states:  "Tight, cord-like
23 structure (the tape) was identified easily but could not
24 easily be reached from midline incision, so separate
25 incision was made on the right side overlying the

Page 24

1 cord-like structure.  Cord was grasped and brought
2 forward into better sight and was found to be extremely
3 difficult to cut.  It was coiled up tightly and difficult
4 to grasp.  However, after grasping it with an alice, we
5 cut it with a curved mayo scissors and continued
6 throughout the entire length of the cord to advance the
7 part being grasped and cut with a heavy scissors until
8 the entire length palpable of that corner of the tape and
9 of the entire tail of the tape on the right side had been
10 excised."  Did I read that correctly?
11  A.  Yes.
12  Q.  The tight, cord-like structure that you
13 describe at the beginning of that quotation, does that
14 correspond to the Bard mesh device itself?
15     MR. BOWDEN:  Form.
16 BY THE WITNESS:
17  A.  It corresponds to a portion of the Bard mesh
18 device.
19 BY MR. KIEFFER:
20  Q.  All right.  Thank you.  That tight, cord-like
21 structure that you describe, does it correspond to
22 anything other than or in addition to a part of the Bard
23 mesh device?
24     MR. BOWDEN:  Form.
25 BY THE WITNESS:

Page 25

1  A.  No.
2 BY MR. KIEFFER:
3  Q.  For example, human tissue, anything like
4 that?
5  A.  No.
6  Q.  This was purely a part of the device you're
7 describing?
8  A.  Yes.
9  Q.  And was it a part of the tail of the device?
10  A.  Yes.
11  Q.  Okay.  And your procedure, and, again,
12 forgive me if I'm short-handing this in the interest of
13 time or in layman's terms, but your procedure was
14 essentially to, what might be referred to as a revision,
15 to revise the mesh and trim out a portion that in your
16 judgment was perhaps causing her or contributing to cause
17 her problems at that time?
18  A.  Yes.
19  Q.  Okay.  That particular surgery, Doctor, that
20 revision surgery, insofar as your own work went, your own
21 surgical work and surgical technique, did you feel that
22 it went well?
23  A.  Yes, it did.
24  Q.  Okay.  At the conclusion of the procedure was
25 there anything that in your judgment was untoward?

7 (Pages 22 - 25)

Page 26

1   A.  No.

2       MR. BOWDEN:  Form.

3  BY MR. KIEFFER:

4    Q.  Anything about your particular procedure on

5  that date, that revision procedure, that would have

6  caused you at that time to believe that Ms. Wheeler would

7  continue to experience chronic pain, chronic dyspareunia

8  and other symptoms following completion of your surgery?

9    A.  No.

10    Q.  Doctor, I asked you earlier -- Well, strike

11  that.  Let me ask a different question.

12       Other than your own records and anything that

13  might be in your own chart from any other provider, have

14  you seen any of Ms. Wheeler's medical records subsequent

15  to your own care?

16    A.  I have not.

17    Q.  Okay.  Are you aware from any source at all

18  that after the revision procedure that you performed

19  Ms. Wheeler since that time has had three other revision

20  procedures, revision/removal procedures, related to her

21  Bard device, two performed by a Dr. Lewicky-Gaupp and one

22  performed by a Dr. Janet Tomezsko?

23       MR. BOWDEN:  Form.

24  BY THE WITNESS:

25    A.  I am not.

Page 27

1  BY MR. KIEFFER:

2    Q.  All right.  And I'm not suggesting, sir, that

3  you should be aware of that.  I just want to establish is

4  today the first time you've heard that?

5    A.  Yes, it is.

6    Q.  Are you familiar either with Dr.

7  Lewicky-Gaupp or with Dr. Tomezsko?

8    A.  I'm familiar with the name of Dr. Tomezsko.

9  I do not know her personally.

10    Q.  All right.  Let me switch gears for a moment,

11  Doctor, and ask you some questions about information that

12  Bard specifically did or did not provide you with prior

13  to Ms. Wheeler's surgery in ███████ 2009.  Okay?

14    A.  Yes.

15    Q.  As it relates to Bard products, Bard

16  transvaginal mesh products that you would recommend for

17  and implant in your own patients including Ms. Wheeler,

18  did you rely on Bard to give you accurate safety

19  information about its transvaginal mesh devices?

20       MR. BOWDEN:  Form.

21  BY THE WITNESS:

22    A.  Yes.

23       MR. BOWDEN:  Sorry.  Form objection.

24       Doctor, do me a favor.  Just pause just a

25  little bit.  And, counsel, I'm inferring that we're not

Page 28

1  doing the gotcha rule.  If I don't get it in before his

2  answer, you're not saying I waived an objection?

3       MR. KIEFFER:  Probably not.

4       MR. BOWDEN:  Probably not?

5       MR. KIEFFER:  Well, if it's 30 minutes late,

6  right.

7       MR. BOWDEN:  Yeah, right.  No, of course.

8  Yes, counsel.

9       MR. KIEFFER:  If it's of good timing.

10       MR. BOWDEN:  Yes.  Yes.  Thank you so much.

11       MR. KIEFFER:  If you want a running objection,

12  let me know.

13  BY MR. KIEFFER:

14    Q.  Sir, as it relates to Bard, did you rely on

15  Bard to give you adequate safety information about its

16  devices?

17       MR. BOWDEN:  Form.

18  BY THE WITNESS:

19    A.  Yes.

20  BY MR. KIEFFER:

21    Q.  Did you rely on Bard to give you accurate

22  safety information about potential adverse events

23  associated with its transvaginal mesh device?

24       MR. BOWDEN:  Form.

25  BY THE WITNESS:

Page 29

1    A.  Yes.

2  BY MR. KIEFFER:

3    Q.  Did you rely on Bard to give you adequate

4  information about the potential adverse events associated

5  with its transvaginal mesh devices?

6       MR. BOWDEN:  Form.

7  BY THE WITNESS:

8    A.  Yes.

9  BY MR. KIEFFER:

10    Q.  Did you rely on Bard to give you accurate

11  information about its own safety experience with its

12  transvaginal mesh devices?

13       MR. BOWDEN:  Form.

14  BY THE WITNESS:

15    A.  Yes.

16  BY MR. KIEFFER:

17    Q.  Did you rely on Bard to give you accurate

18  information about any problems it had become aware of

19  associated with its transvaginal mesh devices?

20       MR. BOWDEN:  Form.

21  BY THE WITNESS:

22    A.  Yes.

23

24  BY MR. KIEFFER:

25    Q.  Did you expect that Bard would be honest with

8 (Pages 26 - 29)

Page 30

1 you about the safety information they provided concerning
2 its transvaginal mesh devices?
3      MR. BOWDEN: Form objection.
4 BY THE WITNESS:
5      A.   Yes.
6 BY MR. KIEFFER:
7      Q.   Did you expect Bard to mislead you in any way
8 concerning issues related to the safety of ITS
9 transvaginal mesh devices?
10      MR. BOWDEN: Form objection.
11 BY THE WITNESS:
12      A.   No.
13 BY MR. KIEFFER:
14      Q.   Did you expect that information Bard provided
15 in the Instructions For Use that accompanied its
16 transvaginal mesh devices would have a reasonable
17 scientific basis?
18      MR. BOWDEN: Form objection.
19 BY THE WITNESS:
20      A.   Yes.
21 BY MR. KIEFFER:
22      Q.   Did you expect Bard to withhold safety
23 information as it related to its transvaginal mesh
24 devices?
25      MR. BOWDEN: Form objection.

Page 31

1 BY THE WITNESS:
2      A.   Could you repeat the question?
3 BY MR. KIEFFER:
4      Q.   Yeah.  Did you expect that Bard would
5 withhold safety information about its transvaginal mesh
6 devices?
7      MR. BOWDEN: Form.
8 BY THE WITNESS:
9      A.   No.
10 BY MR. KIEFFER:
11      Q.   All right.  Doctor, I think I know the answer
12 to this question but I have to ask and I should have
13 asked at the outset.  You've given depositions before;
14 right?
15      A.   Yes.
16      Q.   So you know this can sometimes be a tedious
17 exercise, taking small baby steps question by question
18 one at a time.  I guess that's kind of an apologetic
19 preface for why we're kind of doing this step wise.
20      I think I know the answer to this next
21 question but I have to ask.  You did not design the Bard
22 Avaulta mesh product that you implanted in Christine
23 Wheeler; correct?
24      A.   Correct.
25      Q.   And you did not test in the sense of any sort

Page 32

1 of official clinical test on behalf of Bard the Avaulta
2 mesh product that you implanted in Christine Wheeler?
3      A.   Correct.
4      Q.   Insofar as you are concerned, do you believe
5 that Bard is in the best position to know about the
6 unique design features of their mesh devices that might
7 affect patient safety?
8      MR. BOWDEN: Form.
9 BY THE WITNESS:
10      A.   Yes.
11 BY MR. KIEFFER:
12      Q.   Do you recall Bard ever warning you that
13 because of the design of the Avaulta device patients were
14 exposed to an excessive risk of complications?
15      MR. BOWDEN: Form.
16 BY THE WITNESS:
17      A.   No.
18 BY MR. KIEFFER:
19      Q.   Do you recall Bard ever warning you that the
20 Bard mesh had small pores?
21      MR. BOWDEN: Form.
22 BY THE WITNESS:
23      A.   No.
24 BY MR. KIEFFER:
25      Q.   Do you recall Bard ever warning you that

Page 33

1 internally engineers at the company had determined that
2 the Bard Avaulta mesh was over-engineered?
3      MR. BOWDEN: Form.
4 BY THE WITNESS:
5      A.   No.
6 BY MR. KIEFFER:
7      Q.   Do you recall Bard ever warning you that
8 because the design of their mesh devices came from the
9 design of hernia meshes that they were unsafe for
10 transvaginal application?
11      MR. BOWDEN: Form.
12 BY THE WITNESS:
13      A.   No.
14 BY MR. KIEFFER:
15      Q.   Do you recall Bard ever warning you prior to
16 the time that you implanted this device in Ms. Wheeler
17 that their mesh would shrink inside of a woman's body?
18      MR. BOWDEN: Form.
19 BY THE WITNESS:
20      A.   No.
21 BY MR. KIEFFER:
22      Q.   Or that their mesh would fold or wrinkle
23 inside of a woman's body?
24      MR. BOWDEN: Form.
25 BY THE WITNESS:

9 (Pages 30 - 33)

Page 34

```
1      A.   No.
2  BY MR. KIEFFER:
3      Q.   Or that their mesh would deform or rope or
4  curl inside of a woman's body?
5           MR. BOWDEN:  Form.
6  BY THE WITNESS:
7      A.   No.
8  BY MR. KIEFFER:
9      Q.   Were you aware prior to ███████ 2009 that
10 the polypropylene material used by Bard to make the
11 Avaulta mesh is made from non-medical grade
12 polypropylene?
13          MR. BOWDEN:  Form.
14 BY THE WITNESS:
15     A.   No.
16 BY MR. KIEFFER:
17     Q.   Were you aware prior to ███████ 2009 that
18 the manufacturer of the polypropylene material used by
19 Bard to make the Avaulta mesh had warned Bard to never
20 use that particular material for implants intended for
21 permanent placement in the human body?
22          MR. BOWDEN:  Form.
23
24 BY THE WITNESS:
25     A.   No.
```

Page 35

```
1  BY MR. KIEFFER:
2      Q.   Did Bard ever tell you prior to ███████ 2009
3  that its mesh in this particular mesh product that was
4  implanted in Ms. Wheeler could shrink and contract as
5  much as 30 to 50 percent inside of a woman's body?
6           MR. BOWDEN:  Form.
7  BY THE WITNESS:
8      A.   No.
9  BY MR. KIEFFER:
10     Q.   Did Bard ever tell you prior to ███████ 2009
11 that the mesh was too stiff to be compliant with vaginal
12 tissues?
13          MR. BOWDEN:  Form.
14 BY THE WITNESS:
15     A.   No.
16 BY MR. KIEFFER:
17     Q.   Did Bard ever tell you prior to ███████ 2009
18 that the Avaulta mesh device was associated with chronic
19 or permanent dyspareunia?
20          MR. BOWDEN:  Form.
21 BY THE WITNESS:
22     A.   No.
23
24 BY MR. KIEFFER:
25     Q.   Did Bard ever tell you prior to ███████ 2009
```

Page 36

```
1  that their mesh would degrade inside a woman's body?
2           MR. BOWDEN:  Form.
3  BY THE WITNESS:
4      A.   No.
5  BY MR. KIEFFER:
6      Q.   Did Bard ever tell you at any time that their
7  mesh would form what Bard has described internally in
8  their documents as a rigid scar plate inside a woman's
9  vagina?
10          MR. BOWDEN:  Form.
11 BY THE WITNESS:
12     A.   No.
13 BY MR. KIEFFER:
14     Q.   Do you recall Bard ever warning you that
15 should complications ever arise with their transvaginal
16 mesh devices the devices could never be fully and safely
17 removed from a woman's body?
18          MR. BOWDEN:  Form.
19 BY THE WITNESS:
20     A.   No.
21 BY MR. KIEFFER:
22     Q.   Do you recall Bard ever warning you that they
23 were aware of a high failure rate associated with the
24 Avaulta device?
25          MR. BOWDEN:  Form.
```

Page 37

```
1  BY THE WITNESS:
2      A.   No.
3  BY MR. KIEFFER:
4      Q.   Do you recall Bard ever warning you that
5  their mesh was too stiff for transvaginal application?
6           MR. BOWDEN:  Form.
7  BY THE WITNESS:
8      A.   No.
9  BY MR. KIEFFER:
10     Q.   Do you recall Bard ever warning you that the
11 foreign body response associated with their devices was
12 permanent or chronic in nature?
13          MR. BOWDEN:  Form.
14 BY THE WITNESS:
15     A.   No.
16 BY MR. KIEFFER:
17     Q.   Do you recall Bard ever warning you that
18 their devices specifically could cause permanent vaginal
19 pain, permanent pelvic pain and permanent groin pain?
20          MR. BOWDEN:  Form.
21 BY THE WITNESS:
22     A.   No.
23
24 BY MR. KIEFFER:
25     Q.   Do you recall Bard ever warning you that
```

10 (Pages 34 - 37)

Page 38

1 their devices could affect a woman's ability to walk or
2 to sit without pain?
3     MR. BOWDEN: Form.
4 BY THE WITNESS:
5   A. No.
6 BY MR. KIEFFER:
7   Q. Do you recall Bard ever telling you that the
8 Avaulta device had the potential to fray or rope after
9 implantation?
10     MR. BOWDEN: Form.
11 BY THE WITNESS:
12   A. No.
13 BY MR. KIEFFER:
14   Q. Okay. That it was prone to degradation in
15 vivo?
16     MR. BOWDEN: Form.
17 BY THE WITNESS:
18   A. No.
19 BY MR. KIEFFER:
20   Q. And that it had a unique combination of small
21 pores and heavy weight characteristics that posed unique
22 risks?
23     MR. BOWDEN: Form.
24 BY THE WITNESS:
25   A. No.

Page 39

1 BY MR. KIEFFER:
2   Q. Doctor, if Bard had determined at any point
3 prior to      2009 that their transvaginal mesh
4 devices including the Avaulta shrunk, contracted,
5 bunched, degraded, deformed and broke down inside of a
6 woman's body thereby causing excessive risk of chronic
7 dyspareunia and pain in patients, you would have expected
8 Bard to share that information with you, would you not?
9     MR. BOWDEN: Form.
10 BY THE WITNESS:
11   A. Yes.
12 BY MR. KIEFFER:
13   Q. Would you have expected Bard to share that
14 information if they had it?
15     MR. BOWDEN: Form objection.
16 BY THE WITNESS:
17   A. Yes.
18 BY MR. KIEFFER:
19   Q. And if Bard did share that type of
20 information with you, would you have incorporated that
21 information into your clinical practice in your decision
22 making?
23     MR. BOWDEN: Form objection.
24 BY THE WITNESS:
25   A. Yes.

Page 40

1 BY MR. KIEFFER:
2   Q. And in      2009, were there other
3 surgical options and medical devices available to treat
4 pelvic organ prolapse and/or stress urinary incontinence
5 other than Bard transvaginal mesh devices?
6     MR. BOWDEN: Form objection.
7 BY THE WITNESS:
8   A. Yes.
9 BY MR. KIEFFER:
10   Q. And did you, in fact, use some of those other
11 non-Bard devices in your practice from time to time?
12     MR. BOWDEN: Form objection.
13 BY THE WITNESS:
14   A. Yes.
15 BY MR. KIEFFER:
16   Q. Doctor, if Bard would have told you prior to
17      2009, Dr. Feinstein, we think our mesh
18 contracts, shrinks, bunches, degrades inside of a woman's
19 body causing chronic dyspareunia and chronic pain, would
20 you have considered using alternative surgical or medical
21 devices other than the Bard transvaginal mesh?
22     MR. BOWDEN: Form objection.
23
24 BY THE WITNESS:
25   A. Yes.

Page 41

1 BY MR. KIEFFER:
2   Q. If Bard would have provided you additional
3 safety information of the sort that we have discussed
4 over the last few minutes, would you have passed that
5 additional safety information along to your patients in
6 an informed consent conversation?
7     MR. BOWDEN: Form objection.
8 BY THE WITNESS:
9   A. Yes.
10 BY MR. KIEFFER:
11   Q. And if a patient such as Mrs. Wheeler
12 received additional safety information about the Bard
13 device and informed you that she did not want to proceed
14 with having a Bard transvaginal mesh device implanted in
15 her body, you would have honored and respected that
16 request; is that true?
17     MR. BOWDEN: Form.
18 BY THE WITNESS:
19   A. Yes.
20 BY MR. KIEFFER:
21   Q. Doctor, when approximately was the last time
22 that you recall implanting a Bard transvaginal mesh
23 device in a patient?
24     MR. BOWDEN: Counsel, are you talking about
25 just Avaultas or are you talking about other stuff as

11 (Pages 38 - 41)

Page 42

1 well?
2       MR. KIEFFER:  Any.
3       MR. BOWDEN:  Okay.
4       THE REPORTER:  I'm sorry?  Are you talking
5 about?
6       MR. KIEFFER:  Yeah, let me ask it again.
7       MR. BOWDEN:  Yeah.  I'm sorry.
8       THE REPORTER:  I didn't --
9       MR. BOWDEN:  It doesn't matter.  He's going to
10 clean it up.  Not that it wasn't clean already, counsel.
11 I apologize.
12       MR. KIEFFER:  Sure.
13 BY MR. KIEFFER:
14       Q.   Doctor, what is your best recollection as to
15 the last time, a year is sufficient, that you likely
16 implanted any Bard transvaginal mesh device in a patient?
17       A.   I don't remember exactly.
18       Q.   Okay.  Are you aware that at some point in
19 time Bard ceased selling its transvaginal mesh devices
20 entirely?
21       MR. BOWDEN:  Form.
22 BY THE WITNESS:
23       A.   Yes.
24 BY MR. KIEFFER:
25       Q.   Are you aware that there is currently a

Page 43

1 controversy surrounding the safety of certain
2 transvaginal mesh devices?
3       MR. BOWDEN:  Form.
4 BY THE WITNESS:
5       A.   Yes.
6 BY MR. KIEFFER:
7       Q.   Are you aware that recently all transvaginal
8 mesh devices to treat pelvic organ prolapse were banned
9 from sale in the United States?
10       MR. BOWDEN:  Form objection.
11 BY THE WITNESS:
12       A.   Yes.
13 BY MR. KIEFFER:
14       Q.   You are familiar -- Strike that.
15       Are you familiar with something that is
16 referred to as the Bard Instructions For Use?
17       A.   Yes.
18       Q.   It would have accompanied the product?
19       A.   Yes.
20       Q.   All right.  Prior to the first time, whenever
21 that was, that you would have implanted a Bard Avaulta
22 device would you have likely reviewed the Instructions
23 For Use?
24       A.   Yes.
25       Q.   And then based upon whatever you gleaned from

Page 44

1 that carried that information forward to further and
2 future surgeries that you did to implant the device?
3       A.   Yes.
4       Q.   I'm not suggesting that you necessarily would
5 have reviewed that information before each and every
6 case, but certainly it's information that you would have
7 reviewed at least when you began using that particular
8 product initially?
9       A.   Yes.
10       Q.   Was it -- was your take-away when you
11 reviewed the Bard Avaulta Instructions For Use that
12 complications from that device in general were somewhat
13 rare and not common?
14       A.   Yes.
15       Q.   If you had known, Doctor, that complications
16 from the Avaulta device are, in fact, common and not
17 rare, would that likely have influenced your decision
18 making about whether or not to use that product for your
19 patients?
20       MR. BOWDEN:  Form.
21 BY THE WITNESS:
22       A.   Yes.
23
24 BY MR. KIEFFER:
25       Q.   As part of a risk/benefit analysis?

Page 45

1       A.   Yes.
2       Q.   If the risk outweighs the benefits, it's
3 typically a product that you wouldn't recommend or use?
4       MR. BOWDEN:  Form.
5 BY THE WITNESS:
6       A.   Yes.
7 BY MR. KIEFFER:
8       Q.   Did Bard ever tell you prior to ▮▮▮▮▮ 2009
9 that should complications arise with the Avaulta device
10 that a patient could have multiple revision surgeries
11 that, nevertheless, would not completely resolve the
12 symptoms that the patient was suffering from as a result
13 of the device itself?
14       MR. BOWDEN:  Form.
15 BY THE WITNESS:
16       A.   No.
17 BY MR. KIEFFER:
18       Q.   The type of safety information that we've
19 been discussing the last few minutes, is that information
20 that you would have liked to have known about if Bard had
21 that information back in 2009?
22       MR. BOWDEN:  Form objection.
23
24 BY THE WITNESS:
25       A.   Yes.

12 (Pages 42 - 45)

Page 46

1 BY MR. KIEFFER:
2     Q.   You'd want that kind of information
3 communicated to you so that you could pass it on to your
4 patients?
5         MR. BOWDEN:  Form objection.
6 BY THE WITNESS:
7     A.   Yes.
8 BY MR. KIEFFER:
9     Q.   When you implanted the Bard Avaulta device in
10 Christine Wheeler, do you recall in any way at all
11 deviating from the Bard Avaulta Instructions For Use?
12        MR. BOWDEN:  Form.
13 BY THE WITNESS:
14    A.   No.
15        MR. BOWDEN:  Sorry.  Withdrawn.
16 BY MR. KIEFFER:
17    Q.   In other words -- and this may be an
18 imprecise term for this purpose, but you've heard from
19 time to time people use the term off-label use?
20    A.   Yes.
21    Q.   Off-label use of a drug or a medical device,
22 meaning that a physician in his or her own judgment might
23 prescribe a drug or implant a device for a purpose that's
24 not specifically mentioned in the labeling for the drug
25 or device; correct?

Page 47

1     A.   Yes.
2     Q.   Nothing about your implantation of the Bard
3 Avaulta device in Ms. Wheeler was off-label, was it?
4     A.   No.
5     Q.   When you implanted the Bard Avaulta device in
6 Christine Wheeler, did you rely in part on your own
7 education, training and experience?
8     A.   Yes.
9     Q.   Did you also rely in part on the safety
10 information that Bard provided you in its Instructions
11 For Use?
12        MR. BOWDEN:  Form.
13 BY THE WITNESS:
14    A.   Yes.
15 BY MR. KIEFFER:
16    Q.   And relied on it to be accurate and complete?
17        MR. BOWDEN:  Form.
18 BY THE WITNESS:
19    A.   Yes.
20 BY MR. KIEFFER:
21    Q.   Let me ask you a few more questions, Doctor,
22 about the implant procedure in 2009.  Based on your
23 normal practice and routine, was there sometimes a Bard
24 sales representative present during implantation
25 procedures?

Page 48

1     A.   Occasionally.
2     Q.   Has -- at any point in time has any
3 representative of Bard ever criticized your surgical
4 technique associated with a Bard transvaginal mesh
5 device?
6     A.   Not --
7         MR. BOWDEN:  Form.
8 BY THE WITNESS:
9     A.   -- to my knowledge.
10        MR. BOWDEN:  Form.
11 BY MR. KIEFFER:
12    Q.   Certainly not to you?
13    A.   No.
14    Q.   I think I asked this question in perhaps one
15 form but perhaps not as completely as I would have liked
16 earlier, so let me ask it differently this time.  During
17 the 2009 surgery in [         ] 2009 when you implanted the
18 Bard Avaulta device in Ms. Wheeler, were you satisfied
19 that you had achieved proper placement of the device?
20    A.   Yes.
21    Q.   To your knowledge, had any doctors ever
22 criticized your surgical technique associated with Bard
23 transvaginal mesh devices?
24    A.   No.
25    Q.   In your review of your own chart and in

Page 49

1 particular your operative note from the [       ] 2009
2 surgery, did you see any indication that the mesh that
3 you placed in Ms. Wheeler was in any way folded or
4 bunched or improperly placed at the time your procedure
5 was completed?
6         MR. BOWDEN:  Form.
7 BY THE WITNESS:
8     A.   No.
9 BY MR. KIEFFER:
10    Q.   Okay.  Are there any notations in your 2009
11 operative note that would suggest that the mesh was
12 folded over or wrinkled at the conclusion of your
13 procedure?
14    A.   No.
15    Q.   If you had made any observations relating to
16 the mesh being folded over or wrinkled during your
17 operation, is it fair that you would have either
18 corrected that at the time and/or noted it in your
19 operative note?
20    A.   Yes.
21    Q.   Based on your review of the operative note,
22 are you confident that the Bard transvaginal mesh was not
23 wrinkled or folded over during the surgery?
24    A.   Yes.
25        MR. BOWDEN:  Just for the record, in case

13 (Pages 46 - 49)

Page 50

1  anyone's curious what that noise was, the Doctor's dog is
2  present and he was shaking himself, just in case anyone's
3  curious watching this video, if anyone actually watches
4  this video.
5  BY MR. KIEFFER:
6      Q.   It may be reflected on your CV, Doctor, but
7  just for the sake of our video record, when did you start
8  practicing medicine here in Chicago?
9      A.   The date that I finished my residency which
10  was 1985.
11      Q.   All right.  And so you practiced medicine
12  from 1985 until you retired in 2015?
13      A.   Yes.
14      Q.   So 30 years?
15      A.   Yes.
16      Q.   All right.  During that period of time, did
17  you have the opportunity to treat patients who suffered
18  from stress urinary incontinence?
19      A.   Yes.
20      Q.   A number of them?
21      A.   Yes.
22      Q.   And did you have the opportunity to treat
23  patients who suffered from pelvic organ prolapse?
24      A.   Yes.
25      Q.   A number of them?

Page 51

1      A.   Yes.
2      Q.   Did there come a point in time where Bard
3  approached you to act as a physician consultant for them?
4      A.   I don't think so.
5      Q.   Let me ask it differently.  Did Bard -- did
6  you at certain points in time enter into agreements with
7  Bard to serve as a physician preceptor or proctor helping
8  to train other doctors in the use and placement of Bard
9  transvaginal mesh devices?
10      A.   I had been a preceptor and a surgical trainer
11  for various manufacturers.  I don't remember exactly
12  which ones I've worked for.  I had good relationships
13  with multiple, but I don't remember which ones I served
14  as a preceptor for, but I did serve as a surgical trainer
15  and preceptor for some of them.
16      Q.   Fair enough.  Let me -- bear with me just a
17  moment.  I want to just mark a few things for the record.
18      MR. KIEFFER:  Ma'am, would you mark this for
19  me?
20      (Exhibit No. 5 marked as
21      requested.)
22  BY MR. KIEFFER:
23      Q.   Doctor, we've just handed you Exhibit Number
24  5.  This is a document that we got from Bard.  It's
25  entitled "Bard MDU Physician Education Continuum," and it

Page 52

1  says:  "Bard Is Pleased To Announce," and then it lists
2  several different doctors, and on the first page it has
3  your name, Dr. Charles Feinstein.  It says:  "Dr.
4  Feinstein has joined the Bard MDU program as a preceptor
5  specializing in sling repairs.  He is a urologist in
6  Northbrook, Illinois and is affiliated with Weiss
7  Memorial Hospital," and then it goes on to provide some
8  information about some training that you may be
9  providing.  Do you see that?
10      A.   Yes.
11      Q.   Does that document refresh your recollection
12  that at least at certain points in time you would have
13  served as an instructor or preceptor on certain Bard
14  products?
15      A.   That's what it says.
16      Q.   Okay.
17      MR. KIEFFER:  That 6?
18      THE REPORTER:  Yes.
19      (Exhibit No. 6 marked as
20      requested.)
21  BY MR. KIEFFER:
22      Q.   Doctor, the court reporter just handed you
23  what we've marked as Exhibit 6.  This is a letter dated
24  January 2nd, 2008.  It's addressed to you.  It's
25  regarding the Bard MDU advances in female pelvic medicine

Page 53

1  training program.  And let me just direct your attention
2  to the second paragraph of the letter after:  "Dear, Dr.
3  Feinstein."  It states:  "This letter agreement will
4  confirm that Bard Urological Division, C.R. Bard, Inc.,
5  is retaining you, Dr. Feinstein, to conduct training and
6  educational services as set forth in this letter
7  agreement."  Do you see what I just read?
8      A.   I do.
9      Q.   Does this in any way help to refresh your
10  recollection that Bard did retain you at certain points
11  in time to provide training and educational services?
12      A.   That's what it indicates.
13      MR. KIEFFER:  Seven.
14      (Exhibit No. 7 marked as
15      requested.)
16  BY MR. KIEFFER:
17      Q.   Doctor, the court reporter just handed you
18  what we've marked as Exhibit Number 7.  This is a letter
19  from Bard dated August 6, 2008 addressed to you.  The
20  second paragraph under "Dear Dr. Feinstein" appears to
21  communicate more or less the same information as in the
22  last exhibit, that Bard was retaining you to provide or
23  conduct certain training and educational services.  Do
24  you see that?
25      A.   Yes, I do.

14 (Pages 50 - 53)

Page 54

1    Q.   And then if you take a look several pages
2 back after the last page of the letter the little page
3 number ends in 377, is that your signature?
4    A.   Yes, it is.
5    Q.   All right.
6              (Exhibit No. 8 marked as
7                   requested.)
8         MR. BOWDEN:  Can we go off the record for one
9 second?
10        THE VIDEOGRAPHER:  Now going off the record at
11 10:24 a.m.
12             (Discussion had off the
13                   record.)
14        Now going back on the record at 10:26 a.m.
15        MR. BOWDEN:  Just for the record, to the
16 extent that -- counsel and I have had a discussion off
17 the record.  To the extent that these are internal Bard
18 documents that should have been noticed to us prior to
19 the deposition under the pretrial orders 48 hours in
20 advance, we just object to this whole line of questioning
21 and move to have it stricken, but that should be decided
22 a different day.  Sorry, Jon, go ahead.
23
24 BY MR. KIEFFER:
25    Q.   Doctor, we've just marked Exhibit 8 and

Page 55

1 handed it to you.  That is a letter from Bard dated
2 August 11, 2005 addressed to you, is it not?
3    A.   Yes.
4    Q.   All right.  And it thanks you for your
5 interest in the Bard MDU Physician Program, a
6 professional education program designed to build
7 familiarity with Bard products and bring excellence in
8 techniques to physicians who surgically treat female
9 incontinence; correct?
10        MR. BOWDEN:  Form.
11 BY THE WITNESS:
12    A.   Yes.
13 BY MR. KIEFFER:
14    Q.   And then it goes on to state:  "The guiding
15 principles and compensation plans of the program are
16 noted here for your review"?
17    A.   Yes.
18    Q.   And turning to the last page of Exhibit 8, is
19 that your signature?
20    A.   Yes.
21        MR. BOWDEN:  And I -- counsel, I assume I've
22 got a running objection to all similar situated documents
23 that are --
24        MR. KIEFFER:  Sure.  That's fine.
25        MR. BOWDEN:  Just for the record, this is also

Page 56

1 one of those documents that I think should have been
2 noticed 48 hours in advance.  We're objecting to this
3 line of questioning.  Go ahead.  Sorry, counsel.
4         Nine, I believe?
5        MR. KIEFFER:  Yeah, nine.
6              (Exhibit No. 9 marked as
7                   requested.)
8 BY MR. KIEFFER:
9    Q.   Doctor, the court reporter has just handed
10 you a Bard document that we were provided.  It's entitled
11 "Bard MDUSM Physician Education Continuing -- or
12 Continuum."  It says:  "Total Department."  There is a
13 date and then some names to the right of that and dollar
14 amounts to the right of that.  If you turn to the second
15 page of that exhibit, it looks like one, two, three,
16 four, five, six names from the bottom your name, Charles
17 Feinstein, appears.  Do you see that?
18    A.   Yes.
19    Q.   To the right of that there's a line item that
20 says $500.  Do you see that?
21    A.   Yes.
22    Q.   And then to the right of that a line item
23 that says $94,786.11.  Do you see that as well?
24    A.   Yes.
25    Q.   Okay.  Does that appear to represent

Page 57

1 compensation that Bard would have paid you over some
2 period of time?
3        MR. BOWDEN:  Form objection.
4 BY THE WITNESS:
5    A.   I have no idea.
6 BY MR. KIEFFER:
7    Q.   Okay.  Do you recall how much compensation
8 Bard paid you over the years?
9    A.   I do not recall $94,786.11.  That I
10 definitely do not recall.
11    Q.   You don't recall the specific total?
12    A.   If there was a total, it was less than $5,000
13 for sure in my opinion as far as I remember.
14    Q.   Been a few years; right?
15    A.   Oh, yes.
16    Q.   Do you recall when you last worked for -- as
17 a preceptor or a consultant in any capacity for Bard?
18    A.   Probably ten years ago.
19    Q.   That would be 2009?
20    A.   Somewhere around there I'm guessing.
21        MR. KIEFFER:  Mark this for me.
22             (Exhibit No. 10 marked as
23                   requested.)
24 BY MR. KIEFFER:
25    Q.   Doctor, the court reporter just marked as

15 (Pages 54 - 57)

1 Exhibit 10 an e-mail exchange between you and a gentleman
2 named Adam Silver dating to 2010. The subject has to do
3 with events at the ICS-IUGA meeting. Do you see that?
4     A.   Yes.
5     Q.   What is the ICS-IUGA meeting for the benefit
6 of our jury?
7     A.   ICS is the International Continent Society,
8 and it's a meeting of interested professionals.
9     Q.   All right. And IUGA?
10     A.   Same thing. It's International Urogynecology
11 I think Associates, but I don't remember exactly.
12     Q.   Okay. And if you turn to the second page of
13 that exhibit, there's a note from Mr. Silver. It states:
14 "Dr. Dear Feinstein, I hope all is well with you. I
15 would like to invite you to two events that will be
16 occurring on Wednesday, 8-25 at the upcoming ICS-IUGA
17 meeting. In the morning of 8-25 there will be a
18 symposium on Ajust at the convention center (see attached
19 invite). We are also having an Ajust User Group dinner
20 meeting on Wednesday evening (see attached invite). This
21 should be an excellent event, and we would very much like
22 to have you attend. Please let me know if you are able.
23 I look forward to seeing you in Toronto. Best regards,
24 Adam." Do you see that?
25     A.   Yes.

1     Q.   And then turning forward in the e-mail, the
2 bottom of the first page it looks like you responded on
3 August 23rd. You said: "Thanks for the invite. I'll be
4 happy to attend. Sign me up. See you in Toronto;"
5 correct?
6     A.   Yes.
7     Q.   Did you from time to time attend
8 Bard-sponsored events or presentations?
9     A.   Yes, I did.
10     Q.   All right. The gentleman Adam Silver, do you
11 recall who he is?
12     A.   No, I don't.
13     Q.   In the carbon copy line there's a gentleman
14 named Matthew Sirmon, S-I-R-M-O-N. Was Matthew Sirmon a
15 Bard sales representative that called on you from time to
16 time?
17     A.   Yes, he was.
18     Q.   And how about Rick VanAlmen?
19     A.   Don't remember that name.
20     Q.   All right. Was Matthew Sirmon from time to
21 time, to the best of your recollection, present during
22 procedures or surgeries where you would have implanted
23 Bard transvaginal mesh devices?
24     MR. BOWDEN: Form.
25 BY THE WITNESS:

1     A.   Occasionally he was present.
2 BY MR. KIEFFER:
3     Q.   Boiling down the last few exhibits that we
4 have looked at, Doctor, is it true that for at least a
5 period of several years Bard did hire you to train other
6 physicians in how to implant its transvaginal mesh
7 devices?
8     A.   Yes --
9     MR. BOWDEN: Form.
10 BY THE WITNESS:
11     A.   -- but on a very limited basis.
12 BY MR. KIEFFER:
13     Q.   Okay. And during that several year period of
14 time, to your recollection, did any Bard employee or any
15 other physician associated with Bard, to your knowledge,
16 ever criticize in any way your surgical technique in
17 implanting Bard transvaginal mesh devices?
18     MR. BOWDEN: Form objection.
19 BY THE WITNESS:
20     A.   No.
21 BY MR. KIEFFER:
22     Q.   No one ever told you your surgical technique
23 was unsafe?
24     MR. BOWDEN: Form.
25 BY THE WITNESS:

1     A.   No.
2 BY MR. KIEFFER:
3     Q.   Did you at some point in time attend yourself
4 Bard-sponsored training with respect to its transvaginal
5 mesh devices?
6     A.   I don't remember specifics but most likely,
7 yes.
8     Q.   And assuming that you did, would it have been
9 your expectation that information Bard provided you at
10 those sessions related to the safety of their
11 transvaginal mesh devices was honest, accurate and
12 complete?
13     MR. BOWDEN: Form objection.
14 BY THE WITNESS:
15     A.   Yes.
16     MR. KIEFFER: Eleven.
17         (Exhibit No. 11 marked as
18         requested.)
19 BY MR. KIEFFER:
20     Q.   Doctor, we just marked as Exhibit 11 some
21 information that is -- we obtained from LinkedIn
22 pertaining to you. It has your name, and then it states
23 about, and there's some background information on you.
24 It states: "Principal physician at Charles Feinstein,
25 M.D. and Associates. Dr. Charles Feinstein is a

16 (Pages 58 - 61)

Page 62

1  world-renowned physician and surgeon specializing in the
2  field of urology with locations in Chicago and
3  Northbrook, Illinois. Dr. Feinstein offers a minimally
4  invasive procedure which takes only 15 to 20 minutes to
5  treat urinary incontinence. Patients are typically back
6  to normal activities in about two days, and to date more
7  than 1,000,000 women have undergone this treatment with a
8  95 percent improvement rate." Did I read that correctly?
9      A.   Yes.
10     Q.   Is this information that at some point in
11 time would have appeared on LinkedIn pertaining to you?
12     A.   I have no idea.
13     Q.   If this is out there on LinkedIn, is it
14 likely that you had a hand in preparing it?
15     A.   No.
16     Q.   A member of your staff?
17     A.   I doubt it.
18     Q.   Any idea where it came from?
19     A.   No.
20     Q.   Not at all?
21     A.   No.
22     Q.   Okay. Is the information that I just read in
23 that portion of the first paragraph, is that accurate
24 insofar as you're concerned?
25     A.   No. If it says that more than 1,000,000

Page 63

1  women have undergone this treatment, is it implying that
2  I did more than 1,000,000 treatments?
3      Q.   I don't know what it's implying. That's not
4  necessarily how I read it.
5          MR. BOWDEN: That's not how I read it either.
6          THE WITNESS: Okay.
7  BY MR. KIEFFER:
8      Q.   I read it for whatever it's worth.
9      A.   It says it takes 15 to 20 minutes. That's
10 accurate. It treats urinary incontinence. It's very
11 successful, so that I would agree with.
12     Q.   Okay. Fair enough.
13             (Exhibit No. 12 marked as
14                 requested.)
15         Doctor, I'm handing you what we've marked as
16 Exhibit Number 12. This is a document. It has your
17 practice name in the upper left, Charles Feinstein, M.D.
18 and Associates and then a heading "Cure Urinary
19 Incontinence." Do you recognize this?
20     A.   Vaguely.
21     Q.   Okay. It states: "Cure Urinary
22 Incontinence. Millions of women around the world suffer
23 from urinary incontinence. There is a simple 15-minute
24 procedure that can cure urinary incontinence once and for
25 all." Did I read that correctly?

Page 64

1      A.   Yes.
2      Q.   Does this appear -- does this look like some
3  sort of, whatever word you want to use, advertisement or
4  marketing material that would have come out with respect
5  to you and your practice at some point in the past?
6      A.   Yes.
7      Q.   Okay. Did you from time to time pay to
8  advertise your services and the services of your medical
9  practice?
10     A.   Yes.
11     Q.   Okay. And in terms of the sorts of
12 advertising that you did, was some of that advertising
13 print?
14     A.   Yes.
15     Q.   And was some internet?
16     A.   Yes.
17     Q.   Was there some billboard advertising?
18     A.   Yes.
19     Q.   And did you from time to time have radio ads
20 or make appearances on radio shows?
21     A.   Yes.
22     Q.   Television shows?
23     A.   Television shows, no, not that I remember.
24     Q.   All right. And for those things that we just
25 talked about --

Page 65

1      A.   I was occasionally interviewed for television
2  news. Does that come under your question?
3      Q.   Yeah. Fair enough. Let me -- let me follow
4  up on that. With respect to print or radio or
5  billboard-type advertising, would those have been things
6  that you or your practice paid for?
7      A.   Yes.
8      Q.   Did I ask you did you do any internet
9  advertising?
10     A.   I'm sure we did.
11     Q.   Okay. And would you have likely paid for
12 that as well?
13     A.   Yes.
14     Q.   And then if you were interviewed, for
15 example, for like a television program or television
16 news, would that have been something you would have paid
17 for or something that the particular station did of its
18 own accord?
19     A.   They did it on their own accord.
20         MR. KIEFFER: Okay. Doctor, at this time I
21 think I am going to pass the witness to my colleague here
22 who will have some questions of his own, and then I'm
23 going to reserve the remainder for my time for any
24 follow-up questions I might have.
25         MR. BOWDEN: For the record, it is 24 minutes,

17 (Pages 62 - 65)

Page 66

1 23.3 seconds. Although, counsel, I've never been known
2 to be a stickler for things like that.
3     MR. KIEFFER: Want to take any sort of a
4 break?
5     MR. BOWDEN: No. Let's just -- let's just do
6 it.
7     CROSS EXAMINATION
8 BY MR. BOWDEN:
9     Q. Doctor, good morning. My name is as you
10 heard before we got started and -- well, when we got
11 started, when we introduced ourselves. My name is Wade
12 Bowden. I'm an attorney from West Palm Beach, Florida.
13 I work for a law firm called Greenberg Traurig. Do you
14 know me?
15     A. No, I do not.
16     Q. Do you know anybody from my law firm?
17     A. No, I do not.
18     Q. Have you spoken to anybody from my law firm
19 prior to today?
20     A. The secretary who arranged this appointment.
21     Q. Kimberly?
22     A. Probably. I believe Ms. Black, if I
23 remember.
24     Q. Okay. And do you know Mr. Kieffer?
25     A. No, I do not.

Page 67

1     Q. And have you spoken with anybody from Mr.
2 Kieffer's law firm prior to today?
3     A. I do not think so.
4     Q. Okay. And just for the record, this is your
5 deposition in the case of Wheeler versus Bard. We're
6 taking it here today by notice and agreement of counsel
7 for purposes of discovery and all the purposes allowed
8 under what we call the Federal Rules of Civil Procedure
9 and something called the MDL-2187 protective order which
10 applies to this litigation, deposition guidelines and
11 Pretrial Order Number 40.
12     And, Doctor, I think Mr. Kieffer entered into
13 this a little bit with you prior. Have you been deposed
14 before?
15     A. Yes.
16     Q. How many times?
17     A. I don't remember.
18     Q. Do you know if it's less than 20, more than
19 20?
20     A. Less than 20.
21     Q. And were you deposed in any cases
22 involving transvaginal mesh?
23     A. Yes.
24     Q. Do you know how many times?
25     A. Maybe two or three.

Page 68

1     Q. Okay. And so you know the drill here
2 obviously. You're sworn to tell the truth just like in a
3 court of law; correct?
4     A. Yes.
5     Q. And so far you've been doing just fine as far
6 as the general basics like letting counsel finish their
7 question before you answer it, answering verbally.
8 You've been doing great, so I won't go through all that
9 litany with you. But just, Doctor, if you have any
10 question at any time what I'm saying or what I mean or
11 you need me to clarify my question, could you please just
12 ask me to do that and I will?
13     A. Yes.
14     Q. And if you don't, I'm going to infer you've
15 understood me; okay?
16     A. Yes.
17     Q. And, Doctor, we haven't taken a break in the
18 last hour and a half. If you need to, you can do so any
19 time you need to. I'm sure you're aware of that;
20 correct?
21     A. Yes.
22     Q. Okay. Doctor, do you recall Mrs. Wheeler as
23 a patient at all?
24     A. Somewhat.
25     Q. Can you tell me what it is you recall?

Page 69

1     A. I recall her husband.
2     Q. Yeah, you mentioned that before. What about
3 her husband particularly do you recall?
4     A. Well, on Page 1 of my notes, the very first
5 page, it says: "Husband was very angry and upset over
6 the wait in the waiting room. He said my office smells
7 worse than his barn with his horses. He was extremely
8 rude to all staff and screaming obscenities to everyone."
9     Q. Okay. And do you know -- do you have any
10 idea what that's about?
11     A. That's about his personality.
12     Q. Okay. Just, he was just a boisterous
13 individual I guess we'll say?
14     A. To put it politely.
15     Q. Okay. That's fair. I was trying to be
16 polite.
17     Okay. Anything else that you recall about
18 Mrs. Wheeler as an individual just from your own
19 recollection without looking at records?
20     A. That she was a very nice, sweet lady.
21     Q. Okay. Doctor, just to sort of -- and forgive
22 me. Because we're doing this out of order, there's a few
23 things that I would have said at the beginning that Mr.
24 Kieffer didn't, and that's not anything other than just
25 style. Mr. Kieffer did say something at the beginning.

18 (Pages 66 - 69)

Page 70

1  He said that Plaintiffs are not alleging you did anything
2  wrong, and he said I don't know what the defense's
3  position is on that, and I think you may have heard me
4  say quickly we're not saying that either. Did you hear
5  me say that?
6      A.  Yes.
7      Q.  Okay. So no one's taking issue with your
8  clinical judgment here. You understand that; right?
9      A.  Yes.
10     Q.  All right. And we've simply asked you here
11 today in your capacity as a treater for Mrs. Wheeler not
12 as an expert. Do you understand that?
13     A.  Yes.
14     Q.  In other words, you're a fact witness.
15 You're here to talk to us about what care you provided to
16 Mrs. Wheeler and what you observed of her?
17     A.  Yes.
18     Q.  Okay. Doctor, do you -- having said that, do
19 you consider yourself to be an expert for either party in
20 this case?
21     A.  No.
22     Q.  Have you been asked by any party in this case
23 to serve as an expert?
24     A.  No.
25     Q.  Prior to the deposition besides talking to

Page 71

1  the assistant in my office about scheduling did you speak
2  with anybody about this deposition?
3      A.  No.
4      Q.  Do you view yourself as the Plaintiff's
5  advocate in this case? Other than being a healthcare
6  advocate. I mean a legal advocate.
7      A.  Legal advocate, no.
8      Q.  Okay. In other words, you're not hoping to
9  help anybody in this lawsuit one way or the other; is
10 that a fair statement?
11     A.  Yes.
12     Q.  You're just here to say who, what, when and
13 where you saw; right?
14     A.  Correct.
15     Q.  Okay. Doctor, you've already talked about
16 everything you did in association with preparing for the
17 deposition today when you spoke to Mr. Wheeler -- excuse
18 me -- Mr. Kieffer; is that correct?
19     A.  Yes.
20     Q.  Have you ever seen a copy of the complaint in
21 this case or any deposition?
22     A.  I don't think so.
23     Q.  Okay. And you were shown some documents
24 produced by the Bard Corporation, which I've already
25 stated on the record my objection to that because it's

Page 72

1  actually something we're supposed to get notice of, but
2  prior to seeing any of these documents today had you ever
3  seen any documents produced by Bard in this civil action?
4      A.  These specific -- these same documents?
5      Q.  Yeah, the -- well, other than the ones you
6  signed obviously with the MDU stuff?
7      A.  No.
8      Q.  So you don't know the context of any of those
9  things; is that a fair statement?
10     A.  Yes.
11     Q.  Okay. Doctor, are you board certified?
12     A.  No.
13     Q.  All right. Have you ever sat for board
14 certification exam?
15     A.  Yes.
16     Q.  When did you sit for board certification
17 exam?
18     A.  1985.
19     Q.  And did you not pass?
20     A.  Correct.
21     Q.  Did you try again?
22     A.  I tried twice and stopped after that.
23     Q.  All right. And have you ever had any
24 training in female pelvic medicine or reconstructive
25 surgery?

Page 73

1      A.  Yes.
2      Q.  What was your training?
3      A.  I've had hundreds and hundreds of hours of
4  post-graduate seminars. I went to multiple training
5  courses. I went to multiple surgical courses all over
6  the country.
7      Q.  Okay. And so, Doctor, you are a fairly
8  experienced urologist and surgeon; is that a fair
9  statement?
10     A.  Yes.
11     Q.  It's fair to state you're not an engineer?
12     A.  Correct.
13     Q.  Biomedical or otherwise?
14     A.  Correct.
15     Q.  And you don't devine -- excuse me. You don't
16 design medical devices?
17     A.  Correct.
18     Q.  And you've never done so?
19     A.  Correct.
20     Q.  Basically from your CV, Doctor, it looks like
21 you've been in private urological practice since -- you
22 were in private urological practice since you finished
23 your training; is that fair?
24     A.  Yes.
25     Q.  Did you ever have any partners or work with

19 (Pages 70 - 73)

Page 74

1 anybody else?
2    A.  I did not.
3    Q.  Okay.  We've seen some documentation with
4 regard to you working for the Bard Corporation as you
5 recall.  You appeared not to recall that prior to counsel
6 showing you those documents.  Does that -- is that
7 because you worked for a lot of companies that
8 manufacture and distribute pelvic mesh?
9    A.  I worked for two or three companies and
10 didn't remember specifically which ones because it was
11 over ten years ago.
12    Q.  Do you know which -- so is that Bard plus
13 another company?
14    A.  Yes.
15    Q.  What's the other company?
16    A.  I believe I worked for Pfizer and may have
17 worked for others.  I'm not sure.
18    Q.  All right.  And just generally speaking,
19 Doctor, have you ever seen anything in your practice that
20 suggests that Bard products were made from something that
21 wasn't medical grade?
22    A.  No.
23    Q.  And it looks like -- and I'll go back to the
24 specific exhibits, but it looks like a lot of the
25 exhibits that were shown to you about what you do in your

Page 75

1 practice and the things you do to improve women's health
2 and conditions were actually procedures designed to
3 alleviate stress urinary incontinence; is that a fair
4 statement?
5        MR. KIEFFER:  Object to form.
6 BY THE WITNESS:
7    A.  Yes.
8 BY MR. BOWDEN:
9    Q.  Okay.  And in this instance, you used a
10 product that was not a Bard product in association with
11 alleviating Mrs. Wheeler's stress urinary incontinence;
12 yes?
13    A.  Yes.
14    Q.  You used a Bard Avaulta to alleviate her
15 pelvic organ prolapse, her cystocele; is that a fair
16 statement?
17    A.  Yes.
18    Q.  How has your track record been with regard to
19 the Bard Avaulta device from your recollection?  How
20 many -- Strike that.  I'll ask a better question.
21        What has your success rate, to your
22 recollection, been with the Bard Avaulta device?
23        MR. KIEFFER:  Object.
24 BY THE WITNESS:
25    A.  Success in correcting the cystocele?

Page 76

1 BY MR. BOWDEN:
2    Q.  Well, let's start with that.
3    A.  One hundred percent.
4    Q.  Okay.  And how about success as far as lack
5 of necessity to reoperate as far as you are aware whether
6 it's by revision or otherwise?
7        MR. KIEFFER:  Objection.
8 BY THE WITNESS:
9    A.  As far as I'm aware on my own cases that came
10 back to me, less than five percent --
11 BY MR. BOWDEN:
12    Q.  Okay.
13    A.  -- maybe less than three percent.
14    Q.  So viewing that -- And strike that.
15        You also used the Bard Align device to
16 alleviate stress urinary incontinence; is that a fair
17 statement?
18    A.  Not very often.
19    Q.  All right.  What was your preferred device
20 for alleviating stress urinary incontinence when you were
21 in practice?
22    A.  The Coloplast -- the Aris tape by Coloplast.
23    Q.  Is that also made from polypropylene?
24    A.  Yes.
25    Q.  Do you know if it's made from Marlex

Page 77

1 polypropylene?
2        MR. KIEFFER:  Objection, foundation.
3 BY MR. BOWDEN:
4    Q.  Do you know?
5    A.  I do not know.
6    Q.  Okay.  And how was your success rate with the
7 Aris?
8    A.  Extremely --
9        MR. KIEFFER:  Objection.
10 BY THE WITNESS:
11    A.  Sorry.  Extremely good.
12 BY MR. BOWDEN:
13    Q.  Yeah, just leave a little bit of a half of a
14 heartbeat so Mr. Kieffer's objection can get in.
15    A.  Yes, sir.
16        MR. BOWDEN:  Mr. Kieffer, you know this
17 already, but there's no waiver obviously.
18        MR. KIEFFER:  Thank you.
19 BY MR. BOWDEN:
20    Q.  I'm sorry.  I think you said that your
21 success rate with the Aris is extremely good?
22    A.  Yes.
23    Q.  Do you recall ever having to reoperate on any
24 individuals in whom you implanted an Aris device?
25    A.  Maybe one or two percent.

20 (Pages 74 - 77)

Page 78

1    Q.  Okay.  And do you recall ever having to --
2  Strike that.
3        Do you know how many Aligns you implanted
4  during your career?
5        MR. KIEFFER:  Same objection.
6  BY THE WITNESS:
7    A.  Not very many.
8  BY MR. BOWDEN:
9    Q.  All right.  Is that -- does that mean 20,
10  less than 20?
11    A.  Probably less than 20.
12    Q.  Do you remember ever having any issues with
13  any of the individuals in whom you implanted an Align?
14    A.  No.
15        MR. KIEFFER:  Objection.
16  BY THE WITNESS:
17    A.  Sorry.  No.
18  BY MR. BOWDEN:
19    Q.  All right.  Did you ever have to reoperate on
20  anybody in whom you implanted an Align?
21        MR. KIEFFER:  Objection.
22  BY THE WITNESS:
23    A.  No.
24  BY MR. BOWDEN:
25    Q.  Okay.  Sorry.  Just one second.  Mr. Kieffer

Page 79

1  asked you a bunch of hypothetical questions, and I'm not
2  going to belabor the record with what they all
3  were, things like did Bard ever tell you they never
4  made -- Strike that.
5        Did Bard ever tell you they didn't make the
6  Avaulta device out of non-medical grade polypropylene.
7  Do you recall those questions?
8    A.  Yes.
9    Q.  All those questions were premised on factual
10  assertions that Mr. Kieffer made to you that have not
11  been substantiated in this deposition.  Do you understand
12  that?
13        MR. KIEFFER:  Objection.
14  BY THE WITNESS:
15    A.  Yes.
16  BY MR. BOWDEN:
17    Q.  Okay.  So your answers to those questions,
18  would you wanted to have known if the mesh roped or
19  curled, was made from non-medical grade polypropylene,
20  would you wanted to have known those things?
21        MR. KIEFFER:  Objection.
22        MR. BOWDEN:  Actually, you've got a point.
23  I'll try the question again.
24  BY MR. BOWDEN:
25    Q.  All those questions were premised on things

Page 80

1  such as if you had known the Bard mesh was not made from
2  medical grade polypropylene or if you had known that it
3  tended to rope, curl or shrink you would have wanted to
4  have known those things.  All those questions were
5  premised on the representation that those things actually
6  happened.  Would you agree with that?
7        MR. KIEFFER:  Objection.
8  BY THE WITNESS:
9    A.  Yes.
10  BY MR. BOWDEN:
11    Q.  And if the evidence were to bear out that
12  those were actually not issues, would your answers to
13  those things change; in other words, if it's not
14  happening, you don't need to know about it?
15        MR. KIEFFER:  Objection.
16  BY THE WITNESS:
17    A.  Correct.
18  BY MR. BOWDEN:
19    Q.  Did you ever see anything in your practice to
20  suggest that Bard Avaulta mesh shrank --
21        MR. KIEFFER:  Objection.
22  BY MR. BOWDEN:
23    Q.  -- excessively?
24    A.  On rare occasions.
25    Q.  Strike that.

Page 81

1        Let me -- let me draw back for a second.  Are
2  you -- do you -- are you familiar with the distinction
3  between contraction and shrinkage?  Do you know what I
4  mean by that?
5    A.  No, I do not.
6    Q.  Is it fair to state that all wounds contract
7  at they heal?
8        MR. KIEFFER:  Objection.
9  BY MR. BOWDEN:
10    Q.  In other words, the tissue as it scars
11  bunches together a little bit, becomes smaller as the
12  fibrous scar tissue forms?
13        MR. KIEFFER:  Objection.
14  BY THE WITNESS:
15    A.  Okay.
16  BY MR. BOWDEN:
17    Q.  Is that a fair statement?
18    A.  Yes.
19    Q.  So do you have any data or any sort of
20  indication that the mesh in and of itself would shrink as
21  would a cotton shirt if you put it in the dryer for too
22  long?
23        MR. KIEFFER:  Objection.
24  BY THE WITNESS:
25    A.  No.

21 (Pages 78 - 81)

Page 82

1 BY MR. BOWDEN:
2    Q.   Okay.  If I were to posit that data shows
3 that polypropylene mesh actually does not shrink and is
4 inert, would you have any reason to disagree with that?
5        MR. KIEFFER:  Objection.
6 BY THE WITNESS:
7    A.   It depends on which fiber you're talking
8 about, which material you're talking about.
9 BY MR. BOWDEN:
10    Q.   Polypropylene.
11        MR. KIEFFER:  Objection.
12 BY THE WITNESS:
13    A.   There are various grades of polypropylene.
14 BY MR. BOWDEN:
15    Q.   Marlex polypropylene used in an Avaulta
16 device.
17        MR. KIEFFER:  Objection.
18 BY THE WITNESS:
19    A.   Repeat the original question.
20 BY MR. BOWDEN:
21    Q.   Do you have any indication that that material
22 in and of itself shrinks as opposed to contracting with a
23 wound as it heals, the Marlex polypropylene used in an
24 Avaulta device?
25    A.   No.

Page 83

1    Q.   Okay.  Did you yourself ever see a high
2 failure rate associated with Avaulta?
3    A.   I did not.
4    Q.   And would you agree that scarring is a
5 natural part of healing as is a certain amount of
6 inflammation?
7        MR. KIEFFER:  Objection.
8 BY THE WITNESS:
9    A.   Yes.
10 BY MR. BOWDEN:
11    Q.   Did you ever observe any sort of fraying or
12 roping in the Bard Avaulta device?
13    A.   This one in particular.
14    Q.   Okay.  Did you see any fraying?
15    A.   No.
16    Q.   Okay.  And do you know what roping means?
17    A.   Turning into a cord-like structure.
18    Q.   Okay.  And that's what's reflected in your
19 operative note?
20    A.   Yes.
21    Q.   Do you think that's a -- do you think what
22 you saw is a risk that is generally present with any
23 synthetic implantation?
24        MR. KIEFFER:  Form objection.
25 BY MR. BOWDEN:

Page 84

1    Q.   In other words, that could have happened with
2 another material?
3        MR. KIEFFER:  Objection, form, speculation.
4 BY THE WITNESS:
5    A.   Possibly.
6 BY MR. BOWDEN:
7    Q.   Okay.  So it's not a unique complication to
8 mesh, in other words?
9        MR. KIEFFER:  Objection, form.
10 BY THE WITNESS:
11    A.   It is a unique complication to mesh.
12 BY MR. BOWDEN:
13    Q.   I'm sorry.  You said that it could possibly
14 occur with other materials?
15    A.   Other meshes.
16    Q.   Okay.  Not just a Bard device but other types
17 of devices?
18        MR. KIEFFER:  Objection.
19 BY THE WITNESS:
20    A.   Correct.
21 BY MR. BOWDEN:
22    Q.   And mesh is made from things other than
23 polypropylene; is that a fair statement?
24    A.   Yes.
25    Q.   Okay.  Did you ever see anything in your

Page 85

1 practice indicating that Bard mesh was too stiff for
2 vaginal implant?
3    A.   No.
4    Q.   In fact, you saw quite the opposite, didn't
5 you?
6        MR. KIEFFER:  Objection, form.
7 BY THE WITNESS:
8    A.   Yes.
9 BY MR. BOWDEN:
10    Q.   Okay.  Were you aware that Bard mesh is
11 actually classified as a macroporous or a large pore
12 mesh?
13        MR. KIEFFER:  Objection, form.
14 BY THE WITNESS:
15    A.   Yes.
16 BY MR. BOWDEN:
17    Q.   Okay.  And is there anything in your practice
18 indicating that that is not so?
19        MR. KIEFFER:  Objection.
20 BY THE WITNESS:
21    A.   No.
22 BY MR. BOWDEN:
23    Q.   Anything in your practice indicating that
24 there's any issue with the mesh pore size?
25    A.   No.

22 (Pages 82 - 85)

Page 86

1    Q.   And is it fair to state that you're not an
2 expert on mesh pore size or any sort of design of vaginal
3 mesh?
4         MR. KIEFFER:  Objection.
5 BY THE WITNESS:
6    A.   Correct.
7 BY MR. BOWDEN:
8    Q.   Okay.  Doctor, again, I'm objecting to the
9 use of the internal Bard documentation because we didn't
10 get notice of it prior to the deposition.  That's
11 actually something that's not supposed to happen in
12 litigation.  I'm not calling out counsel on it or
13 anything like that.  I'm just preserving my objection.
14 But is it fair to state that because you worked for Bard
15 you believe in their products?
16         MR. KIEFFER:  Objection.
17 BY THE WITNESS:
18    A.   Yes.
19 BY MR. BOWDEN:
20    Q.   Okay.  Did you ever experience anything
21 during your exposure to Bard that would make you question
22 their products?
23    A.   No.
24    Q.   And you recall you looked at the figure of, a
25 large figure of money that Bard paid you, and you thought

Page 87

1 that that was inaccurate; is that a fair statement?
2    A.   Yes.
3    Q.   Being a preceptor for Bard, you were simply
4 teaching other physicians techniques in implanting
5 devices; is that a fair statement?
6    A.   Yes.
7    Q.   And you felt that -- did you feel that you
8 did that competently?
9    A.   Yes.
10    Q.   Were you ever -- do you feel like you were
11 ever improperly instructed or improperly pressured to do
12 things you didn't want to do by Bard representatives for
13 their sales or otherwise?
14    A.   No.
15    Q.   Would you ever allow that to happen?
16    A.   No.
17    Q.   In your experience, is Bard a good company?
18         MR. KIEFFER:  Objection.
19 BY THE WITNESS:
20    A.   Yes.
21 BY MR. BOWDEN:
22    Q.   Okay.  And does anything that you saw in the
23 documents regarding your work for Bard just in the prior
24 questioning with Mr. Kieffer -- Strike that.
25         Is there anything in those documents Mr.

Page 88

1 Kieffer showed you about your preceptorship for Bard and
2 your attendance at Bard events, is anything of that
3 abnormal or unique to Bard?
4    A.   No.
5    Q.   Is that basically -- Strike that.
6         Okay.  Just real quickly, Doctor, Exhibits 11
7 and 12 which are the exhibits from your practice -- I
8 don't see 12 in front of me.  Oh, that's because I don't
9 have a copy.  I think you've got 12 right there in front
10 of you somewhere.  Somewhere.  It says 2 but that should
11 be 12.  Oh, yeah, it's 12.  Again, this is Exhibit 12 and
12 11.  And you've seen 12, Doctor.  It says "Cure Urinary
13 Incontinence;" yes?
14    A.   Yes.
15    Q.   And what that relates to is you performing
16 transvaginal polypropylene sling procedures; is that a
17 fair statement?
18    A.   Yes.
19    Q.   It doesn't relate to using transvaginal mesh
20 kits to alleviate pelvic organ prolapse; fair?
21    A.   Correct.
22    Q.   And this LinkedIn page which is 11, you have
23 no memory of this; right?
24    A.   Correct.
25    Q.   So really me asking you to comment on it is

Page 89

1 pointless because you don't know who wrote it or when or
2 why; fair?
3    A.   Correct.
4    Q.   Okay.  Since we're talking about this, I want
5 to show you two articles.  This is -- and I'm sorry.
6         Go off the record real fast.  Do some
7 housekeeping.
8         THE VIDEOGRAPHER:  Now going off the record at
9 11 a.m.
10         (Discussion had off the
11         record.)
12         Now going back on the record at 11:03 a.m.
13 BY MR. BOWDEN:
14    Q.   Doctor, I've handed you a joint statement by
15 two organizations called AUGS and SUFU, the American
16 Urogynecological Society and also the Society of
17 Urodynamics and Female Pelvic Medicine.  I'm not going to
18 read the whole title.  It's a long abbreviation.  Are you
19 familiar with these organizations?
20    A.   Yes.
21    Q.   Do you belong to either one of these
22 organizations?
23    A.   Used to.
24    Q.   Which one -- SUFU, AUGS or both?
25    A.   AUGS.

23 (Pages 86 - 89)

Page 90

1    Q.   Okay.  And do you respect the pronouncements
2  of that organization?
3    A.   Yes.
4    Q.   And this position statement reads -- the
5  title reads -- well, this position statement -- below
6  that the headline is:  "The polypropylene mesh
7  mid-urethral sling is the recognized worldwide standard
8  of care for the surgical treatment of stress urinary
9  incontinence.  The procedure is safe, effective and has
10  improved the quality of life for millions of women."  Did
11  I read that correctly?
12    A.   Yes.
13    Q.   And do you agree with that statement?
14      MR. KIEFFER:  Objection.
15  BY THE WITNESS:
16    A.   I do.
17  BY MR. BOWDEN:
18    Q.   I'm sorry.  You said I do?
19    A.   I do.
20    Q.   Okay.  And, Doctor, if you could turn to the
21  next -- I'm sorry.  Put that face down if you want to
22  next to you.  There's another AUGS/SUFU joint statement I
23  want to show you.  That's Exhibit 14.  This is
24  "Frequently Asked Questions by Patients Mid-urethral
25  Slings for Stress Urinary Incontinence."  Do you see

Page 91

1  that?
2    A.   Yes.
3    Q.   And the second question is the one I'm
4  focusing on.  It says:  "Are mid-urethral slings safe."
5  And it reads:  "The mid-urethral sling is considered safe
6  and effective by the US Food and Drug Administration.  As
7  with any surgery, complications can occur, but they are
8  typically minor and can usually be repaired."
9      MR. KIEFFER:  Objection.
10  BY MR. BOWDEN:
11    Q.   Did I read that correctly?
12    A.   Yes, you did.
13    Q.   And do you agree with that statement?
14      MR. KIEFFER:  Objection.
15  BY THE WITNESS:
16    A.   Yes, I do.
17  BY MR. BOWDEN:
18    Q.   So, Doctor, up until you retired in 2015 you
19  did treat stress urinary incontinence as we discussed;
20  yes?
21    A.   Yes.
22    Q.   And is it fair to state that you had both
23  surgical and nonsurgical options to utilize in treating
24  that condition?
25    A.   Yes.

Page 92

1    Q.   And there's conservative therapies; yes,
2  medication, kegel exercises, things like that?
3    A.   Yes.
4    Q.   And then there's non-conservative or surgical
5  options; correct?
6    A.   Yes.
7      MR. KIEFFER:  Objection.
8  BY MR. BOWDEN:
9    Q.   What surgical options did you use at the time
10  of your retirement to alleviate stress urinary
11  incontinence?
12    A.   Transobturator tape.
13    Q.   Made out of polypropylene?
14    A.   Yes.
15    Q.   And that's the Aris you referred to?
16    A.   Yes.
17    Q.   And you said that you preferred -- you
18  preferred that over the Align?
19    A.   I did.
20    Q.   Any reason?
21    A.   I just liked it better.
22    Q.   Is it fair to state that there is no
23  accounting for taste?
24    A.   Yes, it's fair to state that.
25    Q.   Okay.  And is that occur -- is that what's

Page 93

1  true in this circumstance, you just have a preference;
2  yes?
3    A.   Yes.
4    Q.   Do you have any issue with the design and the
5  efficacy of the Align?
6    A.   No.
7    Q.   Okay.  And do you ever do collagen injections
8  or things like a Birch or a Marchetti -- an MMK
9  procedure, Marshall-Marchetti?
10    A.   Collagen injections, extremely rare.
11    Q.   Okay.
12    A.   And the other two, no.
13    Q.   And that's because the Birch and the MMK,
14  those are procedures that are more invasive than a
15  polypropylene transvaginally implanted sling; is that a
16  fair statement?
17      MR. KIEFFER:  Objection.
18  BY THE WITNESS:
19    A.   Yes.
20  BY MR. BOWDEN:
21    Q.   And also the morbidity is higher; yes?
22      MR. KIEFFER:  Objection.
23  BY THE WITNESS:
24    A.   Yes.
25  BY MR. BOWDEN:

24 (Pages 90 - 93)

Page 94

1   Q.   And the failure rate for those two procedures
2   is also higher than for a mid-urethral polypropylene
3   sling; yes?
4       MR. KIEFFER:   Objection.
5   BY THE WITNESS:
6       A.   Yes.
7   BY MR. BOWDEN:
8       Q.   And you agree that there is literature
9   supporting the safety and efficacy of polypropylene
10  implanted transvaginally to alleviate stress urinary
11  incontinence; yes, Doctor?
12      MR. KIEFFER:   Objection.
13  BY THE WITNESS:
14      A.   Yes.
15  BY MR. BOWDEN:
16      Q.   Okay.  And this is a little unclear.  Did
17  Bard ever train you on the implantation of the Avaulta or
18  the Align?
19      A.   I don't remember specifically but probably.
20      Q.   Okay.  And is it fair to state that you would
21  have found that training satisfactory?
22      A.   Yes.
23      Q.   And is it fair to state that you would not
24  have relied solely on that training alone in -- I'm
25  sorry -- in performing procedures?

Page 95

1       A.   Yes.
2       Q.   You would have used whatever information Bard
3   gave you as amplification of your medical training; is
4   that a fair statement?
5       A.   Yes.
6       Q.   And you would not have relied solely on any
7   information that Bard provided you with regard to
8   technique or its product; is that a fair statement?
9       MR. KIEFFER:   Objection.
10  BY THE WITNESS:
11      A.   Yes.
12  BY MR. BOWDEN:
13      Q.   And, Doctor, in your practice you also
14  treated pelvic organ prolapse?
15      A.   Yes.
16      Q.   Was it primary cystocele or did you also do
17  vault prolapse and rectocele?
18      A.   I did not do rectocele, and I did not do
19  vault prolapse, and I did mostly cystocele.
20      Q.   Okay.  Anything besides cystocele?
21      A.   Rare vault -- rare vault prolapse.
22      Q.   Okay.  And how were you trained in your -- in
23  your residency to treat pelvic organ prolapse?
24      A.   I was not trained in my residency to treat
25  pelvic organ prolapse.

Page 96

1       Q.   Okay.  And how were you initially trained --
2   when and how were you initially trained to treat pelvic
3   organ prolapse?
4       A.   I attended hundreds and hundreds of hours of
5   post-graduate symposium both lectures and practical
6   surgical demonstrations on cadavers and watched live
7   surgery, and that's how I obtained my training.
8       Q.   Okay.  Were you trained -- I'm sorry.  Strike
9   that.
10          What techniques were you trained -- try that
11  again.
12          In what techniques were you trained in that
13  fashion?
14      A.   All the techniques that relate to
15  transobturator tape insertion and all the techniques that
16  relate to the kit approach for anterior pelvic prolapse
17  correction.
18      Q.   And you were never trained in like a native
19  tissue repair like a polyplactation?
20      A.   I was trained in that as well.
21      Q.   Okay.  And which approach did you prefer?
22      A.   I preferred the so-called kit approach to
23  anterior pelvic prolapse using mesh products.
24      Q.   Polypropylene mesh products?
25      A.   Yes.

Page 97

1       Q.   And why was that your preference?
2       A.   Because in my hands it seemed to work the
3   best.
4       Q.   Okay.  And I don't know if you answered this
5   question.  I don't know if this question was asked or
6   answered.  Do you have an estimation in your mind how
7   many times you used the Bard Avaulta anterior device?
8       A.   I'm just guessing but many hundreds of times.
9       Q.   Okay.  And I think you said you had a five
10  percent reoperation rate; is that a fair statement?
11      A.   Yes, it is.
12      Q.   Okay.  And, Doctor, it's fair to state you're
13  not critical of the design or function of the Bard
14  Avaulta device; is that -- is that right?
15      MR. KIEFFER:   Objection.
16  BY THE WITNESS:
17      A.   Yes.
18  BY MR. BOWDEN:
19      Q.   And as far as you're concerned, the Avaulta
20  was a good device in your experience?
21      A.   Yes.
22      Q.   And it's -- is it also fair to state you're
23  not critical of any labeling of the products?
24      A.   Yes.
25      Q.   Okay.  And, Doctor, I was a little unclear

25 (Pages 94 - 97)

Page 98

1 from the records what particular Avaulta was used in this
2 circumstance. It's -- there's several different
3 varities. Do you believe it was an Avaulta Classic or an
4 Avaulta Solo or do you know?
5     A. I don't remember.
6     Q. Okay. Have you ever used an Avaulta Plus?
7     A. I don't remember the distinctions.
8     Q. Okay. Oh, Doctor, I'm sorry. I'm doing this
9 a little bit out of order. I apologize. This is Exhibit
10 15. This is actually our cross notice of the deposition
11 here today which I think you've seen before. Do you
12 recognize that document, Doctor?
13     A. Yes.
14     Q. Okay. So in that document there is a request
15 for documents which appears in what is labeled at the top
16 as Page 5 of 11. You notice there's more than one
17 numbering scheme. I'm asking you to look at the line up
18 here for 5 of 11.
19     A. Yes.
20     Q. And the first item is your current or
21 up-to-date resume or curriculum vitae which you've
22 already supplied to us, and thank you for that. Then
23 there's a bunch of other categories of documents asking
24 for things having to do with your treatment of
25 Mrs. Wheeler, documents reviewed in preparation for the

Page 99

1 deposition, et cetera, et cetera. It goes on for 18
2 items. Have you had a chance to peruse these items prior
3 to sitting down today, Doctor?
4     A. Yes.
5     Q. Okay. And I infer that Exhibit Number 3
6 which was your file on this case is all that you have
7 that's responsive to this document request. Am I correct
8 about that?
9     A. Yes.
10     Q. And your resume, of course?
11     A. Yes.
12     Q. All right. Great. Done with that, Doctor.
13     Doctor, this is Exhibit Number 16. And I
14 just wanted to show it to you real quick. This I believe
15 is your first record of a visit with Mrs. Wheeler. It's
16 a record dated ▮▮▮▮▮▮ ▮▮ 2009?
17     A. Yes.
18     Q. Does this -- it says -- "Surgical Difficulty"
19 is what it reads at the top. Is that -- is this a form
20 that you used in your office?
21     A. Yes, it is.
22     Q. What is the Surgical Difficulty label? What
23 does that mean?
24     A. It refers to items that might have an effect
25 on the difficulty of any surgical procedure that might be

Page 100

1 considered on any given patient.
2     Q. Okay. So at this point you were evaluating
3 Mrs. Wheeler for surgery?
4     A. It was a standard form that I filled out on
5 most patients.
6     Q. Okay. And it looks like when she came to see
7 you initially she was 45 years old and 220 pounds or
8 more; is that fair to state?
9     A. Yes.
10     Q. And she was five feet seven?
11     A. Yes.
12     Q. So that made her -- do you know what the BMI
13 is? I'm not asking you to do that on the fly.
14     A. I can't do it on the fly.
15     Q. Okay. All right. So it's a very high BMI,
16 morbidly obese; yes?
17     A. Yes.
18     MR. KIEFFER: Objection.
19     MR. BOWDEN: Sorry, counsel.
20     THE WITNESS: Sorry.
21     MR. BOWDEN: No, that's okay. I asked the
22 question quickly. You answered it quickly. I didn't
23 want to cut Mr. Kieffer off.
24     THE WITNESS: Excuse me. Can I go off the
25 record?

Page 101

1     MR. BOWDEN: Go off the record, yea.
2     THE VIDEOGRAPHER: Now going off the record at
3 11:14 a.m.
4     (Discussion had off the
5     record.)
6     Now going back on the record at 11:15 a.m.
7 BY MR. BOWDEN:
8     Q. Okay, Doctor. And just -- I'm sorry. Is
9 this your handwriting or your nurse's handwriting?
10     A. Both.
11     Q. Both, okay. Just a few select items here.
12 It reads under cystocele: "Two second degree or third
13 degree;" is that right?
14     A. Yes.
15     Q. "Cystocele protective" something?
16     A. Yes, "protective of worse stress urinary
17 incontinence."
18     Q. So is that a way of saying that she had
19 what's called occult stress urinary incontinence?
20     A. No. She had severe stress urinary
21 incontinence.
22     Q. Okay. So, in other words, sometimes a
23 cystocele can mask stress urinary incontinence. But in
24 this instance it's just not making it not as bad; is that
25 a fair statement?

26 (Pages 98 - 101)

Page 102

1    A.   No.  That means that it was contributing to
2 her problem.
3    Q.   Oh, it was.  Okay.  All right.  And it reads
4 that she had to wear three to five pads daily and one pad
5 a night?
6    A.   I don't see where --
7    Q.   Oh, I'm sorry.  It's under --
8    A.   Yes, that's right.  That's correct.
9    Q.   And it states that she's -- age 20 she had
10 her first child and she had a huge baby at age 28 at 9
11 pounds, 10 ounces?  I'm jumping around a little bit.  On
12 the right-hand side.
13    A.   Huge baby, nine pounds, ten ounces at birth.
14    Q.   Okay.  And does that mean -- did she have an
15 episiotomy?  There's a note of that?
16    A.   I don't see that.
17    Q.   Okay.  It also reads that she had
18 endometriosis plus laparoscopy age 20?
19    A.   Yes.
20    Q.   And I think you referred before to the fact
21 that endometriosis can cause some pretty marked pelvic
22 pain?
23    A.   Yes, it can.
24       MR. KIEFFER:  Objection.
25 BY MR. BOWDEN:

Page 103

1    Q.   Can it cause -- sorry.  Go ahead.
2    A.   Yes, it can.
3    Q.   Can it cause chronic pelvic pain?
4       MR. KIEFFER:  Objection.
5 BY THE WITNESS:
6    A.   Yes.
7 BY MR. BOWDEN:
8    Q.   And do you believe in Mrs. Wheeler that it
9 was doing these things?
10       MR. KIEFFER:  Objection.
11 BY THE WITNESS:
12    A.   Possibly.
13 BY MR. BOWDEN:
14    Q.   Doctor, there's a preoperative diagnosis in
15 this record if you go to the third page.  It says there's
16 failure of conservative therapy; is that correct?
17    A.   Yes.
18    Q.   And she had genuine stress urinary
19 incontinence --
20    A.   Yes.
21    Q.   -- as you referred?
22       And a third degree cystocele which -- what
23 does that mean?
24    A.   On a one to four scale it was a three in my
25 estimation.

Page 104

1    Q.   Does that mean that you could see the
2 cystocele at the introitus?
3    A.   Yes.
4    Q.   In other words, for the consumption of the
5 jury, it looked like a baby's head coming out of her
6 vagina?
7       MR. KIEFFER:  Objection.
8 BY THE WITNESS:
9    A.   Baby's head was still in the vagina.  Coming
10 out of the vagina would have been --
11 BY MR. BOWDEN:
12    Q.   Four?
13    A.   -- four.
14    Q.   In other words, it was like you were looking
15 in the vagina you could see a head coming out --
16       MR. KIEFFER:  Objection.
17 BY MR. BOWDEN:
18    Q.   -- similar to that; yes?
19    A.   You could see a bladder falling down.
20    Q.   Okay.  Fair enough.
21       It also reads that she had penetration
22 incontinence and orgasm incontinence?
23    A.   Yes.
24    Q.   Does that mean that when she was engaged in
25 intercourse with her husband that she would sometimes

Page 105

1 leak urine?
2    A.   Yes.
3    Q.   And does that also mean when she had an
4 orgasm she would sometimes leak urine?
5    A.   Yes.
6    Q.   Okay.  And it says:  "Wet OAB nocturia times
7 two to three."  Overactive bladder?
8    A.   Yes.
9    Q.   Does that mean that she had also urge
10 incontinence?
11    A.   She had urge incontinence by testing but did
12 not complain of it by history.
13    Q.   Okay.  She did not have interstitial
14 cystitis?
15    A.   Not to my knowledge.
16    Q.   Okay.  And so your suggested treatment was
17 the transobturator tape which is the Aris sling; yes?
18    A.   Yes.
19    Q.   And then the cystocele repair?
20    A.   Yes.
21    Q.   Okay.  We are done with that one.
22       Doctor, so was that -- essentially from the
23 first time that you saw Mrs. -- the first time you saw
24 Mrs. Wheeler you knew that she needed surgery to
25 alleviate these two conditions?

27 (Pages 102 - 105)

Page 106

1    A.   Yes.
2    Q.   And I'm sorry.  Refer back to -- refer back
3 to --
4    A.   Not from the first time.  From the second
5 time.
6    Q.   Oh, the second time.  Okay.  Refer back to
7 Exhibit Number 16 for one second where it says suggested
8 treatment TOT.
9    A.   Sixteen, suggested treatment TOT, yes.
10    Q.   That's Page 148.
11    A.   Yes.
12    Q.   It says in the bottom -- I'm sorry.  It
13 says -- right after TOT there's a check mark against,
14 sorry, right by make extra tight?
15    A.   No.
16    Q.   Okay.  No.  So just TOT is check marked?
17    A.   Correct.
18    Q.   So, in other words -- the tensioning we read
19 from your prior notes -- I'm sorry.  I read in your notes
20 the tensioning essentially was determined by you judging
21 from years of experience; is that correct?
22    A.   Yes.
23    Q.   In other words, you would never implant a
24 sling that was overly tensioned?  You know not to do
25 that?

Page 107

1    A.   Correct.
2    Q.   Doctor, would you agree that stress urinary
3 incontinence is a life-altering condition?
4        MR. KIEFFER:  Objection.
5 BY THE WITNESS:
6    A.   Yes.
7 BY MR. BOWDEN:
8    Q.   Would you also agree that a cystocele can be
9 a life-altering condition as well?
10        MR. KIEFFER:  Objection.
11 BY THE WITNESS:
12    A.   Yes.
13 BY MR. BOWDEN:
14    Q.   And in this case it was for Mrs. Wheeler
15 because her cystocele was making her stress urinary
16 incontinence worse?
17        MR. KIEFFER:  Objection.
18 BY THE WITNESS:
19    A.   Yes.
20 BY MR. BOWDEN:
21    Q.   Okay.  And do you agree that these conditions
22 can affect a woman's self-esteem?
23        MR. KIEFFER:  Objection.
24 BY THE WITNESS:
25    A.   Yes.

Page 108

1 BY MR. BOWDEN:
2    Q.   And do you agree that these conditions can
3 affect a woman's sexuality and sexual function?
4        MR. KIEFFER:  Objection.
5 BY THE WITNESS:
6    A.   Yes.
7 BY MR. BOWDEN:
8    Q.   And do you recall in Mr. Wheeler's case that
9 both of those things were true?
10        MR. KIEFFER:  Objection.
11 BY THE WITNESS:
12    A.   Yes.
13 BY MR. BOWDEN:
14    Q.   And you already covered this, but you felt at
15 the time that Mrs. Wheeler was an appropriate candidate
16 for both devices, both the Avaulta and the Aris; yes?
17    A.   Yes.
18    Q.   Do you still feel that way today?
19    A.   Yes.
20    Q.   And, Doctor, just jumping ahead a little bit,
21 you have a very extensive informed consent procedure; is
22 that a fair statement?
23    A.   Yes.
24    Q.   And you engaged in that informed consent
25 procedure with Mrs. Wheeler; is that a fair statement?

Page 109

1    A.   Yes.
2    Q.   All right.  Doctor, I'm going to show you
3 what is going to be marked as Exhibit Number 17.  This is
4 the Avaulta Instructions For Use document.  I'm going to
5 show it to you and ask you if you're familiar with it.
6 I'm sorry.  I asked you if you're familiar with it.
7    A.   Yes.
8    Q.   Yes.  Okay.  So, Doctor, if you turn to Page
9 number -- well, in the bottom corner -- it's 1-7 is the
10 last two pages of the Bates number.
11    A.   Yes.
12    Q.   There's a little tiny 5 at the bottom.  It
13 reads "Adverse Reactions."  Do you see that section?
14    A.   No.
15    Q.   It's right here.
16    A.   Yes.
17    Q.   Okay.  Good.  It reads:  "Adverse Reactions.
18 Complications associated with the proper implantation of
19 the Avaulta Solo Synthetic Support may include but are
20 not limited to those typically associated with surgically
21 implantable materials including," and the first item is:
22 "Postoperative hematoma, seroma, abscess or fistula
23 formation or scarring which may occur following the
24 next -- I'm sorry -- following the implant procedure."
25 Next is:  "Urinary retention, bladder outlet obstruction

28 (Pages 106 - 109)

Page 110

1 and other voiding and defecatory dysfunctions. These
2 conditions may be associated with over-correction or too
3 much tension placed on the implant." Next is:
4 "Perforations or lacerations of vessels, nerves, bladder,
5 bowel, urethra, rectum or any viscera which may occur
6 during implantation procedure." Almost halfway through.
7 Next is: "Irritation at the operative wound site which
8 may elicit a foreign body response that leads to wound
9 dehiscence, inflammation and/or infection." Next is:
10 "Extrusion through vaginal epithelium or erosion into
11 surrounding viscera and/or mucosa," and next is:
12 "Inflammation --" sorry -- "Inflammation, sensitization,
13 pain, dyspareunia, scarification, contraction, device
14 migration and failure of the procedure resulting in
15 recurrence of vaginal wall prolapse." Last is: "Urinary
16 incontinence (stress and urge)." Did I read the adverse
17 reactions accurately, Doctor?
18     A.   Yes.
19     Q.   Do you feel that that is a comprehensive and
20 complete list of possible complications of transvaginally
21 placed polypropylene devices intended to alleviate
22 stress -- excuse me -- intended to alleviate pelvic organ
23 prolapse?
24         MR. KIEFFER:  Objection, form and foundation.
25 BY THE WITNESS:

Page 111

1     A.   Yes.
2 BY MR. BOWDEN:
3     Q.   Okay.  Do you take any issue with the Bard
4 warnings or labeling in this case?
5         MR. KIEFFER:  Objection, form and foundation.
6 BY THE WITNESS:
7     A.   No.
8 BY MR. BOWDEN:
9     Q.   Do you -- is there any reason to question the
10 adequacy of the document I'm holding in my hand, document
11 Exhibit 17?
12         MR. KIEFFER:  Objection, form and foundation.
13 BY THE WITNESS:
14     A.   No.
15 BY MR. BOWDEN:
16     Q.   Okay.  And what I read are complications that
17 are generally associated with implantation of vaginal
18 mesh not just Bard vaginal mesh; is that a fair
19 statement?
20         MR. KIEFFER:  Objection, form and foundation.
21 BY THE WITNESS:
22     A.   Yes.
23 BY MR. BOWDEN:
24     Q.   Did you warn Mrs. Wheeler of all these
25 conditions, all these possibilities?  Let me ask a better

Page 112

1 question.
2         Did you warn Mrs. Wheeler of all these
3 potential complications?
4         MR. KIEFFER:  Objection.
5 BY THE WITNESS:
6     A.   Yes.
7 BY MR. BOWDEN:
8     Q.   And is everything I read from the
9 Instructions for Use document, is that consistent with
10 your contemporaneous understanding at the time you
11 implanted Mrs. Wheeler with the Avaulta of possible
12 complications from those devices?
13     A.   Yes.
14     Q.   And specifically this document warned of
15 possible pain; yes?
16     A.   Yes.
17     Q.   And specifically it warned of possible device
18 migration?
19     A.   Yes.
20     Q.   Which is what you think happened here?
21         MR. KIEFFER:  Objection.
22 BY THE WITNESS:
23     A.   Pain, yes.  Migration, no.
24 BY MR. BOWDEN:
25     Q.   Well, what do you -- what do you -- what's

Page 113

1 the complication you saw during the explant procedure?
2 What would you call that?
3     A.   Severe inflammation in that area, and the
4 inflammation affected the mesh implant which made it
5 contract.
6     Q.   All of those things were warned of in the
7 Instructions For Use document; yes?
8         MR. KIEFFER:  Objection, form.
9 BY THE WITNESS:
10     A.   Yes.
11 BY MR. BOWDEN:
12     Q.   And you informed Mrs. Wheeler of the
13 possibilities of these -- the possibility of these
14 adverse events; yes?
15         MR. KIEFFER:  Objection.
16 BY THE WITNESS:
17     A.   Yes.
18 BY MR. BOWDEN:
19     Q.   Okay.  Doctor, is it fair to state that
20 sexual pain or dyspareunia is not unique to surgery using
21 vaginal mesh?
22     A.   Yes.
23     Q.   Is it fair to state that any pelvic surgery
24 can carry a risk of dyspareunia and does?
25         MR. KIEFFER:  Objection.

29 (Pages 110 - 113)

Page 114

1 BY THE WITNESS:
2    A.   Yes.
3 BY MR. BOWDEN:
4    Q.   So if the contention in this case is that
5 Mrs. Wheeler would not have suffered from dyspareunia if
6 mesh had not been used, that's not accurate; is that a
7 fair statement?
8        MR. KIEFFER:  Objection, form.
9 BY THE WITNESS:
10   A.   That's unknowable.
11 BY MR. BOWDEN:
12   Q.   Okay.  In other words, there's a risk of
13 dyspareunia in any surgery that would have been used to
14 alleviate the cystocele --
15       MR. KIEFFER:  Object --
16 BY MR. BOWDEN:
17   Q.   -- fair?
18       MR. KIEFFER:  -- to form.
19 BY THE WITNESS:
20   A.   Yes.
21 BY MR. BOWDEN:
22   Q.   Did you ever see Mrs. Wheeler suffer from any
23 erosion?
24   A.   No.
25   Q.   And before you implanted the Avaulta is it

Page 115

1 fair to state you knew you'd be implanting a foreign body
2 into Mrs. Wheeler?
3    A.   Yes.
4    Q.   And that the body's inflammatory response
5 could occur to --
6    A.   Yes.
7    Q.   -- a degree?
8        To the degree that it did; yes?
9    A.   Yes.
10   Q.   And you warned her of that; correct?
11       MR. KIEFFER:  Objection.
12 BY THE WITNESS:
13   A.   Yes.
14 BY MR. BOWDEN:
15   Q.   And, Doctor, as far as inflammation is
16 concerned, would you agree that that's a normal part of
17 the healing process?
18       MR. KIEFFER:  Objection.
19 BY THE WITNESS:
20   A.   Yes.
21 BY MR. BOWDEN:
22   Q.   Is that expected after surgery?
23   A.   To a lesser degree.
24   Q.   Okay.  Typically speaking to a lesser degree
25 but this is a known complication; fair?

Page 116

1        MR. KIEFFER:  Objection.
2 BY THE WITNESS:
3    A.   Yes.
4 BY MR. BOWDEN:
5    Q.   And formation of scar tissue is also a normal
6 and expected part of the healing process; is that a fair
7 statement?
8    A.   Yes.
9    Q.   Doctor, would you agree that it's your role
10 as a physician to know the potential complications and
11 benefits of anything you implant in your patient or any
12 device -- Strike that.  Start again.
13       Would you agree it's your role as a physician
14 to understand the procedures of the devices you're going
15 to treat your patient with?
16   A.   Yes.
17   Q.   And then to communicate your knowledge of
18 those procedures in layman's terms to the patient, both
19 the benefits and the drawbacks?
20   A.   Yes.
21   Q.   And at that point after you fully advised
22 your patient the patient makes an informed decision as to
23 whether or not he or she would want to proceed with the
24 treatment?
25   A.   Yes.

Page 117

1    Q.   Reminds me, Doctor.  You practiced as a
2 urologist for 30 years.  Did you specialize in males or
3 females or did you do both?
4    A.   For the first 15 years I specialized in
5 males, and for the second 15 years I specialized in
6 females.
7    Q.   Okay.  Doctor, this is Exhibit Number 18.
8        MR. BOWDEN:  Jon, I apologize if you cannot
9 read my handwriting.  I'm doing my level best I promise
10 you.  Although -- just let me know if that's unclear.
11 BY MR. BOWDEN:
12   Q.   Doctor, do you recognize Exhibit Number 18?
13   A.   Yes.
14   Q.   What is Exhibit Number 18?
15   A.   It's a discussion that we had with the
16 patient after testing.
17   Q.   Okay.  This is approximately during the
18 time -- I'm sorry.  This is during the time period of
19 your first visit with her?
20   A.   The second visit.
21   Q.   Second visit, okay.  Doctor, it reads:
22 "Discussion after urodynamic evaluation.  I have reviewed
23 the results of all studies with the patient.  I've
24 carefully explained to her the details of stress urinary
25 incontinence and if appropriate anterior pelvic prolapse

30 (Pages 114 - 117)

Page 118

1 and cystocele both in English," et cetera. It speaks to
2 other languages. You had a discussion with her in
3 English as depicted in this paragraph; yes?
4    A. Yes.
5    Q. Then it reads: "I've explained my --" should
6 that say endorsed recommended procedure?
7    A. Yes.
8    Q. "To the patient in great detail for the
9 treatment of her stress incontinence and/or cystocele.
10 I've also explained this is not her only alternative but
11 she has other options but more conservative and also more
12 aggressive;" is that accurate?
13    A. Yes.
14    Q. That's the conversation you had with her?
15    A. Yes.
16    Q. "I explained all these alternatives to the
17 patient in great detail;" fair?
18    A. Yes.
19    Q. Next it reads: "I have explained to the
20 patient their success rates, failure rates, reasons for
21 success and reasons for failure, complications and the
22 rates of recurrence. I explained the reasons why
23 additional surgery after the original surgical procedure
24 may be needed, and I explained the possible effects of
25 the surgery on her sexuality." Did I read that

Page 119

1 correctly?
2    A. Yes.
3    Q. This is all a conversation you had with
4 Mrs. Wheeler; yes?
5    A. Yes.
6    Q. And it looks like you asked Mrs. Wheeler to
7 sign each page of this document; is that accurate?
8    A. Yes.
9    Q. And at the bottom of each page is her
10 signature; yes?
11    A. And on many of the paragraphs.
12    Q. Oh, I see. So, in other words, where you
13 highlighted those are her initials?
14    A. Yes.
15    Q. Okay. And then it reads in the next
16 paragraph: "I have explained to the patient about the
17 FDA black box warning, that the more mesh used in a
18 patient the more likely to have complications such as
19 penetrations, perforations, exposures, erosions of the
20 suture line, most of which are easily taken care of when
21 identified." So is it -- are you talking about the 2008
22 warning from the FDA?
23    A. Yes.
24    Q. Okay. So you specifically drew her attention
25 to that?

Page 120

1    A. Yes.
2    Q. Okay. It reads: "The patient has verbalized
3 complete understanding and asked a number of excellent
4 questions that I've tried to answer completely to the
5 best of my ability." So this was interactive discussion?
6    A. Yes.
7    Q. Doctor, just as an aside, is this document,
8 is this something that you would have -- I'm trying to
9 say this the best way. It looks like you had some
10 paragraphs you could add or delete into this document but
11 it is tailored to, specifically to Mrs. Wheeler?
12    A. Yes.
13    Q. Okay. Then it reads -- I'm not going to read
14 the whole thing, Doctor. You talk about postoperative
15 recommendations, you know, looming activity. Then it
16 moves on to the next paragraph. You've explained that
17 she can't have sex for six weeks after the surgery; yes?
18    A. Yes.
19    Q. Last paragraph in the first page of Exhibit
20 18 is: "I have told the patient that if she does not
21 follow all postop instructions exactly then I do not
22 suggest but guarantee the surgery will fail"?
23    A. Yes.
24    Q. The next page, first paragraph: "I explained
25 that no guarantees of success can be given. I am not

Page 121

1 perfect. Only God does a perfect job every time, and I
2 pledge to put the full benefit of my 25 years of surgical
3 experience and judgment to the best possible outcome for
4 the surgery." Did I read that accurately?
5    A. Yes.
6    Q. And that's a direct quote from a conversation
7 you had with Mrs. Wheeler?
8    A. Yes.
9    MR. KIEFFER: Object to form.
10 BY MR. BOWDEN:
11    Q. Okay. And with regard to the cystocele
12 surgery, you explained that there is a -- there can be up
13 to a ten percent erosion rate?
14    A. Yes.
15    Q. But you didn't see any erosion in this
16 circumstance; yes?
17    A. I did not.
18    Q. Did you explain to her all the other
19 circumstances that could occur such as what happened
20 here?
21    A. Yes.
22    MR. KIEFFER: Object to the form.
23 BY MR. BOWDEN:
24    Q. Great. We're done with that one.
25    Then there's another document. It's actually

31 (Pages 118 - 121)

Page 122

1 labeled "Informed Consent." This is Exhibit Number 19.
2 It looks like this one -- here you go, Doctor. This one
3 is a little bit more expansive than the one I just read
4 from; is that a fair statement?
5    A.   Yes.
6    Q.   Do you know what date this would have been
7 done on? It looks like ████████ ██ 2009?
8    A.   Yes.
9    Q.   So that is also from this second visit you
10 had with Mrs. Wheeler?
11    A.   Yes. It's a more detailed preoperative
12 consent form.
13    Q.   Okay. And yeah, this one -- this one sort of
14 details a little bit of the -- of the premise for the
15 operation; yes?
16    A.   Yes.
17    Q.   And the indications for the procedure read:
18 "The patient is a delightful lady with a very frustrating
19 problem -- stress urinary incontinence which is severely
20 impacting on her quality of life, at times preventing her
21 from attending social and family gatherings, preventing
22 her from going to church and/or preventing her from doing
23 any type of exercise because of severe embarrassment from
24 urinary leakage." Did I read that correctly?
25    A.   Yes.

Page 123

1    Q.   And is that a quote from a conversation you
2 had with Mrs. Wheeler?
3    A.   Yes.
4    Q.   Okay. Then it reads that: "She is suffering
5 from stress urinary incontinence with a significant loss
6 of urine which is completely unexpected and without
7 warning," and you go on to describe stress urinary
8 incontinence; yes?
9    A.   Yes.
10    Q.   And it's your testimony that the cystocele
11 was aggravating the stress urinary incontinence; yes?
12    A.   Yes.
13    Q.   Okay. And then you have a very detailed list
14 of various complications on the next page. I'll let the
15 record speak for itself, but you also had Mrs. Wheeler
16 sign the bottom of that page; yes?
17    MR. KIEFFER: Object to form.
18 BY THE WITNESS:
19    A.   Yes.
20 BY MR. BOWDEN:
21    Q.   And you go again into the black box warning,
22 the FDA warning on the next page which is the third page
23 of this document. She also signed the bottom as well?
24    A.   Yes.
25    Q.   Then her sexual functioning, it reads -- and

Page 124

1 this is from Mrs. Wheeler's perspective, these
2 paragraphs?
3    A.   Yes.
4    Q.   "I'm informed that although the bladder
5 suspension procedure has nothing to do with specific
6 sexual function, such function may be affected by vaginal
7 surgery"?
8    A.   Yes.
9    Q.   "I have mentioned having incontinence during
10 sexual relations before the surgery and for that reason
11 have tended to avoid intercourse because of the
12 embarrassment"?
13    A.   Yes.
14    Q.   This is something that she told you?
15    A.   Yes.
16    Q.   Okay. "Female orgasm is a subject poorly
17 understood. It is in part due to psychological factors.
18 This may or may not be affected by any surgery on the
19 vagina. However, surgery may induce scar tissue
20 formation, and this can affect sensation or cause lack of
21 sensation in the vagina. Therefore, the ability to
22 experience an orgasm can be affected. The size of the
23 vaginal opening and the depth of the channel may also be
24 affected or changed by the surgery. Use of penial
25 penetration may be affected. Intercourse may be painful

Page 125

1 or cause bleeding." That's a conversation you had with
2 her?
3    A.   Yes.
4    Q.   And she voiced her understanding by signing
5 this form?
6    A.   Yes.
7    Q.   It reads in the next paragraph: "I have
8 already mentioned before surgery concerns about sensation
9 and pleasure and enjoyment with sexual relations and
10 discussed desire for sexual relations. This can either
11 be made better or made worse or may not change at all
12 with the surgical procedure." Did I read that correctly?
13    A.   Yes.
14    Q.   And you had that discussion with her?
15    A.   Yes.
16    Q.   Next: "I understand that Dr. Feinstein makes
17 no guarantees, either stated or implied, regarding any
18 changes or improvements in my sexual enjoyment or sexual
19 capability. Neither have any guarantees been made about
20 my sexual partner's enjoyment of having relations with
21 me. I am aware that sexual side effects from this
22 surgery are rare but are possible." Did I read that
23 correctly?
24    A.   Yes.
25    Q.   And that's a conversation you had with her?

32 (Pages 122 - 125)

Page 126

1    A.   Yes.
2    Q.   Okay.  And just the last page, Doctor, this
3 is sort of the portion where she summarizes everything or
4 the form summarizes everything.  "Understanding all these
5 risks and potential complications and knowing that
6 incontinence is a quality of life issue, I have agreed to
7 have this elective surgery because urinary incontinence
8 is making the quality of my life unacceptable"?
9    A.   Yes.
10    Q.   Did she affirm that statement on that date?
11    A.   Yes.
12    Q.   She signed that.  She also stated she read
13 every page, understands everything -- understood
14 everything and that you've answered all of her questions?
15    A.   Yes.
16    THE VIDEOGRAPHER:  Can we go off for one
17 moment?
18    MR. BOWDEN:  Yes, go ahead.
19    THE VIDEOGRAPHER:  Now going off the record at
20 11:37 a.m.
21    (WHEREUPON, a break was
22    taken.)
23    This begins disk two.  Now going back on
24 the record at 11:43 a.m.
25 BY MR. BOWDEN:

Page 127

1    Q.   Doctor, I've just handed you Exhibit Number
2 20.  We've looked at this as part of your record.  It's
3 the operative report from the original implantation of
4 the, both the Coloplast sling and also the Avaulta mesh?
5    A.   Yes.
6    Q.   And it appears that you also have written
7 into the op report the indications for the procedure
8 which appears to be partially duplicative of prior things
9 we've seen; yes?
10    A.   Yes.
11    Q.   You do state in the indication for
12 procedure -- I think this may be a bit of a new thing.
13 It says: "Her problem with incontinence is additionally
14 compromised by her significant cystocele" which is
15 consistent with what you said all throughout the
16 deposition; yes?
17    A.   Yes.
18    Q.   So the cystocele treatment was also an
19 incontinence treatment in Mrs. Wheeler's case?
20    A.   Yes.
21    Q.   Doctor, you already answered this question,
22 but it sounds like you had no unanticipated complications
23 here?
24    A.   Correct.
25    Q.   And you achieved full thickness dissection;

Page 128

1 is that correct?
2    THE REPORTER:  I'm sorry?  You achieved?
3 BY MR. BOWDEN:
4    Q.   Full thickness dissection, I'm sorry, of the
5 various planes for the implantations of both devices?
6    A.   Yes.
7    Q.   Did you use hydrodissection?
8    A.   Yes.
9    Q.   Okay.  And that's where you use a Marcaine
10 and saline solution to make sure that the tissues are
11 appropriately separated and that proper depth is achieved
12 in implantation?
13    A.   Yes.
14    Q.   In other words, you did it right?
15    A.   Yes.
16    Q.   And no buttonholing.  All of the mesh was
17 placed in a tension-free manner; yes?
18    A.   Yes.
19    Q.   All right, Doctor.  We're done with Number
20 20.
21    Number 21 is just your postoperative
22 instructions, Doctor.  I'm sure you recognize this, but
23 let me know if you do not or if you do.  And these are
24 standard postoperative instructions, Doctor?
25    A.   Yes.

Page 129

1    Q.   Is there any indication that she did or did
2 not comply with these?
3    A.   No indication.
4    Q.   No indication either way.  Okay.  That's all.
5    I just do note for the record, Doctor, you
6 have a tendency to make the really important points
7 either bold fonted, larger fonted or a combination of
8 both; yes?
9    A.   Yes.
10    Q.   So it looks like all of your documentation
11 relating to either instructions or warnings are tailored
12 specifically to make sure your patients understand them;
13 is that a fair statement?
14    A.   Yes.
15    MR. KIEFFER:  Object to the form.
16    MR. BOWDEN:  Sorry, counsel.
17 BY MR. BOWDEN:
18    Q.   This is Exhibit Number 22, Doctor.  Do you
19 know what this is?
20    A.   It's a postoperative telephone call summary.
21    Q.   Okay.  It looks like it's dated the same day
22 as the surgery?
23    A.   I'm sorry.  Not a telephone.  It's an office
24 visit form.
25    Q.   Okay.  And it's the same day as the surgery

33 (Pages 126 - 129)

Page 130

1 itself?
2    A.   No, it is not.  It's dated --
3    Q.   Oh, I'm sorry.
4    A.   --███████.
5    Q.   ███-09.  I'm sorry.  So this is the first
6 postoperative instruction, I'm sorry, postoperative
7 visit?
8    A.   It would have been.
9    Q.   Okay.  And -- right.  Exactly.  It's noted on
10 ███████████ 2009 that Mrs. Wheeler did not show up?
11    A.   Correct.
12    Q.   Did you ever discern or figure out the reason
13 why she did not come?
14    A.   No, but she was rescheduled.
15    Q.   Okay.  It looks like that visit happened ten
16 days later.  This is Exhibit Number 23.  Doctor, the date
17 of this visit is ████████ of, sorry, ██████████
18 of 2009.  My copy is a little bit compromised.  I don't
19 know if you've got a better copy in your notes.
20    A.   What date do you have?
21    Q.   ██████████ 2009.
22    A.   This is very compromised.  ███ --
23    Q.   ████████.
24    A.   -- I have ████8, and then I have a few
25 telephone calls.  Here's ████.  Yes, I have it clear as

Page 131

1 day.
2    Q.   Okay.  Where is that in your -- what's the
3 lower right-hand side number say?
4    A.   That's a good question.  Hold on.  That's
5 dated █████.  ████ is Page 34.
6    Q.   Okay.  I got it.  Okay.  And it reads -- and
7 this is -- this is a form that again appears to be done
8 with handwriting both by you and by your nurse?
9    A.   Yes.
10    Q.   And it -- just for taking it sequentially, it
11 reads that -- is she on anticholinergics?
12    A.   Yes, she is.
13    Q.   That's because of her urge incontinence?
14    A.   Yes.
15    Q.   Not related to her stress incontinence?
16    A.   Yes.
17    Q.   And it states that she's eating well,
18 drinking fluids and that she is not dizzy?
19    A.   Correct.
20    Q.   She does have pain that is decreasing; is
21 that fair?
22    A.   Yes.
23    Q.   And there's no bleeding?
24    A.   Correct.
25    Q.   And vaginal discharge that is decreasing and

Page 132

1 there's a bad odor to it; is that right?
2    A.   Yes.
3    Q.   Does this appear like a normal postoperative
4 course so far?
5    A.   Well, it's within the framework of normal.
6    Q.   Okay.  And there's some portions that read
7 now and preop, and there's some handwriting to the left
8 of it that's circled.  Do you know what that says?
9    A.   Yes.
10    Q.   What does it say?
11    A.   It says --
12    Q.   "Attempt kegel exercise"?
13    A.   Pre and post, and it says "falling, heavy and
14 bulge," so preoperative she did not complain of anything
15 falling.  Postoperative she did not complain of anything
16 falling.  Preoperative she did not complain of anything
17 heavy.  Postoperative she did complain of something
18 heavy, and preoperative she did not complain of a bulge,
19 and postoperative she did not complain of a bulge.
20    Q.   And on the left-hand side of sort of that
21 same area does it say "attempt kegel exercises"?
22    A.   I don't know where you're looking.
23    Q.   Right there (indicating).
24    A.   Oh, yes, "start kegel exercises."  That's
25 correct.

Page 133

1    Q.   Okay.  And there's several things that say
2 now and preop.  It says:  "Nocturia two times now."  Two
3 times per night?
4    A.   Yes.
5    Q.   "Before operation two to three times"?
6    A.   Yes.
7    Q.   And urgency, there's -- it says "now no" and
8 before it says?
9    A.   "No by history.  Yes by cystometrogram, CMG."
10    Q.   Okay.  And it reads:  "Now after the
11 operation coughing she is dry; sneezing she is dry"?
12    A.   No.  It says she still has leaking on cough
13 and sneezing.
14    Q.   Oh, she does.  Okay.
15    A.   Those are positive signs, so she still has
16 leak on coughing and sneezing, but she's dry on walking,
17 going up stairs and laughing.
18    Q.   Okay.  And it looks like that she's -- it
19 says:  "How many pads per day."  "Three pads per day wet
20 to soaked with discharge."  That's not with urine?
21    A.   Hard to differentiate, but specifically she
22 complained of discharge.
23    Q.   Okay.  Three pads per day.  Your next visit,
24 Doctor, was on ████████  Again, my copy is a little
25 bit compromised.  It's Exhibit Number 24.

34 (Pages 130 - 133)



Page 134

1    A.   It's very clear here on Page 36.
2    Q.   Yeah.  I'll use your copy, but I'll just --
3 for the record, there's Exhibit 24.  We're looking at
4 Exhibit 4, Page 36 which is another copy of Exhibit
5 Number 24.  Just generally speaking, it reads that she's
6 eating well, drinking well.  She is not dizzy.  She does
7 not have pain; yes?
8    A.   No pain.
9    Q.   And she has no bleeding?
10    A.   No bleeding.
11    Q.   This is a reference to the surgical area?
12    A.   Yes.
13    Q.   And pads per day is two to three.  She is
14 damp only; is that correct?
15    A.   Where is that?
16    Q.   Looking down this area right here
17 (indicating).
18    A.   Oh, yes.  Two to three, correct.  "Mostly
19 discharge."
20    Q.   There's a portion that says "RTO"?
21    A.   Return to office.
22    Q.   "Patient is feeling great"?
23    A.   Yes.
24    Q.   And then above that it says:  "Doing better"?
25    A.   Yes.

Page 135

1    Q.   These are her words?
2    A.   No.  These are her words, my handwriting.
3    Q.   Okay.  That's what I meant, yes.  These are
4 her words to you that she was -- she on that date,
5 ▮▮▮▮ 2010, excuse me, ▮▮▮▮ 2010 said she
6 was "doing great"?
7    A.   Yes.
8    Q.   The next exhibit is Number 25 which is
9 actually a good copy, believe it or not.  Date of the
10 office visit is ▮▮▮▮ 2010.  Although I do have
11 a note that she had missed a visit 20 days before on
12 ▮▮▮▮ 2010; is that correct?
13       MR. KIEFFER:  Objection.
14 BY THE WITNESS:
15    A.   Yes.  She had missed multiple visits.
16 BY MR. BOWDEN:
17    Q.   Okay.  Do you specifically have a notation
18 that she missed a visit on ▮▮▮▮ 2010?
19    A.   Yes, I do.
20    Q.   Okay.  So the next visit that she did come
21 for was this visit on ▮▮▮▮ 2010?  That's
22 Exhibit 25.
23    A.   Yes.
24    Q.   This is 11 weeks postop; yes?
25    A.   Yes.

Page 136

1    Q.   And she says:  "Pain positive but decreasing
2 in front urethra"?
3    A.   Yes.
4    Q.   And is that in the area of the Aris sling?
5    A.   Yes.
6    Q.   Okay.  And then on the right-hand side for
7 the now and the preop area it says:  "Complains of pain
8 at frontal vagina during intercourse and all the time,
9 especially at end of day"?
10    A.   Yes.
11    Q.   Is that again in the area of the sling?
12    A.   At the front of the vagina is all I wrote
13 down, so presumably.
14    Q.   Okay.  Then it says:  "Prescribed Premarin
15 cream;" is that right?
16    A.   Yes.
17    Q.   Dosage, and I'm sorry I can't read the rest
18 of it.
19    A.   It says:  "Massage into the upper vagina
20 three times a week."
21    Q.   Okay.  I'm sorry.  And then impression is:
22 "HAPPY" all capitals?
23    A.   Yes.
24    Q.   And then:  "Huge improvement"?
25    A.   Yes.

Page 137

1    Q.   And those are her words?
2    A.   Yes.
3    Q.   I'm sorry.  This is Exhibit -- Exhibit 26.
4 These are just some notes from your office.  The only
5 thing I wanted to point out from this was just some
6 notations.  The top says:  "CMG ▮▮▮ 09."  That's a
7 reference to the surgery?
8    A.   No.  That's a reference to the testing
9 procedure, cystometrogram.
10    Q.   Okay.  Okay.  And then it says -- I'm sorry.
11 Excuse me.  It says:  "TOT and cystocele Bard ▮▮▮ 09"?
12    A.   Yes.
13    Q.   Below that it says:  "▮ 10 office visit no
14 show --"
15    A.   Yes.
16    Q.   "-- R/S"?
17    A.   Reschedule.
18    Q.   Reschedule.  Okay.  And ▮▮▮ 10:  "Office
19 visit no show reschedule"?
20    A.   Yes.
21    Q.   Then it reads ▮▮▮ 10:  "Came in left didn't
22 want to wait.  Husband was screaming at all office
23 staff"?
24    A.   Yes.
25    Q.   Is that a reference to the instance when you

35 (Pages 134 - 137)

Page 138

1 saw her for the last time where her husband was yelling
2 profanities at the office staff?
3     A. I don't know if that was the last specific
4 time, but I can find out from the chart. It was dated
5 ▬ 10.
6     Q. Yes. And actually, we'll get there, Doctor,
7 if you want to wait.
8     A. Yes, that is correct. No show on follow up
9 after surgery.
10     Q. Okay. And that notation we just looked at,
11 Exhibit 26, is that like a note that your nurse would
12 have done or you would have done?
13     A. Which one?
14     Q. Exhibit 26.
15     A. That was a little summary that I kept on the
16 front of the chart.
17     Q. Okay. This is 27, Doctor. And this is kind
18 of a combination of an office record you've seen before
19 and some notes from you --
20     A. ▬.
21     Q. -- or from your office. And, again, this
22 quality is horrid, so you can probably look at the copy
23 in Exhibit Number 4.
24     A. ▬, yes.
25     Q. I believe that would be MDR00039 in Exhibit

Page 139

1 Number 4; right, Page 49?
2     A. Forty-one?
3     Q. I'm looking at -- I'm looking at ▬
4 2010.
5     A. Yes.
6     Q. I think that -- excuse me. Not ▬
7 ▬.
8     A. Yes. In the -- it was Page 41 on your MDR
9 pages.
10     Q. Okay, yes. There's notes and there's also
11 the official -- I don't know if it's official. The form
12 that you use which is Page 39 --
13     A. Yes.
14     Q. -- so it's 39 and 41. So it says: "Problems
15 with surgery at one point," and I'm looking at Page 39 at
16 this point. "Had a problem with" something "tender on
17 the right side. Had pain since surgery"?
18     A. Where are you reading? On the top?
19     Q. "Problems with surgery. Had a problem with
20 incision. Tender on right side. Had pain since
21 surgery." Page 39.
22     A. Yeah, hold on. Page 39?
23     Q. Yes.
24     A. Okay. Thirty-nine, okay. Got it. Okay.
25 Read again, please.

Page 140

1     Q. It says: "Problems at surgery: Had a
2 problem with incision, tender on right side. Had pain
3 since surgery"?
4     A. Yes.
5     Q. Okay. And that's -- there's a little bit of
6 dissonance here because she had reported early on that
7 there was no pain after the surgery; is that a fair
8 statement?
9     MR. KIEFFER: Object to form.
10 BY THE WITNESS:
11     A. Yes.
12 BY MR. BOWDEN:
13     Q. Okay. It says: "Using Premarin cream."
14 There's nothing -- and I'm on the left side now. There's
15 nothing that's notated after that. But it says: "If
16 she" something?
17     A. "If she sits back relaxed, pain is at zero."
18     Q. What does that indicate to you?
19     A. Well, pulling her forward, if she sits
20 forward, she feels discomfort; that something was
21 pulling, making something tight, holding back, something
22 restricting movement.
23     Q. Okay. And can you tell if that's the sling,
24 if that's the Avaulta or something else or is it
25 something you just can't tell?

Page 141

1     MR. KIEFFER: Object to the form.
2 BY THE WITNESS:
3     A. Can't tell, but logically it would be the
4 Avaulta.
5 BY MR. BOWDEN:
6     Q. Okay. And is that something you could
7 testify to to a reasonable degree of medical probability,
8 in other words, more likely than not from this record?
9     A. Probably.
10     Q. Okay. Probably or yes?
11     A. Yes.
12     Q. Okay. And, again, that was a known
13 complication you would have advised her of?
14     MR. KIEFFER: Object to the form.
15 BY THE WITNESS:
16     A. Yes.
17 BY MR. BOWDEN:
18     Q. And that she would have agreed to accepting
19 the risk of that complication?
20     MR. KIEFFER: Object to form.
21 BY THE WITNESS:
22     A. Yes.
23 BY MR. BOWDEN:
24     Q. It reads at the bottom: "Husband is very
25 upset that she can't travel or ride horses or enjoy sex."

36 (Pages 138 - 141)

Page 142

1 Did I read that correctly?
2    A.   Yes.
3    Q.   Was he with her at that point, Mr. Wheeler?
4    A.   Yes.
5    Q.   And do you recall anything about this visit?
6    A.   Just what it says on the paper.
7    Q.   Okay.  And then impression, it says: "I will
8 call patient with --" I'm sorry.  I can't read that.
9    A.   "In two weeks to --" I can't see it either.
10 "I will call patient in two weeks to" something.
11   Q.   Something surgery?
12   A.   Yeah, hold on.  Wait.  Wait.  Wait.  I should
13 have it here.  This is ▇▇▇▇.
14   Q.   Yes.
15   A.   Yeah, hold on.  Let me go get the original so
16 it doesn't get cut off.  It says: "I will check -- I
17 will call patient in two weeks to check progress."
18   Q.   Okay.  And, Doctor, if you look at Page 42 of
19 your -- Strike that.
20        The next visit I have -- well, I'm sorry.
21 Excuse me one second.
22        Look at 27, Exhibit 27, the first page which
23 are all these notations?  It says --
24   A.   Twenty-seven.
25   Q.   Yeah.

Page 143

1    A.   Twenty-seven, yes.
2    Q.   And this handwriting here, is that your
3 nurse's handwriting?
4    A.   At the top is my nurse.  On the bottom is me.
5    Q.   Okay.  So it says, your handwriting:
6 "Vaginal exam.  No perforations seen.  No buttonhole
7 seen"?
8    A.   Yes.
9    Q.   So that means there was no obvious issue at
10 least upon vaginal exam with either implant, the Aris or
11 the Avaulta?
12   A.   Correct.
13   Q.   I'm done with that one.
14        The next one is Exhibit 28.  This is a
15 two-page exhibit.  One is your standard form, and the
16 other one is some notes.  I'm sorry.  This is a visit
17 from ▇▇▇ ▇▇ 2010, and the better copy is in Exhibit 4
18 at Page 44.
19   A.   Hold on.  Forty-four?
20   Q.   Yes.
21   A.   Okay.  One second.  Okay.  Got it.
22   Q.   And she complains of right lower quarter pain
23 on H2o2 irrigation, is that what it says?
24   A.   Yeah, Hydrogen peroxide irrigation and
25 antibiotics Bactrim and Macrobid.

Page 144

1    Q.   Okay.
2    A.   And then I wrote "nothing helps."
3    Q.   It says: "Pain continues.  Sex is painful in
4 right lower quarter.  Right side of vagina pain is
5 constant, worse on sitting or sitting forward."  Did I
6 read that correctly?
7    A.   Yes.
8    Q.   Then it says at the bottom: "Excised tape
9 right deep vagina"?
10   A.   Yes.
11   Q.   What is that referring to?
12   A.   It refers to my impression of the problem.
13   Q.   When you say tape though, what are you
14 talking about?
15   A.   The tail coming off of the Avaulta implant.
16   Q.   So you hadn't -- you hadn't -- you hadn't
17 visualized any of these things yet but you had come to
18 the conclusion that it might be the tail of the Avaulta.
19 Do you know why that was your conclusion?
20   A.   Because on examining her, feeling exactly
21 where her tape -- where her pain was, that corresponded
22 to the tail of the Avaulta tape.
23   Q.   Okay.  And if you look at Exhibit Number 28,
24 the second page, at the very top is where I'm looking at.
25   A.   Okay.

Page 145

1    Q.   You said: "ITT Dr. F."  I think that says
2 ITT.  Do you know what that means?
3    A.   I have no idea.
4    Q.   Okay.  It says: "He said --" I'm sorry.  Do
5 you know whose handwriting this is?
6    A.   I do not.
7    Q.   "He said only two out of the hundreds he has
8 performed has this problem," and there's some drawings.
9    A.   Okay.
10   Q.   Do you know what this is?
11   A.   Who this is?
12   Q.   Do you know -- do you know what this is?  Do
13 you know what this document is?
14   A.   No, I don't.  I don't have it in my chart.
15   Q.   And you don't recognize the handwriting?
16   A.   It came from a chart of mine.  It must have
17 been a nurse, but I don't recognize it.
18   Q.   Okay.  And it seems to indicate there that
19 you had said that only two out of the hundreds of times
20 you performed this procedure would you have had this
21 problem.  Does that sound right?
22        MR. KIEFFER:  Object to the form.
23 BY THE WITNESS:
24   A.   Yes.
25 BY MR. BOWDEN:

37 (Pages 142 - 145)

Page 146

1   Q.   All right.  And, Doctor, this is actually
2  your operative report, Exhibit 29, from -- you referred
3  to it before when counsel questioned you -- from your
4  main office chart, but this is the report individually.
5   A.   From ████ ████
6   Q.   Yes, ████ 2010.
7   A.   Yes.
8   Q.   This is Exhibit 29.
9   A.   Yes.
10   Q.   Give me a second.  There's that and there's
11  that.
12        You've already testified to this, Doctor, but
13  is this -- once you had performed this procedure would
14  you have expected that her pain would have been
15  alleviated?
16   A.   I would hope so.
17   Q.   Okay.  Do you know Dr. Ramakrishna?
18   A.   It's a very common Indian name.
19   Q.   Okay.
20   A.   But probably no.
21   Q.   Okay.  Doctor, going to your last record
22  which is from Exhibit -- this is Exhibit Number 30 which
23  is from -- again, that was that ████ 2010 date.
24   A.   That's ████ 2010, yes.
25   Q.   Yes.

Page 147

1   A.   The last record I have for her.
2   Q.   This is it right here --
3   A.   Yes.
4   Q.   -- Exhibit Number 30.
5   A.   Yes.
6   Q.   It reads at the top:  "They came in then left
7  without office visit.  Very upset.  Husband was screaming
8  profanities at the staff."  We talked about this several
9  times.  Is that your handwriting or is that somebody
10  else's?
11   A.   That's me.
12   Q.   Okay.  "Patient --" it says at the bottom:
13  "Patient -- patient's husband very upset and said --"
14   A.   "Said he never wanted to come back."
15   Q.   Okay.  "No show on follow-up after surgery."
16  Is that a reference to the original -- I mean -- I'm
17  sorry.
18   A.   That means there was no office visit that
19  day.
20   Q.   Okay.  "Tried to schedule by telephone.  They
21  refused multiple times."  Did I read that correctly?
22   A.   Yes.
23   Q.   Do you recall anything about that interaction
24  other than what's written here?
25   A.   No.

Page 148

1   Q.   The Dr. Ramakrishna I'm referring to is Dr.
2  Renuka Ramakrishna who practices in Kankakee, Illinois.
3  Have you heard of that doctor?
4   A.   No.
5   Q.   If Mrs. Wheeler had reported to Dr.
6  Ramakrishna shortly after the second surgery that her
7  pain was alleviated, would that surprise you or would
8  that be what you expected?
9        MR. KIEFFER:  Object to form.
10  BY THE WITNESS:
11   A.   It would be what I would hope for.
12  BY MR. BOWDEN:
13   Q.   Okay.  Doctor, have you had any other
14  interactions with the Wheelers at all following this
15  visit on ████ 2010?
16   A.   Yes.  He sued me for billing issues.
17   Q.   Who did?  Mr. Wheeler?
18   A.   Yes.
19   Q.   How was that resolved?
20   A.   With an out-of-court settlement.
21   Q.   Okay.  Are you allowed to say what the
22  settlement was or is it confidential?
23   A.   It's not confidential.  I don't remember the
24  details but a certain amount of money changed hands.
25   Q.   Who paid whom in that circumstance?

Page 149

1   A.   My insurance company made an offer to him,
2  and I think it was acceptable.
3   Q.   What were -- do you recall what the billing
4  issues were?
5   A.   Yes.  You notice in that -- in one of these
6  things here one of the -- let's see.  The one that you
7  handed me that I said I don't recognize it because it was
8  probably written by one of my nurses --
9   Q.   Right.
10   A.   -- and I didn't have it in my -- here, this
11  page here.
12   Q.   Yes.
13   A.   It said:  "No bills for this procedure per
14  doctor."
15   Q.   Yes.  That was for the excision procedure;
16  yes?
17   A.   That was for the second procedure.
18   Q.   Right.
19   A.   Yes.  He billed -- he sued me saying that
20  that's illegal not to bill him because -- in other words,
21  not to bill him for a co-pay or a deductible because if
22  the insurance company established a price for a surgery,
23  let's say $100 and they paid 80 percent, let's say $80
24  and the patient was supposed to pay $20 as their co-pay
25  responsibility and I waived that, then I was committing

38 (Pages 146 - 149)

Page 150

1 fraud on the insurance company because their approval of
2 $100 was taking into consideration that $20 would have
3 been paid by the patient. If I had no intention of
4 paying -- charging the patient the $20, then the $100
5 should have been lowered to $80 as the full charge of the
6 procedure and being that's the case what I was doing was
7 committing fraud on the insurance company.
8     Q.    So Mr. Wheeler alleged that you were
9 alleging -- Strike that.
10        Mr. Wheeler was alleging you were committing
11 fraud on the insurance company by not charging his wife
12 for a certain procedure?
13    A.    Yes.
14    MR. KIEFFER:  Object to the form.
15 BY MR. BOWDEN:
16    Q.    Okay. When was that resolved?
17    A.    Many years ago. I don't know. Three years
18 ago, four years ago.
19    Q.    Do you know --
20    A.    Three years ago.
21    Q.    Do you know what court that was filed in?
22    A.    I don't remember.
23    Q.    Would it have been state court in Illinois?
24    A.    Yes.
25    Q.    Would it have been the county that you live

Page 151

1 in?
2    A.    Yeah. Sure.
3    Q.    What county are we in right now?
4    A.    Cook.
5    Q.    Okay. Forgive me. I don't know Chicago. I
6 didn't know if we were outside of Cook County or not.
7    A.    Cook.
8    Q.    Did you have an attorney for that?
9    A.    Yes.
10    Q.    Who was your attorney?
11    A.    I don't remember.
12    Q.    Did he have an attorney for that, Mr.
13 Wheeler?
14    A.    Certainly.
15    Q.    Do you recall the name of that --
16    A.    I do not.
17    Q.    So was this Wheeler versus Feinstein in Cook
18 County?
19    A.    It was Wheeler versus Feinstein in Cook
20 County, I believe so, yes.
21    Q.    Okay. Doctor, if you look at Exhibit -- do
22 you have Exhibit 4 in front of you?
23    A.    I'm sure it's in the pile somewhere. Which
24 one is 4? Yes, I have Exhibit 4 here.
25    Q.    Okay. And if you look at the very first

Page 152

1 page, you had stated that your first visit with
2 Mrs. Wheeler was not the visit that I thought that it was
3 which was ███. It looks like it was actually ███?
4    A.    It was ███, that is correct.
5    Q.    And is that record depicted at 3?
6    A.    Yes. It's Page 1 and 3.
7    Q.    Page 1 and 3. So it's two different records
8 for that visit?
9    A.    No. It's two different pages for that visit.
10    Q.    Okay. All right. Okay. You had noted some
11 things under previous surgery. Bladder, no;
12 hysterectomy, no; tubal ligation, no?
13    A.    Correct.
14    Q.    But you have a media --
15    A.    Mediastenoscopy.
16    Q.    What is that?
17    A.    Where they put a hole right over here
18 (indicating) and they look inside behind your chest plate
19 to look into the area between your lungs and around your
20 heart usually for the purpose of doing some lymph node
21 biopsies.
22    Q.    Okay.
23    A.    And they evidently thought she had lymphoma
24 according to my note but found out she had sarcoidosis
25 from lymph node biopsy.

Page 153

1    Q.    It says: "Add on to note. Husband very
2 angry and upset over wait in waiting room. He said my
3 office smells worse than his barn with horses. Extremely
4 rude to all staff"?
5    A.    Yeah, there was another one in there if you
6 want me to find it. I could tell you what it said.
7 Yeah, the bottom line that's cut off says: "Screaming
8 obscenities to everyone."
9    Q.    So on the first visit the husband was
10 screaming obscenities?
11    A.    Yes.
12    Q.    Go to the second record involving this
13 initial visit of ███ 2009.
14    A.    Yes.
15    Q.    It says: "Which office," and then it's
16 written next to there "stinky office"?
17    A.    Yes. Correct.
18    Q.    So you had more than one office at that
19 point. This is the one that Mr. Wheeler considered to be
20 stinky?
21    A.    Correct.
22    Q.    Okay. And there's just some notations on the
23 right-hand side about Mrs. Wheeler's stress urinary
24 incontinence which I think we've covered before. She
25 changes three pads a day. She feels embarrassed by the

39 (Pages 150 - 153)

Page 154

1 problem; is that correct?
2    A.   Yes.
3    Q.   This is all things she said to you?
4    A.   Yes.
5    Q.   She was afraid of getting an odor because of
6 the incontinence?
7    A.   Yes.
8    Q.   She's frustrated by the problems?
9    A.   Yes.
10    Q.   And she avoided activities like church,
11 family get-togethers, exercising?
12    A.   Yes.
13    Q.   Dancing?
14    A.   Yes.
15    Q.   Was she also avoiding riding horses at that
16 point?
17    A.   I don't know that, but her husband said so
18 later, yes.
19    Q.   Okay.  And it says: "Does incontinence cause
20 you to have depression?  No.  Maybe."
21    A.   Where is that?
22    Q.   Under depression.
23    A.   Yes.  Yeah, no, and then when she thought
24 about it, she said maybe.
25    Q.   And then she's not reclusive, but it says

Page 155

1 "husband owns the" something conspiracy?
2    A.   Insurance company, and she worked for him I
3 think at his insurance company.
4    Q.   Okay.  What does it say below there --
5 "occupational" something sour?
6    A.   "Occupation, insurance sales."
7    Q.   Okay.  Doctor, if you go to Page 5, there's a
8 drawing.
9    A.   Four, five, yes.
10    Q.   What is that?
11    A.   That's my attempt to be an artist.
12    Q.   So was this you explaining what you were
13 going to do as far as implanting the devices when you
14 have the informed consent discussion with Mrs. Wheeler on
15 the 19th of ▓▓▓▓ 2009?
16    A.   I don't know exactly what date this was
17 drawn, but it was my attempt to show her how we would fix
18 her problem.
19    Q.   Would it have been the same date as the
20 informed consent documents we looked at before?
21    A.   It could have been.
22    Q.   And the -- it looks like the top document --
23 I'm sorry.  The top part of the document, that is a
24 picture of the Avaulta?
25    A.   Yes.

Page 156

1    Q.   And then to the left is a picture of a
2 person.  Is that where the Avaulta would go and how it's
3 implanted?
4    A.   Yes.
5    Q.   And you would have described the trocars and
6 the arms and how that worked anatomically --
7    A.   Yes.
8    Q.   -- as far as implanting the Avaulta?
9    A.   Yes.
10    Q.   And then the picture in the middle looks like
11 it's a picture of the Coloplast sling?
12    A.   It's the Coloplast sling, and if you turn the
13 picture sideways --
14    Q.   It's also the Avaulta?
15    A.   -- it shows the support for the base of the
16 bottom.  If you're holding the picture sideways, it shows
17 the support with the separate sling for the base of the
18 bladder, and it shows the transobturator tape under the
19 mid urethra.
20    Q.   Okay.  And, again, is it likely looking at
21 this that that was part of the informed consent
22 discussion you had with her?
23    A.   Yes.
24    Q.   If you go to page Number 30, it looks like
25 this is a telephone call from ▓▓▓▓ 2009?

Page 157

1    A.   Thirty, yes.
2    Q.   It says:  "How's the patient feeling today."
3 It says: "Fantastic"?
4    A.   Yes.
5    Q.   Is that what she would have said to you on
6 ▓▓▓▓ 2009?
7    A.   She didn't say it to me.  She said it to the
8 nurse who made the follow-up phone call.
9    Q.   Do you know who the nurse was?
10    A.   I do not.
11    Q.   Okay.  If you go to Number 31, this is a call
12 that's ▓▓▓▓ 2009?
13    A.   Correct.
14    Q.   Reads, just part of this I'm reading:  "Is
15 there any swelling or redness of the operative site?  No.
16 Is there bleeding?  No.  Is there a lot of vaginal
17 discharge?  No."  Did I read that all correctly?
18    A.   Yes.
19    Q.   Is that what Mrs. Wheeler told your nurse on
20 that day?
21    A.   Yes.
22    Q.   It says:  "The patient has no problem with
23 constipation, blood in urine, fever or chills;" yes?
24    A.   Yes.
25    Q.   So it looks like the patient was doing well

40 (Pages 154 - 157)

Page 158

1 that day?
2    A.   Yes.
3    Q.   Doctor, look at page Number 42.  That's just
4 a drawing.  Do you know what that's -- it looks like it's
5 another drawing of the Avaulta.  Do you know what that
6 pertains to?
7    A.   Just -- I'm assuming that it's a picture of
8 the Avaulta, and the line down the middle is probably the
9 incision underneath the bladder.
10   Q.   Okay.  Doctor, if you look at page Number 48,
11 this is a record from ████ ████ of 2010.
12   A.   Forty-eight.  Okay.
13   Q.   This appears to be something that relates to
14 a phone call that occurred four days after the surgery,
15 the revision surgery?
16   A.   Yes.
17   Q.   Down at the bottom it says:  "Dr. Feinstein
18 called.  Spoke to patient.  Doing great"?
19   A.   Yes.
20   Q.   "Called twice and spoke to once"?
21   A.   Yes.
22   Q.   Do you recall Mrs. Wheeler saying to you on
23 ████ ████ 2010 that she was doing great?
24   A.   I don't recall, but that's what it says.
25   Q.   Okay.  The next is a call from ████ ████

Page 159

1 2010?
2    A.   What page?
3    Q.   Next page, 49.
4    A.   Yes.
5    Q.   And just selectively here I'm reading:
6 "Nausea and vomiting, how many episodes.  No.  Is the
7 patient in pain?  Very little."  Did I read that
8 correctly?
9    A.   Yes.
10   Q.   Does this connote a conversation that you
11 would have had, your office would have had with
12 Mrs. Wheeler on ████ ████ 2010, about seven days after
13 that second surgery?
14   A.   Yes.
15   Q.   Okay.  Then the last note, Doctor, is on
16 Page 50.  It's ████ ████ 2010?
17   A.   Yes.
18   Q.   Does this connote a phone call your office
19 would have had with Mrs. Wheeler on ████ ████, 2010,
20 approximately 15 days after surgery?
21   A.   Yes.
22   Q.   It says:  "Is the patient in pain?  No."
23   A.   Correct.
24   Q.   Is that what your patient -- is that what
25 Mrs. Wheeler would have said to your office on ████ ████

Page 160

1 2010?
2    A.   Yes.
3    Q.   "Can the patient control bladder?"  Answer:
4 "Yes."  Is that correct?
5    A.   Yes.
6    Q.   "Patient has had no accident, accidents, no
7 urine escaping when coughing, no urine escaping when
8 sneezing;" is that accurate?
9    A.   Correct.
10   Q.   It says at the bottom she's concerned she was
11 having two weeks of spotting.  Is that normal in a
12 postoperative course like this?
13   A.   It may be normal, but it's not the desired
14 effect.
15   Q.   Okay.  Within the parameters?
16      MR. KIEFFER:  Object to the form.
17 BY THE WITNESS:
18      A.   Within the parameters.
19 BY MR. BOWDEN:
20   Q.   Okay.  Doctor, do you know what damages
21 Mrs. Wheeler is being -- is suing for in this lawsuit?
22   A.   I do not.
23   Q.   Did you ever tell Mrs. Wheeler that her Bard
24 Avaulta caused her any injury?
25   A.   I did not.

Page 161

1    Q.   Did you ever tell her the Avaulta was
2 defective?
3    A.   I did not.
4    Q.   Did you ever tell her the Avaulta caused any
5 negative effects to her whatsoever?
6    A.   I did not.
7    Q.   Counsel covered with you experiences with
8 Bard sales representatives.  Did you find any of those
9 interactions to be abnormal or outside the norms of
10 your -- of medical practice?
11   A.   I did not.
12   Q.   Okay.  And, Doctor, is it fair to state that
13 in this case you have no criticism of Bard or its pelvic
14 mesh devices?
15      MR. KIEFFER:  Object to the form.
16 BY THE WITNESS:
17      A.   Correct.
18 BY MR. BOWDEN:
19   Q.   Is it fair to state that it's your opinion
20 that Bard's -- it is not your opinion in this case --
21 you're not going to testify in this case that Bard's
22 Avaulta caused her any problems that she's complaining of
23 in this lawsuit, is it, Doctor?
24   A.   That's correct.
25   Q.   And it is not your opinion that Bard or

41 (Pages 158 - 161)

Page 162

1 her -- or Mrs. Wheeler's Avaulta mesh caused or
2 contributed at all to anything she's complained about in
3 this lawsuit; is that correct, Doctor.
4     MR. KIEFFER: Object to the form, foundation.
5 BY THE WITNESS:
6     A.   That is correct.
7 BY MR. BOWDEN:
8     Q.   And you're not going to show up at trial in
9 this case and offer opinions that are critical of Bard or
10 the Avaulta; is that a fair statement?
11     MR. KIEFFER: Object to form, foundation.
12 BY THE WITNESS:
13     A.   That is correct.
14 BY MR. BOWDEN:
15     Q.   And, Doctor, you don't know what Plaintiff's
16 current condition is, so you're not going to render any
17 opinion about the cause of her current condition; is that
18 a fair statement?
19     A.   That is correct.
20     Q.   Doctor, have you seen all those television
21 commercials about Bard -- I'm sorry. Excuse me. Have
22 you seen all those television commercials about vaginal
23 mesh and the lawsuits about vaginal mesh?
24     MR. KIEFFER: Object to form.
25 BY THE WITNESS:

Page 163

1     A.   Yes.
2 BY MR. BOWDEN:
3     Q.   What do you think of those?
4     MR. KIEFFER: Objection to form.
5 BY THE WITNESS:
6     A.   I think in large part that's the reason why
7 it was removed from the marketplace.
8 BY MR. BOWDEN:
9     Q.   And what do you mean by that? Because of the
10 lawsuits not because of anything wrong with the devices?
11     MR. KIEFFER: Object to form.
12 BY THE WITNESS:
13     A.   Correct.
14 BY MR. BOWDEN:
15     Q.   Okay. Do you think the lawsuits have
16 hampered the ability of physicians to alleviate
17 conditions that are bothering women in this country?
18     MR. KIEFFER: Object, form, foundation.
19 BY THE WITNESS:
20     A.   Yes.
21 BY MR. BOWDEN:
22     Q.   And do you think that the litigation in those
23 commercials are a disservice to millions of women who
24 have issues with pelvic organ prolapse?
25     MR. KIEFFER: Object to form, foundation.

Page 164

1 BY THE WITNESS:
2     A.   Yes.
3 BY MR. BOWDEN:
4     Q.   Doctor, you are obviously a highly qualified
5 surgeon, and no one can question that. But are you an
6 epidemiologist?
7     MR. KIEFFER: Object to the form.
8 BY THE WITNESS:
9     A.   No.
10 BY MR. BOWDEN:
11     Q.   Are you a pathologist?
12     A.   No.
13     Q.   Do you have any patents?
14     A.   No.
15     Q.   Are you a material scientist?
16     A.   No.
17     Q.   Microbiologist?
18     A.   No.
19     Q.   Bacteriologist?
20     A.   No.
21     Q.   Immunologist?
22     A.   No.
23     Q.   Neurologist?
24     A.   No.
25     Q.   Pain specialist?

Page 165

1     A.   No.
2     Q.   Specialist in FDA regulations?
3     A.   No.
4     Q.   Have you ever been qualified by a judge at
5 trial as an expert in the design, development or
6 manufacture of pelvic mesh?
7     A.   No.
8     Q.   Have you ever been directly employed by any
9 company that designs or develops pelvic mesh?
10     A.   No.
11     Q.   Are you an expert in the design of pelvic
12 mesh?
13     A.   No.
14     Q.   On the materials used to make it?
15     A.   No.
16     Q.   On the development of designs of pelvic mesh?
17     A.   No.
18     Q.   Are you an expert in the manufacturing of
19 pelvic mesh?
20     A.   No.
21     Q.   Are you an expert on the biomechanical
22 testing of pelvic mesh?
23     A.   No.
24     Q.   Have you ever conducted any laboratory
25 testing on Avaulta mesh?

42 (Pages 162 - 165)

Page 166

1    A.   No.
2    Q.   And you didn't conduct any laboratory testing
3 on the Avaulta that you excised from Mrs. Wheeler, did
4 you?
5    A.   No.
6    Q.   Doctor, you're not a labeling expert, are
7 you?
8    A.   No.
9    Q.   And you never drafted a label for a medical
10 device?
11   A.   No.
12   Q.   And you've never worked at a medical device
13 company drafting labeling for any medical devices; right?
14   A.   No.
15   Q.   And you don't hold yourself as an expert in
16 FDA regulations, do you?
17   A.   No.
18   Q.   You've never been qualified by a judge at
19 trial as an expert in such?
20   A.   No.
21   Q.   And you do not hold yourself out as an expert
22 on industry standards in the medical device manufacturing
23 industry, do you?
24   A.   No.
25   Q.   And you're not a warnings factor -- I'm

Page 167

1 sorry.  Excuse me, Doctor.
2         You're not a warnings expert, are you?
3    A.   No.
4    Q.   Or a human factors expert?
5    A.   No.
6    Q.   You're not offering legal opinions here;
7 correct?
8    A.   Correct.
9    Q.   And you're not going to tell the jury how to
10 interpret the law?
11   A.   Correct.
12   Q.   And you're not an ethics opinion -- I'm
13 sorry.  Strike that.
14         You're not an ethics expert in either medical
15 or otherwise?
16   A.   No.
17   Q.   And, Doctor, when you did work for Bard for
18 their training, did you feel like you did good work
19 benefiting medicine and the health of women in this
20 country?
21         MR. KIEFFER:  Object to form.
22 BY THE WITNESS:
23   A.   Yes.
24 BY MR. BOWDEN:
25   Q.   Would you do it again today if you had the

Page 168

1 choice?
2    A.   Yes.
3         MR. BOWDEN:  Pass the witness, counsel.
4         MR. KIEFFER:  Thank you.  Doctor, do you need
5 a break --
6         MR. BOWDEN:  Yeah, do you need a break?
7         MR. KIEFFER:  -- or should we plow forward?
8         THE WITNESS:  No, sir.
9         MR. KIEFFER:  All right.  Thank you.

Page 169

1           REDIRECT EXAMINATION
2 BY MR. KIEFFER:
3    Q.   Doctor, in follow-up, you have not been --
4 you were asked a number of questions by Bard's counsel
5 about its products.  To be clear, you have not been shown
6 any internal documents from Bard concerning issues
7 related to the safety of any of its transvaginal mesh
8 products including the Avaulta; true?
9    A.   True.
10   Q.   You have not been provided with any testimony
11 of any Bard employees concerning what Bard knew and when
12 it knew it concerning the safety of its transvaginal mesh
13 products or adverse events associated with them including
14 the Avaulta; true?
15   A.   True.
16   Q.   You have not implanted a Bard product did you
17 say in approximately ten years?
18   A.   I've been retired for five years, so it's at
19 least five years.
20   Q.   Okay.  And I think you testified earlier
21 you've not served as a consultant to Bard in perhaps
22 probably ten years?
23   A.   Probably.
24   Q.   All right.  You were asked a number of
25 questions about Mrs. Wheeler's husband.  You have not

43 (Pages 166 - 169)

Page 170

1 been furnished with his deposition testimony in this
2 case; correct?
3     A.   Correct.
4     Q.   So you don't know what his testimony was
5 concerning circumstances or his perception of
6 circumstances on certain visits to your offices; true?
7     A.   True.
8     Q.   Is it fair to say that regardless of what
9 notations might have been made in certain records
10 regarding Mr. Wheeler, Mr. Wheeler did not influence the
11 type of surgery or the specific types of medical devices
12 that you recommended for his wife; correct?
13     A.   Correct.
14     Q.   And nothing about Mr. Wheeler or his
15 personality or his behavior influenced the manner in
16 which you conducted either of the surgeries that you
17 performed on his wife; correct?
18     A.   Correct.
19     Q.   You were asked some questions by Bard's
20 counsel about pain, specifically vaginal or pelvic pain,
21 in relation to the condition of endometriosis.  You
22 recall generally that exchange?
23     A.   Yes.
24     Q.   And I wrote this down.  You testified at one
25 point that endometriosis possibly could have caused

Page 171

1 Mrs. Wheeler some pain.  Do you recall testifying to that
2 effect?
3     A.   Yes.
4     Q.   Is it fair to say that you can't testify to a
5 reasonable degree of medical certainty or probability
6 that, in fact, Mrs. Wheeler was having vaginal or pelvic
7 pain as a result of endometriosis when she first
8 presented to you; is that fair?
9         MR. BOWDEN:  Form.
10 BY THE WITNESS:
11     A.   Yes.
12 BY MR. KIEFFER:
13     Q.   In fact, we've looked at your records for a
14 while today.  We don't have to look at them unless you
15 need to look back.  But in your initial encounters with
16 Mrs. Wheeler, she did not report, certainly it's not
17 documented, any sort of chronic vaginal pain or pelvic
18 pain; true?
19     A.   True.
20     Q.   She only started reporting those things after
21 the implant of the device; right?
22     A.   Correct.
23         MR. BOWDEN:  Form.
24 BY THE WITNESS:
25     A.   Correct.

Page 172

1 BY MR. KIEFFER:
2     Q.   As a matter of housekeeping, Doctor, you were
3 briefly shown this Avaulta Instructions For Use.  It was
4 marked as Exhibit 17, and counsel read from one section
5 of it pertaining to potential complications and adverse
6 events.  Let me show you -- let me take a moment to
7 mark -- Would you mark this for me?
8         MR. BOWDEN:  Thirty-one, counsel.
9             (Exhibit No. 31 marked as
10             requested.)
11         And this would fall in my same objection,
12 counsel, about using Bard documents without notice.
13         MR. KIEFFER:  Yeah.  And actually to be clear,
14 this was included in documents provided by the Wheelers,
15 and a version of it is in at least one version of his
16 chart that has been produced in this litigation.
17         MR. BOWDEN:  Okay.
18         MR. KIEFFER:  This is part of his record.
19         MR. BOWDEN:  I'm not withdrawing the
20 objection, but I hear what you're saying.
21         MR. KIEFFER:  Yeah.
22 BY MR. KIEFFER:
23     Q.   Doctor, Exhibit Number 31 is a document
24 that's been produced in this case.  There's some fairly
25 faint, although you can see it, pen markings toward the

Page 173

1 center of that, do you see that, some lines and
2 squiggles?
3     A.   I see a circle and a squiggle.
4     Q.   Okay.  And let me just represent to you,
5 Doctor, and in fairness, I'm paraphrasing here, but
6 according to the testimony of Mrs. Wheeler or Mr. Wheeler
7 or both, after Mrs. Wheeler developed pain and
8 complications following the first implant surgery and, in
9 fact, after you performed the revision surgery you
10 explained to them and gave them this particular
11 illustration with your markings on it that you used in
12 trying to describe to them what you perceived to be the
13 problem that necessitated the revision.  Okay.  Let me
14 just make that representation to you.  All right?
15     A.   If that's your representation --
16     Q.   Okay.
17     A.   -- that's your representation.
18     Q.   As you sit here today, do you have an
19 independent memory of the revision procedure on
20 Mrs. Wheeler?
21     A.   I don't have an independent recollection of
22 anything except what's written down.
23     Q.   All right.  Fair enough.  If the -- would it
24 be fair to assume that if you were performing a revision
25 procedure on a Bard product that you had implanted in a

44 (Pages 170 - 173)

Page 174

1 patient and you were attempting to illustrate for the
2 patient part of the problem, you would attempt to
3 illustrate it on a diagram that showed the actual device
4 that you'd implanted in them in the first instance?
5     MR. BOWDEN: Form.
6 BY THE WITNESS:
7     A. I don't know the answer to that question.
8 BY MR. BOWDEN:
9     Q. Okay. And without meaning to be
10 argumentative, I'm assuming you wouldn't just sort of
11 willy nilly pick up any diagram showing any medical
12 device and use it for illustration purposes?
13     A. That's logical.
14     Q. Let me then again for the sake of
15 housekeeping because I don't think Bard's counsel marked
16 this, let me mark the Avaulta Plus Instructions For Use.
17     MR. BOWDEN: Can I just talk to you off the
18 record real quick?
19     MR. KIEFFER: Okay.
20     MR. BOWDEN: Just -- it's not a big deal.
21 It's 32, counsel.
22     THE VIDEOGRAPHER: Now going off the record at
23 12:31 p.m.
24         (Discussion had off the
25         record.)

Page 175

1         Now going back on the record at 12:36 p.m.
2 BY MR. KIEFFER:
3     Q. Doctor, we're back on the record after a
4 short break. Before we broke I was asking or beginning
5 to ask you some questions about Exhibit 32 which is a
6 copy of some Instructions For Use for the Avaulta
7 Biosynthetic Support System. I think you testified
8 earlier when I was asking you questions that you would
9 have reviewed the Avaulta Plus or Instructions For Use on
10 any of the Avaulta products at least at some point in
11 time before you would have first begun using those
12 devices in your patients.
13     A. Is that a question?
14     Q. Yes.
15     A. Yes.
16     Q. Okay. Sorry. It was kind of a long
17 preamble, but it was a question.
18     Let me direct you to, I think you're already
19 there, Page 4. There is a paragraph entitled "Adverse
20 Reactions." Do you see that?
21     A. Yes.
22     Q. Without necessarily taking up our time to
23 read it, that is certainly not nearly the list of
24 potential reactions or complications that Bard's counsel
25 read a little earlier today when he showed you the

Page 176

1 Instructions For Use for the Avaulta Solo; correct?
2     MR. BOWDEN: Form objection.
3 BY THE WITNESS:
4     A. I'm not sure.
5 BY MR. KIEFFER:
6     Q. He had kind of a laundry list of the Avaulta
7 Solo. This is fairly abbreviated information as it
8 pertains to the Avaulta Solo Plus; would you agree?
9     MR. BOWDEN: Form.
10 BY THE WITNESS:
11     A. If you say so.
12 BY MR. KIEFFER:
13     Q. Doctor, if you would be so kind, would you
14 take a look at Exhibit 4 which we marked earlier today
15 which is a copy of your chart? Thank you. You have it
16 there. Turn, if you would, to Page 43. At the top of
17 Page 43 there's a note dated ▇ 10. Do you see that?
18     A. Yes.
19     Q. And it says: "Christine Wheeler pelvic
20 exam." Is that particular handwriting yours or a nurse's?
21     A. Mine.
22     Q. Okay. And then it says: "Preop diagnosis,"
23 and then 1, 2, 3, 4, 5, 6. Do you see that?
24     A. Yes.
25     Q. Is that your handwriting?

Page 177

1     A. Yes.
2     Q. And that -- I've read it. I'm going to try
3 not to take up our time reading it again, but that
4 verbiage corresponds almost verbatim to the typed
5 operative note of that day that we went through earlier,
6 does it not?
7     A. Yes.
8     Q. For example, and again this is just -- I'm
9 picking on some of the language. You talk about a -- it
10 talks about very deep right lateral pain, number 8 on a
11 scale of 1 to 10, with very easily palpable cord
12 structure corresponding exactly to her pain being the
13 tail of the Avaulta tape on the deep right side. That's
14 pretty much verbatim I think what you wrote in the typed
15 report; correct?
16     A. Correct.
17     Q. All right. And then if you would turn to the
18 next page which is Page 44, that note is dated ▇ of
19 2010 in the upper right corner?
20     A. Yes.
21     Q. And that indicates it's a telephone
22 follow-up; right?
23     A. Yes.
24     Q. Okay. Chief complaint, you talked about that
25 before, and it says under chief complaint -- the last

45 (Pages 174 - 177)

Page 178

1 couple of words are "nothing helps;" right?
2      MR. BOWDEN:  Form.
3 BY THE WITNESS:
4      A.  Yes.  Wait.  Yes, "nothing helped."
5 BY MR. KIEFFER:
6      Q.  Okay.  And then under preop -- I want to make
7 sure that I can read all this -- it says:  "Pain
8 continues.  Sex is painful in right lower quadrant, right
9 side of vagina.  Pain is constant.  Worse on sitting or
10 sitting forward."  Did I read that correctly?
11     A.  Yes.
12     Q.  And then the next couple lines, it starts
13 with:  "Pain."  I can't read all those words.
14     A.  "Pain, pulling feeling is worse in the last
15 few months."
16     Q.  All right.
17     A.  "Plan number one, to OR under general
18 anesthesia.  Pelvic exam under anesthesia and excise tape
19 in the right deep vagina."
20     Q.  Thank you.  I just want to get that clear for
21 the sake of our record.
22         To be clear, because there might have been a
23 little bit of confusion in some of the earlier
24 questioning, your -- the revision surgery you performed
25 in ▇ 2010 was because of complications and problems

Page 179

1 that had arisen in relation to the Bard Avaulta device
2 not some issue with the Coloplast Mentor Aris tape;
3 correct?
4      MR. BOWDEN:  Form, form objection.
5 BY THE WITNESS:
6      A.  Yes.
7 BY MR. KIEFFER:
8      Q.  And your note is quite clear, is it not, that
9 on pelvic exam you were able to isolate and identify the
10 area of her pain as corresponding exactly with a portion
11 of the Avaulta implant?
12     A.  Yes.
13     Q.  And that is the portion that you sought to
14 address and remedy to the best of your ability when you
15 did that revision surgery?
16     A.  Yes.
17     Q.  Is it fair to say that neither at the time of
18 surgery nor thereafter did you document or form an
19 opinion that the Coloplast Mentor Aris tape was causing
20 Mrs. Wheeler some untoward and lasting postoperative
21 complication?
22     MR. BOWDEN:  Form objection.
23 BY THE WITNESS:
24     A.  Correct.
25

Page 180

1 BY MR. KIEFFER:
2      Q.  You were asked by Bard's counsel about
3 whether you had ever seen any evidence of shrinkage
4 regarding the Avaulta product, and you testified that you
5 had on occasion; is that correct?
6      A.  Yes.
7      Q.  All right.  And you also testified that you
8 saw roping in this particular Bard Avaulta device on
9 re-examination several months later?
10     MR. BOWDEN:  Form.
11 BY THE WITNESS:
12     A.  Yes.
13 BY MR. KIEFFER:
14     Q.  That would be this ▇ -- ▇ 2010
15 visits and your subsequent revision surgery?
16     A.  Yes.
17     Q.  And you would describe what -- that tight
18 cord-like structure is what you would correlate to the
19 term roping?
20     A.  Yes.
21     Q.  Which you also described as curling?
22     MR. BOWDEN:  Form.
23 BY THE WITNESS:
24     A.  I'm not sure of that.
25

Page 181

1 BY MR. KIEFFER:
2      Q.  Okay.  You also said that this roping that
3 you saw in Mrs. Wheeler in ▇ 2010 is a unique
4 complication of mesh; true?
5      MR. BOWDEN:  Form.
6 BY THE WITNESS:
7      A.  Yes.
8 BY MR. KIEFFER:
9      Q.  You don't get that kind of complication, for
10 example, in native tissue repairs?
11     MR. BOWDEN:  Form.
12 BY THE WITNESS:
13     A.  Correct.
14 BY MR. KIEFFER:
15     Q.  You testified earlier that you did not see in
16 Mrs. Wheeler device migration; true?
17     A.  True.
18     Q.  But you said you saw, and I wrote it down in
19 quotes, "severe inflammation"?
20     MR. BOWDEN:  Form.
21 BY MR. KIEFFER:
22     A.  The cording or the curling up of the tail was
23 consistent with severe inflammation in my opinion.
24 BY MR. KIEFFER:
25     Q.  Okay.  And I wrote down that you testified,

46 (Pages 178 - 181)

Page 182

1  but I want to know if I got this right, that it was
2  inflammation to a greater degree than what you would
3  typically expect?
4      A.  Yes.
5          MR. BOWDEN:  Form.
6  BY MR. KIEFFER:
7      Q.  There's always going to be some amount of
8  inflammation ancillary to a surgery; true?
9      A.  Yes.
10     Q.  This was inflammation of a different sort?
11     A.  Yes.
12         MR. BOWDEN:  Form.
13 BY MR. KIEFFER:
14     Q.  Significant or a magnitude higher?
15         MR. BOWDEN:  Form.
16 BY THE WITNESS:
17     A.  Yes.
18 BY MR. KIEFFER:
19     Q.  I'm sorry.  Yes?
20     A.  Yes.
21         MR. BOWDEN:  Sorry.  Yes.  Right.
22 BY MR. KIEFFER:
23     Q.  Also something that's known as a foreign body
24 response?
25         MR. BOWDEN:  Form.

Page 183

1  BY THE WITNESS:
2      A.  Yes.
3  BY MR. KIEFFER:
4      Q.  Doctor, you were shown, just very briefly you
5  were shown Exhibits 13 and 14 which are a couple of
6  documents from AUGS.  You recall that?
7      A.  Yes.
8      Q.  Neither of those documents reference the Bard
9  Avaulta product specifically, do they?
10     A.  No.
11     Q.  Did you testify earlier, Doctor, that with
12 respect to Bard anterior Avaulta implantations your own
13 reoperation rate is approximately five percent?
14     A.  Yes.
15     Q.  Let me ask you a couple questions, if I may,
16 Doctor, about a couple of your sort of informed
17 consent-related documents.  These were marked as Exhibits
18 18 and 19.  Do you have those handy in your file?
19     A.  Do you have a page, MDR page?
20     Q.  Counsel marked them separately, so I was just
21 going --
22         Doctor, with respect -- do you have Exhibit
23 18 there?
24     A.  Yes.
25     Q.  With respect to Exhibit 18, I have just a

Page 184

1  couple questions for you.  The one, two, third paragraph
2  down after the boldface discussion you state:  "I have
3  explained to the patient their success rates, failure
4  rates, et cetera."  Do you see that?
5      A.  Yes.
6      Q.  It's fair to say, isn't it, Doctor, that you
7  can't warn a patient about or explain to a patient things
8  that Bard may know but hasn't told you about any risks or
9  complications unique to its transvaginal mesh devices
10 including the Avaulta product; true?
11     A.  True.
12     Q.  The next paragraph down you say:  "I've
13 explained to the patient about the FDA black box
14 warning."  You see that paragraph?
15     A.  Yes.
16     Q.  And then you mention some potential
17 complications related to that.  For example,
18 penetrations, perforations, exposures and erosions.  You
19 see that?
20     A.  Yes.
21     Q.  And then you go on to state:  "Most of which
22 are easily taken care of when identified."  Do you see
23 that?
24     A.  Yes.
25     Q.  And that's information that you would have

Page 185

1  specifically communicated to Mrs. Wheeler, that if she
2  encountered these sorts of complications, in your
3  judgment and experience they would typically be easily
4  taken care of?
5      A.  Yes.
6      Q.  If you turn to the next page of that same
7  exhibit, Doctor, the second full paragraph you state:
8  "There is a total 95 percent improvement rate with
9  incontinence surgery, 85 percent total cure rate of
10 incontinence, no pads at all with an additional 10
11 percent significantly improved rate."  Do you see that?
12     A.  Yes.
13     Q.  And that's information you would have
14 communicated to Mrs. Wheeler as well?
15     A.  Yes.
16     Q.  If you turn to Exhibit 19, Doctor, some of
17 this, just to be clear, some of this is written out of
18 in the first person -- I, Christine Wheeler, and I am
19 aware of this and I am aware of that.  You understand
20 what I'm referring to?
21     A.  Okay.
22     Q.  I mean this is a document you drafted; right?
23     A.  Yes.
24     Q.  Okay.  And at least part of it or most of it
25 you drafted in the first person for the patient to

47 (Pages 182 - 185)

Page 186

1 basically acknowledge I'm aware of these things; right?
2    A.   Most of it is starting with the patient.
3    Q.   Okay.  On the second page of Exhibit 19 under
4 Risk of Complication, you see the first paragraph: "I'm
5 aware of the general risks of anesthesia"?
6    A.   Yes.
7    Q.   The second paragraph: "I am also aware of
8 specific complications of mid-urethreal sling bladder
9 neck suspension."  You see that as well?
10    A.   Yes.
11    Q.   Then the third paragraph starts out: "I am
12 aware of the risk of perforation and erosion, et cetera."
13 Do you see that?
14    A.   Yes.
15    Q.   A very similar question to what I asked you a
16 moment ago.  You can't discuss with the patient any sorts
17 of unique risks or adverse events associated with this
18 product that Bard may know about but has not shared with
19 you; correct?
20        MR. BOWDEN:  Form.
21 BY THE WITNESS:
22    A.   Correct.
23 BY MR. KIEFFER:
24    Q.   All right.  This last paragraph on this same
25 page it states:  "I am aware of the adductor longus

Page 187

1 syndrome.  That is a pain in the upper legs postop
2 lasting a few days to a few weeks from the needles
3 inserting the sling penetrating the tendinous insertion
4 of the adductor longus."  Do you see that?
5    A.   Yes.
6    Q.   Do you believe Mrs. Wheeler had an
7 understanding of the adductor longus?
8    A.   Is that a question?
9    Q.   Yes.
10    A.   I believe that she was informed that there
11 are multiple different types of pain syndromes that are
12 possible.  This is one of them.
13    Q.   Okay.  If you'd turn to the next page,
14 there's a discussion under FDA black box warning.  You
15 see that?
16    A.   Yes.
17    Q.   It states: "I am aware that the FDA has
18 issued a black box warning about using mesh in the human
19 body.  They mention what has been known all along without
20 any new or unknown problems.  That is --" you see what
21 I'm reading?
22    A.   Yes.
23    Q.   That's your narrative there not hers;
24 correct?
25        MR. BOWDEN:  Form.

Page 188

1 BY THE WITNESS:
2    A.   Correct.
3 BY MR. KIEFFER:
4    Q.   Your take on the FDA black box warning?
5    A.   Yes.
6    Q.   And then the last sentence there it says:
7 "These exposures, perforations or penetrations are
8 usually handled easily by applying hormone cream to the
9 area or cutting out a small amount of mesh exposed or
10 resuturing the area if need arises."  You see that?
11    A.   Yes.
12    Q.   And, again, that's information you would have
13 communicated to Mrs. Wheeler, namely that the sorts of
14 things identified in the FDA black box warning that you
15 identify here are usually handled easily if she were to
16 encounter them?
17    A.   Yes.
18        MR. BOWDEN:  Thirty-three.
19            (Exhibit No. 33 marked as
20             requested.)
21        MR. KIEFFER:  Yeah, that's fine.
22        MR. BOWDEN:  3-3.  Are these just the
23 discharge instructions --
24        MR. KIEFFER:  Yes.
25        MR. BOWDEN:  -- for the second procedure?

Page 189

1        MR. KIEFFER:  Yes.
2 BY MR. KIEFFER:
3    Q.   Doctor, we've handed you what's been marked
4 today as Exhibit 33.  My question is:  On the top where
5 it says "PS billing info," is that all your handwriting?
6    A.   Yes, it is.
7    Q.   And what's in the box there, is that all your
8 handwriting?
9    A.   Yes.
10    Q.   And you've signed it and dated it there?
11    A.   Yes.
12    Q.   Okay.  There's some discussion there about
13 the patient having no out-of-pocket expenses for today's
14 procedure.  You see all that?
15    A.   Yes.
16    Q.   Okay.  Do you recall what you -- what your
17 total billings were in this case with respect to the care
18 of Christine Wheeler?
19    A.   I do not.
20    Q.   If I told you that it was $165,779.39, would
21 that sound right to you?
22        MR. BOWDEN:  Form.
23 BY THE WITNESS:
24    A.   That may have been what was billed.  We
25 probably got paid one percent of that.

48 (Pages 186 - 189)

Page 190

1 BY MR. KIEFFER:
2    Q.   All right.  The lawsuit filed by Mr. Wheeler,
3 do you recall that being what was referred to sometimes
4 as a Qui tam action?
5    A.   Yes.
6    Q.   Mr. Wheeler proceeding on behalf of the State
7 of Illinois?
8    A.   Yes.
9    Q.   Allegations were basically improper billing
10 procedures under federal law?
11    A.   Yes.
12    Q.   I won't get into the nuances, but it had to
13 do with allegations about procedures in your practice
14 whereby you would waive co-pays and deductibles, things
15 of that nature?
16    A.   Yes.
17    Q.   And you gave a deposition in that matter?
18    A.   Yes.
19    Q.   And you were represented by counsel?
20    A.   Yes.
21    Q.   Do you recall in that deposition on a number
22 of occasions asserting your 5th Amendment right to refuse
23 to answer questions on the basis that it might
24 incriminate you?
25    A.   I don't remember.

Page 191

1    Q.   Okay.  Regardless, that matter was resolved
2 out of court by way of settlement?
3    A.   Is that a question?
4    Q.   Yeah.
5    A.   Yes.
6         MR. KIEFFER:  All right.  Let's -- can we go
7 off the record for a second?
8         MR. BOWDEN:  Sure.
9         THE VIDEOGRAPHER:  Now going off the record at
10 12:53 p.m.
11         (Discussion had off the
12         record.)
13         Going back on the record at 12:58 p.m.
14         MR. KIEFFER:  Doctor, we are back on the
15 record.  While we were on a break, we marked as Exhibit
16 34 a thumb drive that contains a fairly brief video in
17 which you appear providing some information about certain
18 aspects of your medical practice and answering some
19 questions.
20         With counsel's permission, we're going to
21 actually play that for you and make it a part of our
22 record, and then I just have some very brief questions
23 about it in follow up.  Okay?
24         MR. BOWDEN:  Let me just state for the record
25 that Bard reserves all objections to the admissibility of

Page 192

1 this video including hearsay, but obviously I can't stop
2 this from happening now and will do.  We'll go forward
3 with -- and what's going to happen, if I recall
4 correctly, is we're going to play the video.  It is not
5 visible right now on the camera but later on in the
6 record it will be visible through electronic means and
7 yeah, that's it.  So -- and I'm now also making sure that
8 the actual transcript of what is being said is being
9 typed into the record as it is played contemporaneously.
10         Like I said, we reserve all rights as far
11 as the admissibility of this -- this video is concerned.
12 All set?
13         MR. KIEFFER:  Yes.  Thank you.
14         (WHEREUPON, the following
15         proceedings were reported
16         and transcribed from the
17         video:)
18         DR. FEINSTEIN:  Hi.  My name is Dr. Charles
19 Feinstein.  Thank you for coming to my offers.  We are
20 located on Lake Shore Drive in Chicago on 4700 North.
21 That's Lake Shore Drive and Lawrence.  Our phone number
22 is (847) 291-9058.  That's (847) 291-9058, and we
23 specialize in problems with bladder control for men and
24 for women.
25         We have for your convenience four nurses

Page 193

1 with us full time all day long who speak beautiful
2 Polish, and they are here to help us to help you, and
3 they're here for your convenience all day every day.
4         EXAMINATION
5 BY THE INTERVIEWER:
6    Q.   Doctor, what is urinary incontinence?
7    A.   Urinary incontinence is a problem that's very
8 common in America.  It affects 30,000,000 women, and it's
9 simply where the person, the woman, loses control of her
10 bladder and the urine comes out without control.
11    Q.   Is all the same or are they different types
12 of urinary incontinence?
13    A.   There are many different types of
14 incontinence.  The two most common types are called
15 stress incontinence, and that means the woman loses urine
16 when she coughs and sneezes, when she laughs, when she
17 does any exercise, jumping up or down, when she rides a
18 bicycle, does any trampoline, and a woman can also lose
19 urine when she's screaming at her husband or screaming at
20 the children.
21         There's another type of incontinence which is
22 called overactive bladder, and that means that the lady
23 has to run to the bathroom in a big hurry and she just
24 can't get there fast enough and the urine comes out
25 before she gets to the bathroom.

49 (Pages 190 - 193)

Page 194

1   Q.   Which types are (inaudible) with medications?
2   A.   The medications are very successful for only
3   one type of incontinence and that is the overactive
4   bladder where the woman has to run to the bathroom in a
5   hurry, can't get there fast enough and urine leaks before
6   she gets there.  Medicines can help with that particular
7   problem.
8   Q.   So which types are handled by the surgery?
9   A.   The surgery is for the other type of problem
10  where the woman loses urine when she coughs, when she
11  laughs, when she screams at her husband, when she
12  exercises, plays tennis, volleyball, soccer, when she
13  tries to run or do the treadmill, and she's losing urine
14  when all of those muscle activities, those physical
15  activities, and for that type of problem we have a
16  surgical procedure which takes 15 minutes, very
17  successful.
18  Q.   Are there some times when both medication and
19  surgery are need to help the patient?
20  A.   That's a very good question.  Yes, there are.
21  Many women have both problems at the same time where they
22  have the overactive bladder, running to the bathroom in a
23  big hurry, but they also lose urine every time they cough
24  and sneeze and when they lift up a bag of heavy
25  groceries, so that can also be two problems at the same

Page 195

1   time, and they would require both treatments at the same
2   time.
3   Q.   How many people in America have problem with
4   urinary incontinence?
5   A.   Almost everybody.  There's at least
6   30,000,000 women in America, and it may be even higher
7   than that, who have problems with urinary incontinence.
8   Q.   So is incontinence only an old ladies
9   disease?
10  A.   Well, most people think that it's an old
11  ladies disease, and as a matter of fact, urinary
12  incontinence in old ladies is the number one reason in
13  America that women get put into nursing homes.  However,
14  my practice is different because we specialize in young
15  women.  Most of my patients are between the ages of 28
16  and 55, and they are having urinary incontinence, and
17  they've had it, some of them, for 15 years before they
18  come to see me.
19  Q.   Is there any benefit from physical therapy?
20  A.   We find that physical therapy is an excellent
21  treatment.  We use it in combination with the surgery,
22  and we also use it in combination with the medicines
23  because it makes the muscles stronger, and if we can make
24  the muscles stronger in the female pelvic region, we'll
25  have better results.

Page 196

1   Q.   So what are the pelvic exercises?
2   A.   The pelvic exercises are exercises that are
3   specially designed to prevent the organs inside the woman
4   from falling down and from falling out.  The bladder can
5   fall down.  The uterus can fall down.  The rectum can
6   fall down, and the pelvic exercise, physical therapy that
7   we teach helps the muscles to strengthen so that those
8   problems where the organs fall down can be avoided.
9   Q.   Can you briefly describe the surgery for
10  urinary incontinence and how does it work, should the
11  women afraid of it because I think this is a common
12  question?
13  A.   Well, everybody's always afraid if you
14  mention the word surgery, so we don't mention surgery.
15  We call it a procedure, and it takes 15 minutes.  It's an
16  outpatient procedure.  We do it in our office.  We come
17  in.  We get you ready.  We do the procedure.  It takes 15
18  minutes, and at the end you stay another hour or so.  You
19  go home.  By the next day you're able to drive, and
20  you're able to do almost all of your normal activities
21  the very next day after the surgery.
22  Q.   Do you use anesthesia during the surgery or
23  the patient can be awake?
24  A.   We usually use anesthesia but we don't have
25  to.  There are some patients who prefer to be awake, and

Page 197

1   that's perfectly okay.  We don't mind.  But most of our
2   cases have anesthesia because I don't like any patients
3   to feel any pain at all.
4   Q.   Some women say I feel like something is
5   falling out of my bladder.  Is it incontinence?
6   A.   Incontinence is when you're leaking and when
7   you're wet.  When there's a problem of organs falling
8   down, that's a separate problem, and it frequently
9   happens at the same time either with the incontinence or
10  without the incontinence, but the bladder can fall down.
11  The uterus can fall down, and the rectum can fall down,
12  and they can all come through the pelvic area and can
13  become a very big problem.
14  Q.   So why does the bladder prolapse happen?
15  A.   Bladder prolapse is very frequent after
16  hysterectomy when they take out the uterus, and that
17  weakens all the muscles, and once they weaken the muscles
18  from the surgery of the hysterectomy everything falls
19  down.
20  Q.   Is it treatable?
21  A.   Well, yes, and if it falls down enough, we
22  have to lift it back up and lock it into place, and that
23  requires a surgery.
24      DR. FEINSTEIN:  Hi, this is Dr. Feinstein, and
25  I thank you for coming and listening to us today.  My

50 (Pages 194 - 197)

Page 198

1 office is located on Lake Shore Drive in Chicago on 4700
2 North, and that's Lake Shore Drive and Lawrence. My
3 phone number is (847) 291-9058. That's (847) 291-9058.
4          We hope that you'll come and visit with
5 us. We'd very much like to help you with any problem
6 that you may have, and for your convenience we have four
7 nurses all day every day who speak beautiful Polish, and
8 they're with us to help you and make your experience much
9 more enjoyable.
10          (End of videotape.)
11 BY MR. KIEFFER:
12     Q.   All right. Doctor, we just spent a few
13 minutes reviewing a video that we marked as Exhibit 34.
14 At the risk of asking an obvious question, that was you
15 on the video; correct?
16     A.   Correct.
17     Q.   All right. The -- what were the
18 circumstances that led you to create that video?
19          MR. BOWDEN:  Form.
20 BY THE WITNESS:
21     A.   I don't remember.
22 BY MR. KIEFFER:
23     Q.   Okay. The -- there were a couple of
24 references in that video at the beginning and the end to
25 having four nurses that speak beautiful Polish. You

Page 199

1 heard that?
2     A.   Yes.
3     Q.   Why the emphasis on nurses who speak Polish?
4 Did you have a large Polish patient base?
5     A.   We did.
6     Q.   Okay. And the young lady that was
7 facilitating or interviewing you on that video, was she
8 Polish?
9     A.   I have no independent recollection, but I
10 presume that she was from the tape.
11     Q.   Okay. And who was she?
12     A.   I have no idea.
13     Q.   She didn't work for you?
14     A.   No.
15     Q.   Okay. Did you pay to have that video
16 created?
17     A.   I don't remember.
18     Q.   Okay.
19     A.   Probably not.
20     Q.   All right. That video was available for a
21 time on the internet, was it not?
22     A.   I don't remember.
23     Q.   And on a website associated with your medical
24 practice?
25     A.   Could have been. I don't remember.

Page 200

1     Q.   Doctor, in your -- in your years implanting
2 Bard transvaginal mesh products including the time that
3 you served as a preceptor or proctor for Bard, do you
4 recall anyone from Bard ever criticizing you or your
5 medical practice in any way at all?
6          MR. BOWDEN:  Form objection.
7 BY THE WITNESS:
8     A.   Not that I could recall.
9 BY MR. KIEFFER:
10     Q.   Okay. You don't have any recollection of
11 anyone from Bard ever criticizing the way in which you
12 selected your patients for implantation with a Bard
13 medical device; is that correct?
14     A.   That is correct.
15     Q.   You don't have any recollection of anyone
16 from Bard ever criticizing anything having to do with
17 your surgical technique when implanting Bard devices; is
18 that also correct?
19     A.   Not that I could recall.
20     Q.   Do you have any memory of anybody from Bard
21 ever criticizing you for any business-related issues such
22 as how you might have advertised services that you
23 provided for the treatment of stress urinary incontinence
24 or pelvic organ prolapse?
25     A.   Not that I could recall.

Page 201

1     Q.   And no memory of anyone from Bard making any
2 business-oriented criticisms of you in relation to things
3 like how you billed for your services; is that also
4 correct?
5     A.   That is correct.
6          MR. KIEFFER:  Okay. Those are all the
7 questions I have at the moment.
8          RECROSS EXAMINATION
9 BY MR. BOWDEN:
10     Q.   Doctor, just a few follow-ups and this is --
11 Strike that.
12          You have been shown two different use or
13 Instructions For Use documents during this deposition
14 today. One was Exhibit 17. One was Exhibit 32. The
15 difference between Exhibit 17, excuse me, Exhibit 17 and
16 32 is that one relates to the Bard Avaulta Solo Synthetic
17 Support System; the other one relates to the Bard Avaulta
18 Plus Biosynthetic Support System. Is it fair to state
19 you have no recollection which you used on Mrs. Wheeler?
20     A.   If you could describe to me the difference
21 between the two, I could tell you which one I used.
22     Q.   Well, one is basically the Bard -- I mean
23 I -- frankly, I don't feel qualified to really describe
24 to you the difference to be honest with you. I'm an
25 attorney not a doctor or a medical device design

51 (Pages 198 - 201)

Page 202

1 specialist, so I can't really describe to you what the
2 difference is.
3     A.   I don't recollect.
4     Q.   Okay.  So if you look at Exhibit Number 32
5 under the Adverse Reactions portion, it reads:
6 "Potential adverse reactions."  Are those typically -- do
7 you want to find it, Doctor, or do you just want me to do
8 it?
9     A.   You do it.
10     Q.   "Potential adverse reactions are those
11 typically associated with surgically implantable
12 materials including hematoma, seroma, mucosal or visceral
13 erosion, infection, inflammation, sensitization,
14 dyspareunia, scarification and contraction, fistula
15 formation, extrusion and recurrence of vaginal wall
16 prolapse, perforations or lacerations of vessels, nerves,
17 bladder, bowel, rectum or any viscera may occur during
18 needle passage."  That's what it says there.
19     A.   Okay.
20     Q.   Doctor, do you feel that that is a full
21 recitation of the potentially likely adverse effects from
22 the implantation of a Bard Avaulta device?
23         MR. KIEFFER:  Object to form, foundation.
24 BY THE WITNESS:
25     A.   Yes.

Page 203

1 BY MR. BOWDEN:
2     Q.   Okay.  And do you feel this encompasses all
3 the conditions of which Mrs. Wheeler complained of to you
4 after she had the procedure with you originally in 2009?
5         MR. KIEFFER:  Object to form, foundation.
6 BY THE WITNESS:
7     A.   Yes.
8 BY MR. BOWDEN:
9     Q.   And do you feel that these are all things of
10 which you warned Mrs. Wheeler prior to her implantation
11 procedure in ████████ of 2009?
12     A.   Yes.
13     Q.   Okay.  Doctor, we had -- I know we discussed
14 shrinkage and contraction.  Again, you don't know whether
15 mesh shrinks of its own chemical properties or whether
16 the wound contracts around it; is that a fair statement?
17 Or strike that.
18         Would you agree that all wounds contract?
19     A.   Yes.
20     Q.   Including wounds having mesh in them?
21     A.   Yes.
22     Q.   In other words, there's nothing abnormal
23 about wound contracture?
24     A.   Yes.
25     Q.   And that's why mesh implantations are done

Page 204

1 tension-free like you do -- did them; yes?
2         MR. KIEFFER:  Form.
3 BY THE WITNESS:
4     A.   Yes.
5 BY MR. BOWDEN:
6     Q.   And counsel had asked if roping is a unique
7 complication of mesh, and you had said, I believe you had
8 said yes.  That technique can happen with any braided
9 material whether it's made out of polypropylene or
10 anything else; is that a fair statement?
11     A.   Yes.
12         MR. KIEFFER:  Object to form, foundation.
13 BY MR. BOWDEN:
14     Q.   And the inflammation in Mrs. Wheeler, I
15 believe you testified on my examination that it was
16 greater than normal but it was still within the
17 parameters of what she was warned about; is that a fair
18 statement?
19         MR. KIEFFER:  Object to the form.
20 BY THE WITNESS:
21     A.   Yes.
22 BY MR. BOWDEN:
23     Q.   And it was also within the parameters of what
24 you could expect can happen during the implantation or
25 following the implantation of a polypropylene mesh

Page 205

1 product?
2         MR. KIEFFER:  Object to form.
3 BY THE WITNESS:
4     A.   Yes.
5 BY MR. BOWDEN:
6     Q.   So, in other words, it was towards the upper
7 end of what you would expect to see but it's still not
8 something that surprises you; is that a fair statement?
9         MR. KIEFFER:  Object to the form.
10 BY THE WITNESS:
11     A.   Yes.
12 BY MR. BOWDEN:
13     Q.   Okay.  Do you have any idea why Mr. Wheeler
14 would have done a Qui tam action against you?  I mean is
15 there any reason that you can think of why he would have
16 gone out of his way to take the rights of the state into
17 his own hands and come after you?
18         MR. KIEFFER:  Object to the form.
19 BY THE WITNESS:
20     A.   He can answer that better than I can.
21 BY MR. BOWDEN:
22     Q.   But what do you think?
23         MR. KIEFFER:  Object to the form, calls for
24 your speculation.
25

52 (Pages 202 - 205)

Page 206

1 BY MR. BOWDEN:
2    Q.   From your experience, your exposure to him
3 and your memory of him?
4       MR. KIEFFER:  Object to the form, calls for
5 speculation.
6 BY THE WITNESS:
7    A.   I think it fit in perfectly with his
8 personality type.
9 BY MR. BOWDEN:
10    Q.   The same kind of personality type that would
11 scream obscenities at your staff for making them wait too
12 long?
13    A.   Yes.
14       MR. KIEFFER:  Object to form.
15       MR. BOWDEN:  Counsel, I'm done.  Do you have
16 any --
17       MR. KIEFFER:  No.
18       MR. BOWDEN:  -- follow-up?
19       MR. KIEFFER:  I don't know that we necessarily
20 need to go off the record.
21       THE WITNESS:  That's my stuff.
22       MR. KIEFFER:  May I look at this?
23       THE WITNESS:  No.  Why would you want to?
24       MR. KIEFFER:  Let's go off the record for a
25 second.

Page 207

1       MR. BOWDEN:  Go ahead.
2       THE VIDEOGRAPHER:  Now going off the record at
3 1:14 p.m.
4          (Discussion had off the
5          record.)
6       Now going back on the record at 1:17 p.m.
7       FURTHER REDIRECT EXAMINATION
8 BY MR. KIEFFER:
9    Q.   Doctor, we took a brief break to ask you
10 about some materials that you brought with you today.  Is
11 it correct that the only records that you have on Ms.
12 Wheeler, medical records, are what you furnished us with
13 and furnished the Marker Group with?
14    A.   Yes.
15    Q.   To be clear, you closed your medical
16 practice; right?
17    A.   Correct.
18    Q.   I assume -- I want to make sure my assumption
19 is correct -- concurrent with when you retired in 2015?
20    A.   Correct.
21    Q.   There's not an ongoing office or office
22 manager or anything like that; right?
23    A.   Correct.
24    Q.   All right.  During the break, you told us
25 something, and I want to follow up on that.  Is it

Page 208

1 correct that during the time you were using Bard
2 transvaginal mesh your recollection is you only --
3    A.   Bard Avaulta mesh.
4    Q.   Thank you.  Let me ask a better question.
5       Is it true that during the time that you were
6 using Bard Avaulta mesh you only ordered and implanted
7 one type or one model of Bard Avaulta mesh?
8    A.   Yes.
9    Q.   You understand there were several, I'll call
10 them variations or iterations, that went by the name Bard
11 Avaulta but there may have been some differences in them?
12 Did you understand that?
13    A.   Yes.
14    Q.   But as it relates to you and your practice,
15 you, to your best recollection, you only purchased and
16 implanted one type of Bard Avaulta mesh throughout the
17 entire time that you were using the Avaulta product; is
18 that true?
19    A.   That is my best recollection.
20    Q.   And would you, therefore, presume that Bard
21 would or should have records indicating what type of
22 Avaulta mesh was sent to your medical practice?
23    A.   Definitely.
24       MR. KIEFFER:  Okay.  Those are all the
25 questions I have.

Page 209

1       FURTHER RECROSS EXAMINATION
2 BY MR. BOWDEN:
3    Q.   And, Doctor, just to be clear, you don't know
4 if that was Bard Avaulta Classic, Solo, Plus or what, is
5 that -- as you testified before you don't know?
6    A.   I don't recollect.
7       MR. BOWDEN:  Okay.  Doctor, you have got the
8 right to review a copy of this transcript before it is
9 finalized and notate any errors that there may have been
10 in -- either in transcription or in substance.  In other
11 words, you can dot I's and cross T's.  You can also
12 change answers.  You can either assert that right and ask
13 to read the transcript and sign an errata sheet with
14 changes or with no changes prior to its finalization or
15 you can waive that right.  Do you know what you want to
16 do, Doctor?
17       THE WITNESS:  I would like to see the record.
18       MR. BOWDEN:  You want to read?
19       THE WITNESS:  Yes.
20       MR. BOWDEN:  Okay.  Witness will read.
21       Doctor, thank you very much for hosting us
22 at your home today.  We appreciate your time.
23       THE WITNESS:  You're welcome.
24       MR. KIEFFER:  Thank you.
25       THE WITNESS:  You're welcome.

53 (Pages 206 - 209)

Page 210

1      THE VIDEOGRAPHER: This concludes this
2  deposition. Now going off the record at 1:20 p.m.
3          (Deposition conclusion
4          time: 1:20 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 212

1  STATE OF ILLINOIS)
       ) SS:
2  COUNTY OF C O O K)
3
       I, KELLY A. BRICHETTO, a Certified Shorthand
4
   Reporter of said state, do hereby certify
5
   that the within named witness, CHARLES FEINSTEIN, M.D.,
6
   was by me first duly sworn to testify the truth, the
7
   whole truth and nothing but the truth in the cause
8
   aforesaid; that the testimony then given by the
9
   above-referenced witness was by me reduced to stenotype
10
   in the presence of said witness; afterwards transcribed,
11
   and that the foregoing is a true and correct
12
   transcription of the testimony so given by the
13
   above-referenced witness.
14
       I do further certify that this deposition was
15
   taken at the time and place in the foregoing caption
16
   specified and was completed without adjournment.
17
       I do further certify that I am not a relative,
18
   counsel or attorney for either party or otherwise
19
   interested in the event of this action.
20
21
22
23
24
25

Page 211

1      SIGNATURE:
2  It was agreed by and between counsel and the parties that
3  the Deponent will read and sign the transcript of said
4  deposition.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 213

1      IN WITNESS WHEREOF, I do hereunto set my hand
2  this 12th day of August, 2019.
3
4
5
6
          *Kelly Brichetto*
7      KELLY A. BRICHETTO
8      CSR License No. 84-3252
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

54 (Pages 210 - 213)

Page 214

```
 1              Veritext Legal Solutions
                   1100 Superior Ave
 2                     Suite 1820
                  Cleveland, Ohio 44114
 3                Phone: 216-523-1313
 4
        August 12, 2019
 5
        To: C. Wade Bowden, Esq.
 6
        Case Name: Wheeler, Christine, et al. v. C.R. Bard, Inc., et al.
 7
        Veritext Reference Number: 3481642
 8
        Witness:  Charles Feinstein, M.D.      Deposition Date:  8/7/2019
 9
10  Dear Sir/Madam:
11
        Enclosed please find a deposition transcript.  Please have the witness
12
        review the transcript and note any changes or corrections on the
13
        included errata sheet, indicating the page, line number, change, and
14
        the reason for the change.  Have the witness' signature notarized and
15
        forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
        If the errata is not returned within thirty days of your receipt of
19
        this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA
```

Page 215

```
 1          DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 3481642
 3      CASE NAME: Wheeler, Christine, et al. v. C.R. Bard, Inc., et
    al.
        DATE OF DEPOSITION: 8/7/2019
 4      WITNESS' NAME: Charles Feinstein, M.D.
 5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7      I have made no changes to the testimony
    as transcribed by the court reporter.
 8
 9  Date        Charles Feinstein, M.D.
10      Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed.
15
        I have affixed my name and official seal
16
        this _____ day of_____, 20____.
17
18          Notary Public
19
            Commission Expiration Date
20
21
22
23
24
25
```

Page 216

```
 1          DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 3481642
 3      CASE NAME: Wheeler, Christine, et al. v. C.R. Bard, Inc., et
    al.
        DATE OF DEPOSITION: 8/7/2019
 4      WITNESS' NAME: Charles Feinstein, M.D.
 5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7      I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9      I request that these changes be entered
    as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date        Charles Feinstein, M.D.
14
        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18  in the appended Errata Sheet;
        They signed the foregoing Sworn
19      Statement; and
        Their execution of this Statement is of
20  their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of_____, 20____.
23
            Notary Public
24
            Commission Expiration Date
25
```

Page 217

```
 1      ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
 2          ASSIGNMENT NO: 3481642
 3  PAGE/LINE(S) /       CHANGE       /REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  Date        Charles Feinstein, M.D.
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23
            Notary Public
24
            _____
25          Commission Expiration Date
```

55 (Pages 214 - 217)

West Virginia Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Review by Witness; Changes; Signing.

If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. The officer shall indicate in the certificate prescribed by subdivision (f)(1) whether any review was requested and, if so, shall append any changes made by the deponent during the period allowed.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.