**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CHRISTINE WHEELER
 and DOUGLAS WHEELER,

       Plaintiffs,                       Case No. 19-cv-08273

v.                                   Honorable John J. Tharp, Jr.

C. R. BARD, INC.,

       Defendant.
_____

**<u>PLAINTIFFS' RESPONSE TO DEFENDANT C.R. BARD, INC.'S</u>**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ..................................................................................................... 1

LEGAL STANDARD ............................................................................................... 1

ARGUMENT ............................................................................................................ 2

I.  Plaintiff's personal injury claims are not barred by the statute of limitations, as there is a fact question as to when the Plaintiffs knew or should have known that Mrs. Wheeler's injuries were caused by Bard's wrongful acts. .................................. 2

II.  Because Dr. Rosenzweig and Dr. Fitzgerald's testimony is admissible, there are disputes of material fact related to the cause of Mrs. Wheeler's injuries. ................. 5

III.  Summary Judgment is not appropriate on Plaintiffs' failure-to-warn claims, as the learned intermediary doctrine presents an issue of fact.................................. 6

IV.  Lost Profits is merely a category of damages and need not be specifically pleaded; additionally, Mrs. Wheeler's lost profits can be reasonably proven.......................... 10

V.  Douglas Wheeler has a viable loss of consortium claim. ............................................. 13

VI.  Plaintiffs have ample evidence to support their punitive damages claim, as Bard ignored warnings not to use the mesh in human implants, and failed to conduct safety studies despite knowledge of potential complications with its device. ........... 13

CONCLUSION ........................................................................................................ 15

CERTIFICATE OF SERVICE ............................................................................... 17

## **TABLE OF AUTHORITIES**

### **Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 1

*Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 462 (7th Cir. 2010) ............................................. 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................. 1, 12-13

*Cisson v. C.R. Bard, Inc.*, No. 2:11-CV-00195, 2013 WL 5700513, at *1 (S.D.W. Va. Oct. 18, 2013), *aff'd sub nom. In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prod. Liab. Litig.*, 810 F.3d 913 (4th Cir. 2016) ................................................................. 13-15

*Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 491 N.E.2d 912 (Ill. App. Ct. 1986) ....... 12

*E.J. McKernan Co. v. Gregory*, 623 N.E.2d 981 (Ill. App. Ct. 1993) ......................................... 12

*Fluker v. County of Kankakee*, 945 F. Supp. 2d 972 (C.D. Ill. 2013) ......................................... 13

*Giles v. Wyeth, Inc.*, 500 F. Supp. 2d 1063 (S.D. Ill. 2007) ......................................................... 6

*Hansen v. Baxter Healthcare Corp.*, 764 N.E.2d 35 (Ill. 2002) ................................................. 6-8

*Happel v. Wal-Mart Stores, Inc.*, 766 N.E.2d 1118 (Ill. 2002) ................................................... 7

*Hoffman v. Orthopedic Sys., Inc.*, 765 N.E.2d 116 (Ill. App. Ct. 2002) ..................................... 3

*Huskey v. Ethicon, Inc.,* 29 F. Supp. 3d 736 (S.D.W. Va. 2014) ................................................. 7

*In re Yasmin & Yaz* (Drospirenone) *Mktg., Sales Practices & Products Liab. Litig.*, 3:09-CV-10012-DRH, 2011 WL 6732245 (S.D. Ill. Dec. 16, 2011) ................................................... 6-7

*Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 359 (Ill. 1978) ......................................................... 14

*Kemmer v. Monsanto Co.*, 217 Ill. App. 3d 188 (5th Dist. 1991) ............................................. 13

*Kennedy v. Medtronic, Inc.,* 851 N.E.2d 778 (Ill. App. Ct. 2006) ............................................. 7

*LaSalle Nat. Bank v. Skidmore, Owings & Merrill*, 635 N.E.2d 564 (Ill. App. 1994) ................. 5

*Mahr v. G.D. Searle & Co.*, 390 N.E.2d 1214 (Ill. App. Ct. 1979) ............................................. 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................... 1

*Mecham v. C.R. Bard, Inc.*, No. 2:19-cv-00750-JNP, 2020 WL 2768997 (D. Utah May 27, 2020) ................................................................................................................................. 5

*Mitsias v. I-Flow Corp.*, 959 N.E.2d 94 (Ill. 2011) ....................................................... 2-3

*Nolan v. Johns–Manville Asbestos*, 421 N.E.2d 864 (Ill. 1981) .................................... 2-4

*Nordhem v. Harry's Cafe, Inc.*, 529 N.E.2d 988 (Ill. App. Ct. 1988) ............................ 12

*Noyola v. Johnson & Johnson*, No. 85 C 2184, 1986 WL 14657 (N.D. Ill. Dec. 16, 1986) .......... 7

*Proctor v. The Upjohn Company*, 682 N.E.2d 1203 (Ill. App. Ct. 1997) ........................ 7

*Roper v. Markle*, 375 N.E.2d 934 (Ill. App. Ct. 1978) ................................................. 3-4

*Sellers v. Boehringer Ingelheim Pharms., Inc.*, 881 F. Supp. 2d 992 (S.D. Ill. 2012) .................. 6

*Smith v. C. R. Bard, Inc.*, No. 2:16-CV-11817, 2018 WL 715448, at *3 (S.D.W. Va. Feb. 5, 2018) ................................................................................................................................. 5

*Usselmann v. Jansen*, 629 N.E.2d 193 (Ill. App. Ct. 1994) .......................................... 12

*Walton v. Bayer Corp.,* 643 F.3d 994 (7th Cir. 2011) .................................................... 6

*Young v. McKiegue*, 708 N.E.2d 493 (Ill. App. 1999) ................................................... 5

## Statutes

735 ILCS 5/13-213(d) ...................................................................................................... 2

Ga. Code Ann. § 51–12–5.1 ............................................................................................ 14

## Rules

Fed. R. Civ. P. 56(a) ......................................................................................................... 1

## INTRODUCTION

Plaintiffs Christine Wheeler and Douglas Wheeler ("the Wheelers," or "Plaintiffs") respectfully submit the following Memorandum in Opposition to the Motion for Summary Judgment by Defendant C.R. Bard, Inc. ("Bard"). The Court should deny Bard's motion, except to the extent that certain claims are conceded. The Wheelers timely filed their case, as they did not know, or have reason to know, that Bard's Avaulta Solo device was causing Mrs. Wheeler's injuries—as opposed to a slow healing process from the implant operation—until Mrs. Wheeler's treating physician raised the possibility of removing mesh in June 2010. The learned intermediary doctrine does not bar Plaintiffs' failure-to-warn claim because Bard's warnings were wholly inadequate. Mrs. Wheeler has never abdicated her claim for lost wages/profits. And, Bard's conduct supports the imposition of punitive damages, as the MDL court has held in applying Georgia's stricter standard to the same conduct by Bard.

## LEGAL STANDARD

Plaintiffs agree that Illinois law governs the substantive issues raised in Bard's motion. Under federal procedural law, summary judgment is proper only if Bard establishes that there is no genuine dispute as to any material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court should not "weigh the evidence and determine the truth of the matter" when considering a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court should draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Summary judgment is improper when the non-moving party presents sufficient evidence for a reasonable factfinder to decide the question in its favor. *Anderson*, 477 U.S. at 248. To defeat summary judgment, the disputed material fact "is not required to be resolved conclusively in favor of the party asserting its existence; rather, **all that is required** is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 248-49 (emphasis added).

## ARGUMENT

I.    **Plaintiffs' personal injury claims are not barred by the statute of limitations, as there is a fact question as to when the Plaintiffs knew or should have known that Mrs. Wheeler's injuries were caused by Bard's wrongful acts.**

The facts demonstrate that Plaintiffs timely filed their action within two years of learning that they had a cause of action, and thus their personal injury claims are not barred. Illinois's statutory discovery rule provides that "the plaintiff may bring an action within 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, of the existence of the personal injury … ." 735 ILCS 5/13-213(d). Bard argues that Plaintiffs' personal injury claims are time-barred because Mrs. Wheeler allegedly knew she had a potential claim by February 2010. However, this argument misstates Mrs. Wheeler's testimony. She has consistently maintained that while she began experiencing symptoms in February 2010, she did not first become aware of a potential claim until June 2010, when Mrs. Wheeler's treating physician first told her that he might need to remove the Avaulta mesh that he had implanted in November 2009.[1] (*See* Plaintiffs' Statement of Additional Material Facts ("PSAMF") at ¶¶ 51-52; *see also* Response to Defendant's Statement of Undisputed Material Facts ("RDSMF") at ¶ 49). Plaintiffs then timely filed suit on April 30, 2012, less than two years later. (RDSMF at ¶ 37).

The discovery rule "postpone[s] the commencement of the relevant statute of limitations until the injured plaintiff knows or reasonably should have known that he has been injured **and that [her] injury was wrongfully caused.**" *Mitsias v. I-Flow Corp.*, 959 N.E.2d 94, 100 (Ill. 2011) (emphasis added); *see also Nolan v. Johns–Manville Asbestos*, 421 N.E.2d 864, 868 (Ill. 1981) (holding that "the cause of action accrues when the plaintiff knows or reasonably should know of an injury and also knows or reasonably should know that the injury was caused by the wrongful acts of another"). The limitations period does not begin to run until the "plaintiff becomes

---

[1] Defendant also tries to paint Mrs. Wheeler as an individual who failed to attend follow-up appointments. However, Mrs. Wheeler rescheduled her visits for the two missed appointments, and attended several follow-up visits with Dr. Feinstein on December 28, 2009, January 5, 2010, February 22, 2010, May 25, 2010, and June 8, 2010. (*See* Response to Defendant's Statement of Undisputed Material Facts at ¶ 29).

aware that the cause of the problem stems from another's negligence and not from natural causes." *Hoffman v. Orthopedic Sys., Inc.*, 765 N.E.2d 116, 122 (Ill. App. Ct. 2002).

"Wrongful cause" contains two distinct elements, (1) cause, and (2) wrongfulness. *See Mitsias*, 959 N.E.2d at 101. With respect to "cause," the "plaintiff must have sufficient information to conclude that her injury was caused by the acts of another." *Id.* As for "wrongfulness," the *Mitsias* court explained:

> [A]n injured plaintiff should reasonably know that her injury is wrongfully caused, and the statute of limitations begins to run, as soon as she has sufficient information about her injury **and its cause** to spark inquiry in a reasonable person as to whether the conduct of the party who caused her injury might be legally actionable.

*Id.* (emphasis added). A plaintiff must have more than "a mere suspicion that wrongdoing might have occurred in order to trigger the limitations period." *Id.* at 102. Further, knowledge of "wrongful cause" requires that "plaintiff is or should be aware of some possible fault on the part of the defendant." *Id.* "The fact that a party suspects wrongful conduct, without examining the reasons underlying those suspicions, is not enough to constitute constructive knowledge than an injury was wrongfully caused." *Id.*

Thus, a plaintiff must have sufficient information to conclude both that she suffered a physical injury **and** that someone is "at fault" for that injury before the limitations period begins running. *See Nolan*, 421 N.E.2d at 868; *see also Roper v. Markle*, 375 N.E.2d 934, 937-38 (Ill. App. Ct. 1978) (limitations period begins running when injured plaintiff has actual or constructive knowledge of "the possibility that someone is at fault for [the injury's] existence"). If the plaintiff is unaware that someone may be "at fault" for her injury, the statute of limitations will not begin to run. *Roper*, 375 N.E.2d at 938 (stating that mere knowledge of a physical problem does not necessarily indicate awareness that the problem was wrongfully caused).

*Nolan* displays properly-executed "wrongful cause" analysis under Illinois' discovery rule. There, the court held that the statute of limitations did not begin to run until plaintiff, an asbestos worker who brought suit against the manufacturers of asbestos products after contracting asbestosis, had sufficient information to conclude that exposure to asbestos materials at work

caused his condition, even though he had allegedly been aware of his lung problems for many years prior to his receipt of such information. *See Nolan*, 421 N.E.2d at 869.

Similarly, in *Roper*, after a negligently performed hysterectomy infected the plaintiff's kidney, the statute of limitations did not begin to run when plaintiff started experiencing symptoms of infection. Rather, it began running when the plaintiff had reason to know that her infection resulted from the surgeon's actions, not from an organic cause. *Roper*, 375 N.E.2d at 939.

Until June 2010, Mrs. Wheeler had no reason to believe that Bard's defective medical device was causing her injuries. Bard argues that the limitations period began running in February 2010, when Mrs. Wheeler first experienced symptoms. (PSAMF at ¶ 51). But Mrs. Wheeler's physician, Dr. Feinstein, told her that she was simply healing slowly from her November 2009 implant surgery. (*Id.* at ¶ 51). Consistent with this information, Dr. Feinstein's notes state that Mrs. Wheeler was feeling "HAPPY! Huge improvement," as of February 22, 2010. (RDSMF at ¶ 26). Bard's argument asks Mrs. Wheeler to have greater medical knowledge than her doctor. It was only after follow-up visits with Dr. Feinstein—and most notably, a visit in June 2010 at which Dr. Feinstein addressed potentially removing the mesh—that Mrs. Wheeler realized that Bard's defective Avaulta Solo product might be causing her injuries. (PSAMF at ¶ 51). At that time, she had reason to know of her injuries' wrongful cause. Bard claims she was on "inquiry notice" before June 2010, but Mrs. Wheeler had no reason to "inquire" when her physician was telling her that she was simply recovering slowly from the mesh implant. (*Id.* at ¶ 52).

Bard also argues, unpersuasively, that this Court should determine the limitations issue, as a matter of law, simply because the FDA issued some general guidance about mesh in 2008, and because there was an FDA "black box" warning on an informed consent form. (Bard Mem. at 7). First, there is no evidence that Mrs. Wheeler ever saw the FDA's 2008 guidance. Second, Mrs. Wheeler testified that she "[doesn't] even know what a black box is" and she "didn't even know that was in here [the informed consent form]." (PSAMF at ¶ 53). Bard cites no Illinois mesh cases in support of its position, relying only on an unpublished Utah case that involved different facts

and law. (Bard Mem. at 8 (citing *Mecham v. C.R. Bard, Inc.*, No. 2:19-cv-00750-JNP, 2020 WL 2768997 (D. Utah May 27, 2020)).[2] In another Bard mesh case, the MDL court has applied the **Illinois** discovery rule and held that there was a question of fact as to the statute of limitations. *See Smith v. C. R. Bard, Inc.*, No. 2:16-CV-11817, 2018 WL 715448, at *3 (S.D.W. Va. Feb. 5, 2018). This Court should do the same.

Here, the overwhelming evidence demonstrates that Mrs. Wheeler did not know, and did not have reason to know, that her injuries were wrongfully caused by Bard's Avaulta device, as opposed to being a natural result of her prior implant surgery, until June 2010. Previously, Dr. Feinstein told her she was having a slow recovery. Then, his opinion changed, as he informed her that he might need to remove the mesh. (PSAMF at ¶ 51). Not surprisingly, her opinion changed, too. Under Illinois law, Plaintiffs timely filed their claims less than two years later. Or, at least, there is a disputed fact issue that makes summary judgment improper. *See Young v. McKiegue*, 708 N.E.2d 493, 499 (Ill. App. 1999) ("The issue of when a party knew or should have known both of the injury and that it was wrongfully caused is generally one of fact."); *LaSalle Nat. Bank v. Skidmore, Owings & Merrill*, 635 N.E.2d 564, 567 (Ill. App. 1994).

There is no evidence that the Wheelers actually knew that her injuries were wrongfully caused before April 30, 2010—the date that is two years before filing. So, Bard is asking this Court to hold, **as a matter of law**, that the Wheelers should have discovered the cause of their injuries by April 30, 2010—which was only five months after the implant surgery. The statute-of-limitations issue clearly creates a question of fact, and this Court should deny summary judgment.

## II. Because Dr. Rosenzweig and Dr. Fitzgerald's testimony is admissible, there are disputes of material fact related to the cause of Mrs. Wheeler's injuries.

Bard's second argument is essentially a restatement of its *Daubert* arguments. Bard argues that because it believes that Dr. Rosenzweig's and Dr. Fitzgerald's causation testimony is

---

[2] Notably, the *Meachem* court determined that the plaintiff should have known the identity of the manufacturer earlier, *id.* at *6, but to this day Bard maintains that this is a contested issue. (Bard Mem. at 10 n.5).

inadmissible, Plaintiffs cannot prove causation. However, as discussed at length in Plaintiffs' *Daubert* responses, Dr. Rosenzweig and Dr. Fitzgerald's testimony as to causation is admissible.[3] Bard has not contended that Plaintiffs would fail to meet their burden even **with** these experts' testimony, so the inquiry ends there. Because Dr. Rosenzweig and Dr. Feinstein should be permitted to give their causation opinions, for reasons stated in prior briefing that is hereby incorporated by reference, this Court should deny summary judgment on that issue.

### III. Summary Judgment is not appropriate on Plaintiffs' failure-to-warn claims, as the learned intermediary doctrine presents an issue of fact.

Bard's reliance on the learned intermediary doctrine, in seeking summary judgment on Plaintiffs' failure-to-warn claim, is misplaced. Bard claims that Dr. Feinstein knew of all complications associated with Bard's Avaulta device, but Bard's argument is both legally and factually flawed.

The learned intermediary doctrine does not shield a manufacturer who fails to include proper warnings with its product, regardless of what the physician does or does not know. Under Illinois law, the "learned intermediary" doctrine cannot shield a defendant-manufacturer from liability when it fails to adequately warn physicians of the risks associated with a product. *See Giles v. Wyeth, Inc.*, 500 F. Supp. 2d 1063, 1066 (S.D. Ill. 2007) (citing *Hansen v. Baxter Healthcare Corp.*, 764 N.E.2d 35, 43 (Ill. 2002)); *see also Sellers v. Boehringer Ingelheim Pharms., Inc.*, 881 F. Supp. 2d 992, 1006 (S.D. Ill. 2012) (citing *Walton v. Bayer Corp.,* 643 F.3d 994, 1001 (7th Cir. 2011)). The logic is simple: where the manufacturer-defendant fails to warn doctors sufficiently, doctors cannot be considered "learned intermediaries." The adequacy of warnings is a question of fact for the jury. *See Giles*, 500 F. Supp. 2d at 1066 (citing *Hansen*, 764 N.E.2d at 43); *see also In re Yasmin & Yaz* (Drospirenone) *Mktg., Sales Practices & Products*

---

[3] Plaintiffs will not restate their *Daubert* arguments in this brief, however, a full discussion of the admissibility of Dr. Rosenzweig and Dr. Fitzgerald's causation opinions is presented in those briefs.  (*See generally* Dkt. Nos. 94 and 95).

*Liab. Litig.*, 3:09-CV-10012-DRH, 2011 WL 6732245, at \*14 (S.D. Ill. Dec. 16, 2011) (where there is a question of fact as to the adequacy of the warnings, summary judgment should be denied).

A manufacturer is "held to the standard of an expert in the field and ha[s] a continuous duty to warn physicians of the dangers incident to prescribing the [product], to keep abreast of scientific developments touching upon the manufacturer's product and to notify the medical profession of any additional side effects discovered from its use." *Proctor v. The Upjohn Company*, 682 N.E.2d 1203, 1211 (Ill. App. Ct. 1997). Where a manufacturer does not know what it has a duty to know, it fails in its duty as an expert. *Id.* "It c[annot] fulfill th[e] duty merely by waiting for what it consider[s] sufficient proof of a cause-effect relationship before advising the medical profession with an appropriate alert or warning of the possibility of risk in the use of one of its products." *Id.* at 1211-12; *see also*, *Mahr v. G.D. Searle & Co.*, 390 N.E.2d 1214, 1231 (Ill. App. Ct. 1979).

Illinois law requires that manufacturers warn of "dangerous condition[s]," not merely the potential injuries that might result from use of the product. *Huskey v. Ethicon, Inc.,* 29 F. Supp. 3d 736 (S.D.W. Va. 2014) (*citing Happel v. Wal-Mart Stores, Inc.*, 766 N.E.2d 1118, 1123 (Ill. 2002); *Kennedy v. Medtronic, Inc.*, 851 N.E.2d 778, 783 (Ill. App. Ct. 2006); *see also Hansen*, 764 N.E.2d at 42. "[T]he adequacy of warnings is ordinarily a question of fact which is inappropriate for resolution on a motion for summary judgment." *Noyola v. Johnson & Johnson*, No. 85 C 2184, 1986 WL 14657, at \*2 (N.D. Ill. Dec. 16, 1986) (citing *Mahr*, 390 N.E.2d at 1231). "Ultimately, the sufficiency of [the] form, content and intensity [of a warning] is not resolved by pointing to a single document, but remains a question to be resolved by the trier of fact in the light of all the information provided by the manufacturer and all that was reasonably possible to provide." *Id.* (citing *Mahr*, 390 N.E.2d at 1230).

As stated in *Noyola*: "under Illinois law, the physician's awareness of risk is not a sufficient superseding cause to insulate a drug [or device] manufacturer from liability for failure to provide adequate warnings." *Id.* at \*11. Moreover, even where general information about risks is available, a manufacturer still has a duty to warn of more specific failures or complications associated with

a product where its knowledge is comparatively greater than that possessed by members of the medical community. *See Hansen*, 764 N.E.2d at 42.

Here, there is substantial evidence that Bard's Avaulta device causes numerous adverse events, about which Bard failed to warn implanting physicians. These adverse events include: "permanent, lifelong and debilitating pelvic pain, lifelong sexual complications and dysfunction, lifelong risk of multiple surgeries, need for removal of the device, difficulty removing the device, lifelong risk of erosions, chronic and delayed urinary problems, and the risk of serious complications and effect on a patient's quality of life." Bard also failed to warn that its "mesh can degrade and shrink; there is a lifelong risk of contraction; and it was never meant to be used inside the human body." (*See* PSAMF at ¶ 54). Bard further failed to warn of the frequency, severity, and nature of the mesh contraction, and of deformation, fraying, cording and roping/curling of the mesh, and it attempted to downplay the risks by stating that the risks are those "typically associated with surgically implantable materials." (*Id.*). There is substantial evidence that Bard knew or should have known about the risks and defects associated with its device, and that it failed to warn doctors and patients that the polypropylene it used for the manufacture of the mesh in the Avaulta devices was inappropriate for use in the human body. (*See id.*; *see also* PSAMF at ¶ 77 (2002 provisional patent application in which Bard laid out various risks associated with mesh implants); *id.* at ¶ 85 (2011 e-mail by Bard executive stating that all of the problems with the Avaulta products were predictable)). Clearly, Bard's warnings not adequate as a matter of law.

Bard's claim that Dr. Feinstein knew about all risks associated with implanting the Avaulta is also way off base. Dr. Feinstein testified that Bard never warned him:

- that the Avaulta Solo device had small pores (PSAMF at ¶ 59) and would shrink inside of a woman's body (*id.*);

- that the mesh would fold or wrinkle inside a woman's body (*id.*);

- that the mesh would deform, rope, or curl inside a woman's body (*id.*);

- that the product was made from non-medical grade polypropylene (*id.*);

- that the mesh could contract as much as 30-50% inside of a woman's body (*id.*);

- that the device was associated with chronic or permanent dyspareunia (*id.*);

- that the mesh would degrade inside of a woman's body (*id.*);

- that the mesh would form a rigid scar plate inside of a woman's body (*id.*);

- that Bard was aware of a high failure rate associated with the device (*id.*);

- that the foreign body response from the device was permanent or chronic (*id.*);

- that the device could cause permanent vaginal pain, permanent pelvic pain and permanent groin pain (*id.*);

- that the device could affect the ability to walk or to sit without pain (*id.*);

- that the device had the potential to fray or rope after implantation (*id.*);

- or, that the mesh had a unique combination of small pores and heavyweight characteristics that posed unique risks. (*Id.*).

Contrary to Bard's argument, these issues relate directly to Mrs. Wheeler's complications. Plaintiffs expert Dr. Bruce Rosenzweig opines that she has suffered from "mesh erosion, chronic vaginal pain, chronic pelvic pain, chronic dyspareunia," and numerous other types of pain, in addition to undergoing four corrective surgeries. (PSAMF at ¶ 89; RDSMF at ¶ 49). Dr. Rosenzweig opines that these injuries were caused by: (1) mesh degradation; (2) chronic foreign body reaction; (3) mesh that was never meant to be implanted inside the human body; (4) infections and bio-films; (5) deformation, fraying, roping, cording and curling of the mesh; (6) loss of pore size with tension; (7) fibrotic bridging leading to scar plate formation and mesh encapsulation; and (8) shrinkage/contraction of the encapsulated mesh. (PSAMF at ¶ 89). When asked if he had ever observed any sort of fraying or roping in the Bard Avaulta device, Dr. Feinstein responded: "This one in particular." (*Id.* at ¶ 90).

If Bard had fully warned him of these issues, Dr. Feinstein would have considered using different surgical or medical devices. (*Id.* at ¶ 61). Moreover, if Bard provided this additional information about risks and safety, Dr. Feinstein would have passed that information along to his patients, including Mrs. Wheeler. (*Id.* at ¶ 60). If a patient would have determined that she did not

want to proceed with implantation of a Bard transvaginal mesh device after receiving such information, he would have honored and respected that decision. (*Id.* at ¶ 62).

After reading the Avaulta IFU, Dr. Feinstein believed that complications from the device were somewhat rare. Had he known that complications were common, that information would have influenced his decision about whether to use the product. (PSAMF at ¶ 61). Dr. Feinstein relied on the safety information that Bard in its IFU to be accurate and complete. (*Id.* at ¶ 63).[4]

Given that Bard's argument focuses on Dr. Feinstein's alleged knowledge, the relevance of his informed consent discussion with the Wheelers is unclear. (*See* Bard Mem. at 12). Regardless, when asked whether "Dr. Feinstein told you about mesh and some of the potential complications of mesh," Mrs. Wheeler answered: "No, he did not," and stated that the informed consent form she initialed was never explained to her. (*See* RDSMF at ¶ 8). Similarly, Mr. Wheeler stated that Dr. Feinstein never discussed the risks of the Avaulta device with him or his wife, and that he was not aware of any of the risks involved with Mrs. Wheeler's surgery. (*See id.*).

In sum, Illinois law required Bard to inform physicians about all risks with its product, and Bard failed to do so. Thus, the learned intermediary doctrine does not bar Plaintiffs' claim.

### IV.    Lost Profits is merely a category of damages and need not be specifically pleaded; additionally, Mrs. Wheeler's lost profits can be reasonably proven.

Bard takes issue with the Plaintiffs' prior statement that they "preserve any claim for lost profit damages as it relates to Mrs. Wheeler." (*See* Bard Mem., Dkt. No. 136, at 13-14). Bard argues that such a claim is "procedurally barred" and lacks the required evidence. (*Id.*). The Court should reject these arguments and allow Mrs. Wheeler's claim for lost wages/profits.[5]

First, Defendant cites no Illinois law to suggest that a Plaintiff must explicitly plead "lost profits" as a separate claim, much less prove their exact amount before trial. Bard claims that Mrs. Wheeler has never disclosed or discussed a claim for lost profits, but this is patently false. First,

---

[4] Bard has not argued that the Plaintiffs cannot establish proximate causation. (*See* Bard Mem., § III). But Dr. Feinstein's testimony about the effect on his decision-making is relevant because it shows that he did not have all of the relevant risk information when he actually decided to use Bard's product.

[5] Plaintiffs do not contest any of the other issues raised on Bard's Section IV.

the Plaintiffs' Fact Sheet separately listed that both Mrs. Wheeler and Mr. Wheeler would seek damages for "lost wages and earning capacity." (PSAMF at ¶ 65). Second, defense counsel was fully aware of the claim that First Community Insurance suffered as a result of Mrs. Wheeler's injuries. Counsel discussed Mrs. Wheeler's part ownership of First Community Insurance in both Mr. and Mrs. Wheeler's depositions. (*Id.* at ¶ 65). Defense counsel failed to ask to Mrs. Wheeler questions about whether she claimed an interest in the lost profits of First Community. (*See id.* at ¶ 66). Defense counsel's failure to ask these questions is not a failure to disclose by the Plaintiff, especially given the clear statement that Mrs. Wheeler would seek damages for these lost profits on her Plaintiff Fact Sheet. (*Id.* at ¶ 65). Thus, this Court should reject any claim that Mrs. Wheeler's lost profits claim is procedurally barred.[6]

Second, Plaintiff will be able to prove her lost profits damages with reasonable certainty. On this point, Defendant only states that Plaintiff "failed to present any evidence, either documentary, testimonial or expert, to support her purported lost profits claim," and that "at no point during this case has Mrs. Wheeler presented any evidence that she suffered any lost profits, provided any calculation of lost profits, or asserted that such lost profits, if any, could be somehow traced to Bard's product." (*See* Bard Mem. at 13-14). These inaccurate statements do not meet Defendant's burden under *Celotex*. When a party seeks summary judgment for lack of evidence, "the movant must discharge the burden the Rules place upon him: It is not enough to move for

---

[6] Defendant also asserts that the Plaintiff's statement in the MDL briefing that "preserve[d] any claim for lost profit damages as it relates to Mrs. Wheeler," somehow acted as a waiver of Mrs. Wheeler's claim. This argument fails for two reasons. First, this Court denied Defendant's previous motion for summary judgment without prejudice. (*See id.*). There is no binding force behind the previous, now irrelevant, briefs. Bard relies on *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 462 (7th Cir. 2010), but in that case, unlike here, the plaintiff failed to respond to an argument in the only briefs that were before the court. Second, while Plaintiffs previously acknowledged that **Mr. Wheeler** could not legally bring a lost profits claim, Plaintiffs also stated their intent to preserve **Mrs. Wheeler's** claim. There was no need to respond to Bard's original brief on this point, because Bard did not move for summary judgment on **Mrs. Wheeler's** lost profits claim. Finally, the Court should reject the argument that Plaintiffs waived this claim through interrogatory responses. Plaintiffs objected to Bard's interrogatory on damages, under Rule 33(a)(1), arguing that the interrogatory was ambiguous, compound, overly broad, unduly burdensome, and cumulative. The interrogatory included multiple discrete subparts. If instructed to answer by the court, Plaintiffs will do so. But this objection to an interrogatory was not a failure to disclose Mrs. Wheeler's lost profits claim.

summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex*, 477 U.S. at 328 (White, J., concurring). Here Bard has only stated a conclusion without any further support. Therefore, the Court should deny Bard's Motion for Summary Judgment on this issue.

In addition, Plaintiffs have presented a reasonable basis for the jury to calculate lost profit damages. "A plaintiff generally must present competent proof of lost profits from which a reasonable basis of computation can be derived." *E.J. McKernan Co. v. Gregory*, 623 N.E.2d 981, 1000 (Ill. App. Ct. 1993) (citing *Nordhem v. Harry's Cafe, Inc.*, 529 N.E.2d 988 (Ill. App. Ct. 1988)). Illinois law does not require expert testimony to prove lost profits damages, and "mathematical certainty is not required." *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 491 N.E.2d 912, 917 (Ill. App. Ct. 1986). Further, "[i]t is well settled that the question of damages is peculiarly one of fact for the jury." *Usselmann v. Jansen*, 629 N.E.2d 193, 195 (Ill. App. Ct. 1994)). Both Mr. and Mrs. Wheeler testified that Mrs. Wheeler is an owner of First Community Insurance, and that she essentially managed the entire office at the time of her surgeries. (PSAMF at ¶ 66) Mr. Wheeler further described how the lost profits of First Community would be calculated, which is supported by the tax and employment records. (*Id.*). This testimony, and the records it is based on, are a reasonable basis for the calculation of Mrs. Wheeler's lost profits.

As for the causal link between Mrs. Wheeler's injuries, Mrs. Wheeler testified that "95 percent" of the time during which she was unable to work for health reasons stemmed from her mesh-related surgeries. (PSAMF at ¶ 67). Mrs. Wheeler further testified that:

> … there are many days where Dougie would put me in the vehicle and drive me here [to work] just [so] I was here. So I might be here and sometimes I was not mentally prepared to be here because I was on lots of medicine back then. It wouldn't really allow me to think. And so -- but mostly, he wanted to make sure I was here where he could watch me or see me or – because I was -- I've been depressed from time to time. Sometimes I was here, but I didn't do anything. I was just here.

(*Id.*). For these reasons, this Court should permit Mrs. Wheeler to establish her claim for lost wages and profits at trial, as part of her damages.

12

### V. Douglas Wheeler has a viable loss of consortium claim.

To the extent this Court denies summary judgment with respect to any claim asserted by Mrs. Wheeler, then this Court must also deny Bard's motion with respect to Mr. Wheeler's loss of consortium claim. His claim is predicated on that of the injured spouse. *Fluker v. County of Kankakee*, 945 F. Supp. 2d 972 (C.D. Ill. 2013). Defendant's only argument attacking Mr. Wheeler's claim is based on the assumption that the Court will dismiss all of Mrs. Wheeler's claims. However, because Mrs. Wheeler still has viable claims, the derivative nature of Mr. Wheeler's loss of consortium claim renders Bard's argument moot, and the Court should deny Bard's motion with respect to that claim.

### VI. Plaintiffs have ample evidence to support their punitive damages claim, as Bard ignored warnings not to use the mesh in human implants, and failed to conduct safety studies despite knowledge of potential complications with its device.

Bard essentially has no argument on punitive damages, other than claiming that the Plaintiffs have no underlying claims and no evidence of punitive conduct, both of which are false. Bard's first argument fails for the reasons described above. If any of Plaintiffs' claims survive— and most should—then the law stating that "Illinois does not recognize a cause of action for punitive damages alone" is immaterial. (*See* Bard Mem. at 15, citing *Kemmer v. Monsanto Co.*, 217 Ill. App. 3d 188, 199 (5th Dist. 1991)). Bard's second argument fails to discuss any evidence at all, which again raises the question of whether Bard has met its initial burden of production. *Celotex*, 477 U.S. at 328 (White, J., concurring).

Regardless, the first bellwether case in the Bard MDL demonstrates why this Court should allow the punitive damages claim. *See Cisson v. C.R. Bard, Inc.*, No. 2:11-CV-00195, 2013 WL 5700513, at *1 (S.D.W. Va. Oct. 18, 2013), *aff'd sub nom. In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prod. Liab. Litig.*, 810 F.3d 913 (4th Cir. 2016).[7] Cisson also involved one of Bard's Avaulta products, the "Avaulta Plus." *Id.* at *1. The Bard conduct discussed in *Cisson* is equally applicable here, as the punitive damages inquiry focuses on the defendants' conduct.

---

[7] On appeal, Bard challenged the size of the $1.75 million punitive damages award, but did not argue for judgment as a matter of law. The Fourth Circuit affirmed. *In re C.R. Bard*, 810 F.3d at 930-31.

Cisson arose under Georgia law, which sets a higher punitive damages bar than Illinois law. In Georgia, punitive damages may be awarded only where "it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." *Cisson*, 2013 WL 5700513, at *11 (citing Ga. Code Ann. § 51–12–5.1). Notably, the defendant's conduct "must have exceeded gross negligence" for punitive damages to be awarded. *Id.* at *12. Illinois has a similar standard, except that Illinois permits punitive damages for gross negligence. *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 359 (Ill. 1978) (holding that "punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others"). Thus, the bar for awarding punitive damages is lower here than under Georgia law.

The MDL court focused on several factors, all of which are laid out in Plaintiffs' Rule 56.1 statement—using some of the exact same evidence. For instance, Bard used polypropylene resin from Chevron Phillips despite a warning in the product's Material Safety Data Sheet ("MSDS") that the material should not be used "in medical applications involving permanent implantation in the human body or permanent contact with internal body fluids or tissues." *Cisson*, 2013 WL 5700513, at *13; (PSAMF at ¶ 70). A Chevron Phillips executive testified that MSDS warnings "should be taken seriously." (PSAMF at ¶ 76). Rather than asking Chevron Phillips why it included this warning, Bard kept Chevron Phillips in the dark, secretly acquiring polypropylene from third parties, due to concern that it would lose its supply chain if sellers knew about the warning and Bard's use of the device. This concern bore out when third-party supplier Shakespeare cut Bard off after learning about the warning, even after Bard offered to indemnify Shakespeare and its parent company, Jarden. *Cisson*, 2013 WL 5700513, at *13-14; (PSAMF at ¶¶ 73-75).

Bard also knew of the dangers associated with using polypropylene as a permanent implant to treat pelvic organ prolapse, and yet it placed the Avaulta product line onto the market without doing any clinical testing. A 2002 provisional patent application, written on Bard's behalf, stated

that mesh materials have "higher potential for complications such as the occurrence of infection or foreign body reaction around the mesh, or urethral or vaginal wall erosion due to the mesh." *Cisson*, 2013 WL 5700513, at *14; (PSAMF at ¶ 77). In some cases, the mesh would unravel, "creating a sharp 'fishing line' effect, which can slice through the patient's tissue." *Id.* Despite this knowledge, Bard failed to conduct clinical trials to support the safety of the Avaulta products. *Cisson*, 2013 WL 5700513, at *14; (PSAMF at ¶¶ 78-82). A Bard consultant, Dr. Jim Ross, even developed a specific trial for the Avaulta products, but Bard refused to do it. (PSAMF at ¶ 83). Program Manager Robert Orr stated that the trial was canceled for "various reasons that I'm not specifically aware of." (*Id.* at ¶ 79). Senior Product Manager Melissa Johnson seemed to have the answer, writing that clinical trials were "always the first to be cut when we had to reduce expenses." (*Id.* at ¶ 80). Another Bard document lamented that "we always release products with no data." (*Id.* at ¶ 81). Later, in 2011, Mr. Orr wrote that the product line's failure "shouldn't be surprising since the mesh products originally adopted for pelvic floor repair were designed (and cleared) for more general surgical uses … ." (*Id.* at ¶ 85). Finally, when the FDA required Bard to conduct clinical testing in January 2012, to support the safety and efficacy of the Avaulta line, Bard pulled the products from the market, rather than conducting the tests. (*Id.* at ¶ 87).

While creating a dangerous product and failing to test it, Bard also failed to warn physicians and the women who would use the product about its dangers. For instance, Plaintiffs' expert Brian Raybon, a former Bard consultant, lists several issues on which Bard failed to warn in his report and concludes that "Bard's failure to provide adequate and complete information to doctors prevented doctors and patients from reaching fully informed and educated decisions about whether to use Avaulta products." (PSAMF at ¶ 88).

These facts are more than sufficient to allow a reasonable jury to conclude that Bard is liable for punitive damages, under Illinois law.

## <u>CONCLUSION</u>

For all of these reasons, Plaintiffs respectfully request that the Court deny Bard's Motion for Summary Judgment, except to the extent that certain issues are conceded herein.

**Dated:** July 24, 2020                     Respectfully submitted,

*/s/ Jonathan P. Kieffer*
Thomas P. Cartmell
Jeffrey M. Kuntz
Jonathan P. Kieffer
Wagstaff & Cartmell, LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
816-701-1103
jpkieffer@wcllp.com
tcartmell@wcllp.com

*Counsel for Plaintiffs Christine Wheeler*
*And Douglas Wheeler*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document on July 24, 2020, using the Court's ECF electronic filing system, thereby serving notice of the filing upon all counsel of record.

*/s/ Jonathan P. Kieffer*

**Attorney for Plaintiffs**