**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CHRISTINE WHEELER
 and DOUGLAS WHEELER,

      Plaintiffs,                            Case No. 19-cv-08273

v.                                       Honorable John J. Tharp, Jr.

C. R. BARD, INC.,

      Defendant.

_____

**RESPONSE TO DEFENDANT C.R. BARD, INC.'S RULE 56.1 STATEMENT
OF UNDISPUTED MATERIALS FACTS**

      Plaintiffs Christine Wheeler and Douglas Wheeler ("the Wheelers" or "Plaintiffs"), pursuant to Fed. R. Civ. P. 56, Local Rule 56.1, and this Court's Standing Order regarding summary judgment practice, hereby submit their response to the Defendant C.R. Bard, Inc.'s ("Bard's") Statement of Undisputed Material Facts in support of its Motion for Summary Judgment, as well as the Plaintiffs' Statement of Additional Material Facts.

**PLAINTIFFS' RESPONSE AND OBJECTIONS TO
DEFENDAT'S "STATEMENT OF UNDISPUTED FACTS"**

    1.   Plaintiffs, Christine Wheeler ("Plaintiff" or "Mrs. Wheeler") and Douglas Wheeler ("Mr. Wheeler", and together with Mrs. Wheeler, the "Plaintiffs"), are Illinois residents. (Plaintiff's Amended Short Form Complaint, December 25, 2012, ECF 13 ("SFC"), attached hereto as Exhibit A, ¶ 4.)

        **RESPONSE: Undisputed.**

    2.   Bard is a New Jersey corporation with its principal place of business in New Jersey (Master Long Form Complaint and Jury Demand ("MC"), September 26, 2012, MDL 2187 ECF 352, attached hereto as Exhibit B, ¶ 3; C. R. Bard, Inc.'s Answer and Affirmative Defenses to

1

Plaintiffs' Master Long Form Complaint and Jury Demand ("Answer to MC"), September 26, 2012, MDL 2187 ECF 355, attached hereto as Exhibit C, ¶ 3.)

    **RESPONSE: Undisputed.**

3. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties, and Plaintiffs are seeking damages in excess of $75,000.00, exclusive of interest and costs. (Ex. B, MC, ¶ 6; Ex. C, Answer to MC, ¶ 6.)

    **RESPONSE: Undisputed.**

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because Mrs. Wheeler, an Illinois resident, was implanted with the products at issue and received treatment for her alleged injuries in Cook County, Illinois. (Amended Plaintiff Fact Sheet, June 21, 2019 ("PFS"), attached hereto as Exhibit D, § I.4-I.5.)

    **RESPONSE: Undisputed.**

5. Mrs. Wheeler first began experiencing symptoms of urinary stress incontinence in her mid-thirties and the symptoms became progressively worse, to the extent that if she laughed too hard, ran, jumped, played baseball, rode horses, sneezed or relaxed too much she would suffer from incontinence. (Deposition of Christine Wheeler, July 11, 2019 ("Wheeler Dep."), attached hereto as Exhibit E, 52:1-5; 54:2-8.)

    **RESPONSE: Undisputed.**

6. In November 2009, Plaintiff sought treatment for her urinary issues from Dr. Charles Feinstein, M.D., a gynecologist at the Faycor N.A. Surgical Facility in Chicago, Illinois. (Ex. D, PFS, § II.1.)

    **RESPONSE: Undisputed.**

7.   In November 2009, Dr. Feinstein diagnosed Plaintiff with urinary incontinence, incompetent mid-urethral sphincter, and severe anterior prolapse/cystocele. (Deposition of Charles Feinstein, M.D., August 7, 2019 ("Feinstein Dep."), attached hereto as Exhibit F, 14:1-14:13; Ex. E, Wheeler Dep., 56:9-11.)

**RESPONSE: Undisputed.**

8.   Prior to her November 30, 2009 surgery, Plaintiff met with Dr. Feinstein to discuss the risks of the proposed procedure. (Ex. F, Feinstein Dep., 121:24-122:12.)

**RESPONSE: Disputed. Plaintiff explicitly testified that she and Dr. Feinstein did not have a discussion about risks. (*See* Christine Wheeler Dep., Dkt. No. 137-5, at 69:18-21; 69:24-70:6; 71:7-12; 71:23;77:4-14; 80:2-6.) When asked whether Dr. Feinstein told her "about mesh and some of the potential complications of mesh," Plaintiff responded "No, he did not." (*Id.*)**

9.   Prior to her November 30, 2009 surgery, Dr. Feinstein provided Plaintiff with the documents (the "Informed Consent") detailing the risks of the proposed treatment. (Ex. F, Feinstein Dep., 121:24-122:12; Informed Consent, Nov. 19, 2009, attached hereto as Exhibit G.)

**RESPONSE: Disputed in part. Plaintiffs do not dispute the fact that a copy of the mentioned document was provided to Mrs. Wheeler, but Plaintiffs dispute any implication or assertion that Dr. Feinstein and Mrs. Wheeler discussed the risks contained therein or that Mrs. Wheeler understood these risks. (*See* Christine Wheeler Dep., Dkt. No. 137-5, at 69:18-21; 69:24-70:6; 71:7-12; 71:23;77:4-14; 80:2-6.) Mrs. Wheeler testified that:**

> **[w]hat [Dr. Feinstein] had me initial and sign was just a bunch of paperwork. What he said to me very specifically was, this will fix the problem. You can come in, and within an hour, hour and a half, have the surgery and go home the same day. And healing time should be quick. Don't lift anything. Don't have sex until I tell you. And that's what he said to me … . He didn't go into any details on these. He just said to me those things that I already said, that this would fix the incontinence, that it was a same-day surgery, and I would go home that night – that same day, that it would be quickly to heal up (sic), not to have sex or lift anything.**

**(*See id*. at 69:24-70:6.)**

10. Plaintiff initialed every page of the Informed Consent and signed the Informed Consent on November 19, 2009. (Ex. G, Informed Consent; Ex. E, Wheeler Dep., 71:19-73:5.)

**RESPONSE: Disputed in part. Plaintiffs do not contest the fact that Mrs. Wheeler initialed the mentioned document, but again dispute any implication or assertion that Dr. Feinstein and Mrs. Wheeler discussed the risks contained therein or that Mrs. Wheeler understood these risks. (*See* Christine Wheeler Dep., Dkt. No. 137-5, at 69:18-21; 69:24-70:6; 71:7-12; 71:23;77:4-14; 80:2-6.) Mrs. Wheeler specifically testified that "I'm saying I did initial all these places, but he didn't go over all of this." (*See id*. at 71:23-24.)**

11. The Informed Consent states, in part:

I have explained my enclosed recommended procedure to the patient in great detail for the treatment of her stress incontinence and/or cystocele. I have also explained that this is not her only alternative, but she has other options, both more conservative and also more aggressive. I have explained all these alternatives to the patient in great detail.

1 have explained to the patient their success rates, failure rates, reasons for success and reasons for failure, complications and their rates of occurrence. I explained the reasons why additional surgery after the original surgical procedure may be needed, and explained the possible affects [sic] of the surgery on her sexuality.

I have explained to the patient about the FDA BLACK BOX WARNING - that the more mesh used in a patient, the more likely to have complications such as penetrations, perforations, exposures or erosions of the suture line, most of which are easily taken care of when identified.

The patient has verbalized complete understanding and asked a number of excellent questions that I have tried to answer completely to the best of my ability.

(Ex. G, Informed Consent, 1.)

**RESPONSE: Disputed in part. Plaintiffs do not dispute that the informed consent form included this language, but again dispute any implication or assertion that Dr. Feinstein and Mrs. Wheeler discussed the risks contained therein, or that Mrs. Wheeler understood these risks. (*See* Christine Wheeler Dep., Dkt. No. 137-5, at 69:18-21; 69:24-70:6; 71:7-12; 71:23;77:4-14; 80:2-6.)**

12. The Informed Consent states, in part:

There is a total 95% Improvement rate with incontinence surgery: total cure rate of

4

incontinence (no pads at all), with and [sic] additional 10% significantly improved rate ( eg: going from three wet pads/day to one moiste [sic] pad/day).

I also explained, especially if there is cystocele surgery at the same time, there can be up to a 10% erosion rate where the skin incision can open up, and or the mesh can show through the skin, even for years in the future, which may require, additional suturing, or excision of a part of the mesh, or other procedures, even years after the procedure.

It may be the natural evolution after initial presentation of weak muscle support of the pelvis --(stress urinary incontinence and/or cystocele), in years to come, to see further deterioration of the muscular support of the pelvis and the internal pelvic structures (bladder, uterus, cervix, rectum, and possibly intestines or GI tract). This may cause future presentation of cystocele, of rectocele, or cervical and apical prolapse, or of uterine prolapse, or of enterocele prolapse, or a combination of all the above.

All this means, that there is a possibility that there may he further surgery needed in the future for continued deterioration of the muscular pelvic floor.
I reviewed with her that there can be a 30% recurrence of Cystocele, even years after repair.

The patient verbalized understanding of all instructions and expressed willingness to come in in [sic] the near future for corrective surgery.

(Ex. G, Informed Consent, 2.)

> **RESPONSE: Disputed in part. Plaintiffs do not dispute that the informed consent form included this language, but again dispute any implication or assertion that Dr. Feinstein and Mrs. Wheeler discussed the risks contained therein, or that Mrs. Wheeler understood these risks. (*See* Christine Wheeler Dep., Dkt. No. 137-5, at 69:18-21; 69:24-70:6; 71:7-12; 71:23;77:4-14; 80:2-6.)**

13. Informed Consent contains a "Risks of Complications" section, which states:

I am aware of the risks of perforation and erosion of the sling or graft, either through the vaginal incision or through any part of the roof of the vagina, including deep inside the vaginal vault in the far lateral recesses. I am aware of the risk of erosion into the urethra, the bladder neck, the bladder, the contiguous organs surrounding the operative site, and the possibility of erosions, or perforations, into the great blood vessels surrounding the operative site. I understand that these complications, if they occur, will require further surgery to repair.

I am also aware of the specific complications involving the suspension part of the procedure, which range from insufficient suspension to over suspension. Insufficient suspension will result in continued incontinence. Over-suspension of the urethra will result in urinary retention. I may suffer from frequency, urgency, or de novo urgency incontinence. I may suffer from slow stream, hesitancy in the onset of the urinary stream, weak stream, start and stop stream, increased post void residuals, increasing cystitis, repetitive urinary tract infections, urosepsis, and the need to urinate in abnormal positions to help change the angle of the urethra to assist emptying, I may suffer from frank urinary retention and require catheterization.

I am aware that any of these complications will necessitate further surgery to relax the sling, or cut the sling, or remove the sling and may need further surgery in the future to replace the sling with a new one.

(Ex. G, Informed Consent, 4; Ex. F, Feinstein Dep., 109:2-110:18.)

> **RESPONSE: Disputed in part. Plaintiffs do not dispute that the informed consent form included this language, but again dispute any implication or assertion that Dr. Feinstein and Mrs. Wheeler discussed the risks contained therein, or that Mrs. Wheeler understood these risks. (*See* Christine Wheeler Dep., Dkt. No. 137-5, at 69:18-21; 69:24-70:6; 71:7-12; 71:23;77:4-14; 80:2-6.)**

14. The Informed Consent form contains a "Black Box Warning", which states:

I am aware that the FDA has issued a Black Box Warning about using Mesh in the human body. They mention what has been known all along without any new or unknown problems, that is, that the more mesh or foreign material in the body, the more likely it is to have problems of some sort from the mesh. Problems like exposure of the mesh through the vaginal mucosa (skin) or through the incision. These exposures, perforations, or penetrations are usually handled easily by applying hormone cream to the area, or cutting out the small amount of mesh exposed, or resuturing the area, if need arises.

(Ex. G, Informed Consent, 5.)

> **RESPONSE: Disputed in part. Plaintiffs do not dispute that the informed consent form included this language, but again dispute any implication or assertion that Dr. Feinstein and Mrs. Wheeler discussed the risks contained therein, or that Mrs. Wheeler understood these risks. (*See* Christine Wheeler Dep., Dkt. No. 137-5, at 69:18-21; 69:24-70:6; 71:7-12; 71:23;77:4-14; 80:2-6.) Further, Mrs. Wheeler explicitly testified in her deposition that she "[doesn't] even know what a black box is" and she "didn't even know that was in here [the informed consent form]." (*Id.* at 69:9-17.)**

15. The Informed Consent contains a "Sexual Functioning" section, which states:

I am informed that although the bladder suspension procedure has nothing to do with specific sexual function, such function may be affected by vaginal surgery. I have mentioned having incontinence during sexual relations before this surgery, and for that reason has [sic] tended to avoid intercourse because of embarrassment. Female orgasm is a subject poorly understood. It is in part due to psychological factors. This may or may not be affected by any surgery on the vagina. However, surgery may induce scar tissue formation and this can affect sensation or cause lack of sensation in the vagina, Therefore [sic] the ability to experience an orgasm can be affected. The size of the vaginal opening and the depth of the channel may also be affected or changed by the surgery. Ease of penile penetration may be affected. Intercourse may be painful or cause bleeding.

(Ex. G, Informed Consent, 5; Ex. F, Feinstein Dep., 123:25-126:8.)

> **RESPONSE: Disputed in part. Plaintiffs do not dispute that the informed consent form included this language, but again dispute any implication or assertion that Dr. Feinstein and Mrs. Wheeler discussed the risks contained therein, or that Mrs. Wheeler understood these risks. (*See* Christine Wheeler Dep., Dkt. No. 137-5, at 69:18-21; 69:24-70:6; 71:7-12; 71:23;77:4-14; 80:2-6.)**

16. On October 20, 2008, the FDA issued a Public Health Notification: Serious Complications Associated with Transvaginal Placement of Surgical Mesh in Repair of Pelvic Organ Prolapse and Stress Urinary Incontinence. (http://wayback.archive-it.org/7993/20170111190506/http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications/ucm061976.htm, attached hereto as Exhibit H.)

> **RESPONSE: Disputed in part. Plaintiffs do not dispute that the FDA issued the above notification. However, Plaintiffs do dispute any implication or assertion that Mrs. Wheeler was aware of this notification, or that Dr. Feinstein passed this information along to her. (*See* Christine Wheeler Dep., Dkt. No. 137-5, at 69:18-21; 69:24-70:6; 71:7-12; 71:23;77:4-14; 80:2-6.)**

17. Prior to and at the time of Plaintiff's surgery on November 30, 2009, Dr. Feinstein was aware that vaginal pain was a known potential risk or complication attendant with the implantation of the mesh device. (Ex. F, Feinstein Dep., 112:8-113:13; 109:2-112:13.)

> **RESPONSE: Disputed in part as incomplete. Plaintiffs do not dispute that Dr. Feinstein stated that he was aware that some vaginal pain was a known potential**

**risk or complication attendant with the implantation of the mesh device. However, Dr. Feinstein also testified that that Bard never warned him, in its Instructions For Use or elsewhere, that the Avaulta Solo device could cause permanent vaginal pain, permanent pelvic pain, and permanent groin pain (Feinstein Dep., Dkt. No. 137-6, at 37:17-22), or that the device could affect the woman's ability to walk or to sit without pain. (*Id.* at 37:25-38:5).**

18. Prior to and at the time of Plaintiff's surgery on November 30, 2009, Dr. Feinstein was aware that dyspareunia was a known potential risk or complication attendant with the implantation of the mesh device. (Id. at 109:2-112:13.)

> **RESPONSE: Disputed in part as incomplete. Plaintiffs do not dispute that Dr. Feinstein stated that he was aware that some level of dyspareunia was a known potential risk or complication attendant with the implantation of the mesh device. However, Dr. Feinstein also testified that that Bard never warned him, in its Instructions For Use or elsewhere, that the Avaulta Solo device was associated with chronic or permanent dyspareunia. (*Id.* at 35:17-22).**

19. Prior to and at the time of Plaintiff's surgery on November 30, 2009, Dr. Feinstein was aware that mesh erosion was a known potential risk or complication attendant with the implantation of the mesh device. (Id.)

> **RESPONSE: Disputed in part as incomplete. Plaintiffs do not dispute that Dr. Feinstein stated that he was aware that mesh erosion was a known potential risk or complication attendant with the implantation of the mesh device. However, Dr. Feinstein also testified that that Bard never warned him, in its Instructions For Use or elsewhere, that the Avaulta Solo device would shrink inside of a woman's body (*id.* at 33:15-20), that it would fold or wrinkle inside of a woman's body (*id.* at 33:22-34:1), that it would deform or rope or curl inside a woman's body (*id.* at 34:3-7), that it was made from non-medical grade polypropylene (*id.* at 34:9-15), or that the manufacturer of the polypropylene material from which the mesh was made had warned Bard to never use that particular material for implants intended for permanent placement in the human body, (*Id.* at 34:17-25).**

20. Prior to and at the time of Plaintiff's surgery on November 30, 2009, Dr. Feinstein was aware that mesh erosion was a known potential risk or complication attendant with the implantation of the mesh device. (Id.)

**RESPONSE: Disputed in part as incomplete. Plaintiffs do not dispute that Dr. Feinstein stated that he was aware that inflammation was a known potential risk or complication attendant with the implantation of the mesh device. However, Dr. Feinstein also testified that Bard never warned him, in its Instructions For Use nor elsewhere, that the mesh in the Avaulta Solo device would form a rigid scar plate inside of a woman's body (*id.* at 36:6-12); that the mesh could never be fully and safely removed from a woman's body if complications arose (*id.* at 36:14-20); or that the foreign body response from the device was permanent or chronic (*id.* at 37:10-15).**

21. Prior to Plaintiff's implant surgery, Dr. Feinstein, reviewed the Instructions for Use for

Avaulta. (Id. at 43:15-44:9; Avaulta Solo Synthetic Support System Instructions for Use,

attached hereto as Exhibit I.)

**RESPONSE: Disputed in part. Plaintiffs do not dispute that Dr. Feinstein reviewed the Instructions for Use for Avaulta before Mrs. Wheeler's Surgery. However, Dr. Feinstein also testified that that Bard never warned him, in its Instructions For Use or elsewhere, of many problems with the device or injuries that Plaintiff experienced, including that the Avaulta Solo device: had small pores (*id.* at 32:19-23); that it would shrink inside of a woman's body (*id.* at 33:15-20); that the mesh would fold or wrinkle inside of a woman's body (*id.* at 33:22-34:1); that the mesh would deform or rope or curl inside a woman's body (*id.* at 34:3-7); that it was made from non-medical grade polypropylene (*id.* at 34:9-15); that the manufacturer of the polypropylene material from which the mesh was made had warned Bard never to use that particular material for permanent placement in the human body (*id.* at 34:17-25); that the mesh could shrink and contract as much as 30-50% inside of a woman's body (*id.* at 35:2-8); that the device was associated with chronic or permanent dyspareunia (*id.* at 35:17-22); that the mesh would degrade inside of a woman's body (*id.* at 35:25-36:1); that the mesh would form a rigid scar plate inside of a woman's body (*id.* at 36:6-12); that the mesh could never be fully and safely removed from a woman's body if complications arose (*id.* at 36:14-20); that Bard was aware of a high failure rate associated with the device (*id.* at 36:22-37:2); that the foreign body response associated with the device was permanent or chronic in nature (*id.* at 37:10-15); that the device could cause permanent vaginal pain, permanent pelvic pain and permanent groin pain (*id.* at 37:17-22); that the device could affect the woman's ability to walk or to sit without pain (*id.* at 37:25-38:5); that the device had the potential to fray or rope after implantation (*id.* at 38:7-12); or, that the mesh had a unique combination of small pores and heavyweight characteristics that posed unique risks. (*Id.* at 38:20-25).**

22. Plaintiff conceded that before her November 30, 2009 surgery, she received information

of instructions regarding: "[i]ndication of procedure, risk of complications, sexual function

9

issues with surgery during recovery period, pregnancy issues with surgery, operative course and post-op care." (Ex. D, PFS, § II.3.c.)

> **RESPONSE: Disputed in part. Plaintiffs do not dispute the fact that received some information or instructions regarding the above, but dispute any implication or assertion that Dr. Feinstein and Mrs. Wheeler discussed the risks contained therein, or that Mrs. Wheeler understood these risks. (*See* Christine Wheeler Dep., Dkt. No. 137-5, at 69:18-21; 69:24-70:6; 71:7-12; 71:23;77:4-14; 80:2-6.) Instead, Mrs. Wheeler was led to believe that the above-mentioned risks were not an issue. (*See id.*) Further, she testified that she did not receive any documents related specifically to C.R. Bard. (*See id.* at 35:20-23.)**

23. On November 30, 2009, Plaintiff underwent a procedure during which Dr. Feinstein performed: (i) Mid-Urethral Sling Bladder using Coloplast Mentor Aris Tape ("Aries Tape"), (ii) anterior pelvic organ prolapse – cystocele repair using another mesh product, and (iii) cystoscopy and dilation. (Ex. F, Feinstein Dep., 8:7-14; 13:19-25; Ex. D, PFS, § II.1; Operative Report, Nov. 30, 2009, attached hereto as Exhibit J.)

> **RESPONSE: Undisputed.**

24. Dr. Feinstein noted in his records that he performed cystocele using "Avaulta Repair System from BARD" but cannot recollect which type of Avaulta was used during the November 30, 2009 procedure. (Ex. F, Feinstein Dep., 201:12-202:3.)

> **RESPONSE: Disputed. Bard incorrectly suggests there is some question as to whether Dr. Feinstein actually implanted a Bard Avaulta device in Mrs. Wheeler. Dr. Feinstein's operative report from the implantation surgery on November 30, 2009 identifies the Bard product as "AVAULTA REPAIR SYSTEM FROM BARD." (Exhibit 4, Operative Report, November 30, 2009, at WHEELERC_CFEIN__MDR00019-25). Dr. Feinstein testified that he has closed his medical practice and could not recall the name of the specific Bard Avaulta product implanted in Mrs. Wheeler, but that he only used one model/type of Bard Avaulta device in all of the patients in whom he implanted a Bard Avaulta mesh device, and Bard should have records of what Bard Avaulta device it shipped to his office. (Feinstein Dep., Dkt. No. 137-6, at 207:9-208:23). The Bard "Product Sales History" pertaining to Dr. Feinstein produced in this litigation for the period "1/1/04 thru 8/30/12" reflects that the Bard Avaulta Solo device was the only Bard Avaulta device shipped to Dr. Feinstein at any time during this period, including multiple shipments between July 2009 and Mrs. Wheeler's implantation on November 30, 2009 (Sales Record from Bard Defendant Fact Sheet, attached hereto as Exhibit 3).**

**Bard's expert, Matthew Clark, M.D., admitted that he "overlooked" this evidence in connection with certain statements contained in his expert report that question whether a Bard Avaulta product was implanted Mrs. Wheeler. (Deposition of Matthew Clark, M.D., attached hereto as Exhibit 5, at 99:19-101:2; 106:14-115:18).**

25. Plaintiff's November 30, 2009 implantation procedure took place at Faycor N.A. Surgical

Facility in Chicago, Illinois. (Ex. D, PFS, § II.1.)

**RESPONSE: Undisputed.**

26. Plaintiff admitted under oath that she "did not recover from the initial surgery" and first

experienced symptoms of the bodily injuries she attributes to the implantation of the pelvic mesh

product(s) in "February 2010." (Ex. D, PFS, § II.6.b.)

**RESPONSE: Disputed in part. Plaintiffs do not dispute that Mrs. Wheeler stated the above, but dispute any assertion that, in February 2010, she attributed her symptoms to the Bard Device. Dr. Feinstein, the implanting physician, told Mrs. Wheeler that she was simply healing slowly from her November 2009 implant surgery. (*See* Christine Wheeler Dep., Dkt. No. 137-5, at 96:19-21; *see also* Douglas Wheeler Dep., Dkt. No. 85-9, at 36:24-37:4; 40:9-14). Further, Mrs. Wheeler saw Dr. Feinstein for postoperative visits on December 28, 2009 and January 5, 2010. (Feinstein Dep., Dkt. No. 137-6, at 130:15-135:7; *see also* Exhibit 4, at WHEELERC_CFEIN_MDR00034-36). On the latter of these visits, Dr. Feinstein noted, "Doing better. PT is feeling great." (*Id.* at 134:22-25). Mrs. Wheeler saw Dr. Feinstein again for a postoperative visit on February 22, 2010, at which time he concluded as follows: "Impression: HAPPY!!! Huge improvement." (*Id.*, at 135:8-137:2; *see also* Exhibit 4, February 22, 2010 Office Visit, at WHEELERC_CFEIN_MDR00038).**

27. Mrs. Wheeler, on a telephone follow-up call with Dr. Feinstein's office on December 2,

2009 reported she was still leaking urine while coughing, and had a few accidents. (Ex. F,

Feinstein Dep., 156:24-157:10; Postoperative Follow-up Call Record, Dec. 2, 2009, attached

hereto as Exhibit K.)

**RESPONSE: Undisputed.**

28. Mrs. Wheeler, on a telephone follow-up call with Dr. Feinstein's office on December 7,

2009 reported having puffy hands and sore joints pain due to the Vesicare, and reported still

leaking urine with coughing. (Ex. F, Feinstein Dep., 157:11-158:2; Postoperative Follow-up Call

Record, Dec. 7, 2009, attached hereto as Exhibit L.)

> **RESPONSE: Undisputed.**

29. Mrs. Wheeler did not attend a postoperative appointment with Dr. Feinstein

scheduled for December 18, 2009. (Ex. F, Feinstein Dep., 130:9-11; 137:13-17.)

> **RESPONSE: Disputed in part as incomplete. Defendant tries to paint Mrs. Wheeler as an individual who failed to attend follow-up appointments. Mrs. Wheeler rescheduled her visits for two missed appointments, (Feinstein Dep., Dkt. No. 137-6, at 130:9-19) and she attended several follow-up visits with Dr. Feinstein on December 28, 2009, January 5, 2010, February 22, 2010, May 25, 2010, and June 8, 2010. (*See generally*, Exhibit 4).**

30. At a post-op visit on December 28, 2009 with Dr. Feinstein, Mrs. Wheeler reported

nocturia, incontinence with coughing and sneezing, using 3 pads per day that were wet to soaked

with discharge. (Ex. F, Feinstein Dep., 130:15-133:23; Postoperative Report, Dec. 28, 2009,

attached hereto as Exhibit M.)

> **RESPONSE: Undisputed.**

31. At a post-op visit on December 28, 2009, Dr. Feinstein noted positive vaginal

discharge. (Ex. F, Feinstein Dep., 130:15-132:2; Ex. M, Postoperative Report, Dec. 28, 2009.)

> **RESPONSE: Undisputed.**

32. At a post-op visit on January 5, 2010, Mrs. Wheeler reported nocturia, incontinence,

using 2-3 pads per day that were soaked, and Dr. Feinstein noted vaginal discharge, (Ex. F,

Feinstein Dep., 133:23-135:7; Postoperative Report, Jan. 5, 2010, attached hereto as Exhibit N.)

> **RESPONSE: Disputed in part as incomplete. Plaintiffs does not dispute that Mrs. Wheeler reported these symptoms on January 5, 2010, but notes that the facts as set out in paragraph 32 are incomplete. In addition to the above, Dr. Feinstein noted "Doing better. PT is feeling great." (Feinstein Dep., Dkt. No. 137-6, at 134:22-25; *see also* Exhibit 4, at WHEELERC_CFEIN_MDR00034-36).**

33. On January 18, 2010, Mrs. Wheeler called Dr. Feinstein complaining of "something pulling (7 wks)" while sitting down. (Ex. F, Feinstein Dep., 140:5-141:4; Postoperative Followup Call Record, Jan. 18, 2010, attached hereto as Exhibit O.)

**RESPONSE: Undisputed.**

34. Mrs. Wheeler did not attend a postoperative appointment with Dr. Feinstein scheduled for February 2, 2010. (Ex. F, Feinstein Dep., 137:13-17.)

**RESPONSE: Disputed in part as incomplete. Defendant tries to paint Mrs. Wheeler as an individual who failed to attend follow-up appointments. Mrs. Wheeler rescheduled her visits for two missed appointments, (*See* Feinstein Dep., Dkt. No. 137-6, 135:17-22) and attended several follow-up visits with Dr. Feinstein on December 28, 2009, January 5, 2010, February 22, 2010, May 25, 2010, and June 8, 2010. (*See generally*, Exhibit 4).**

35. On February 22, 2010, Mrs. Wheeler attended a post-op visit with Dr. Feinstein's office and reported pain in the front of the vagina with intercourse, and pain all day, especially worsening at the end of the day. (Ex. F, Feinstein Dep. 135:8-137:2; Postoperative Report, Feb. 22, 2010, attached hereto as Exhibit P.)

**RESPONSE: Undisputed.**

36. On May 25, 2010, Plaintiff complained of pain on her right side and reported having this pain since her November 30, 2009 surgery. (Ex. F, Feinstein Dep., 138:17-141:4; Progress Notes, May 25, 2010, attached hereto as Exhibit Q.)

**RESPONSE: Undisputed.**

37. Plaintiffs filed their initial Short Form Complaint on April 30, 2012 directly into C. R. Bard, Inc., Pelvic Repair System Products Multi-District Litigation 2187 ("Bard MDL"). (ECF 1.)

**RESPONSE: Undisputed.**

38. Plaintiffs filed their Amended Short Form Complaint on December 25, 2012. (Ex. A, SFC).

**RESPONSE: Undisputed.**

39. In their Short Form Complaint, Plaintiffs asserted claims against Bard, Sofradim Production SAS, Analytic Biosurgical Solutions, Mentor Worldwide LLC, Coloplast A/S, Coloplast Corp., Coloplast Manufacturing US, LLC, and Porges S.A. (Ex. A, SFC, ¶ 6.)

**RESPONSE: Undisputed.**

40. Plaintiffs settled their claims against Coloplast relating to alleged injuries caused by Aries Tape. (Ex. E, Wheeler Dep., 33:23-24; 109:17-16; ECF 39.)

**RESPONSE: Undisputed.**

41. Plaintiffs' claims against Porges S.A., Coloplast A/S and Coloplast Manufacturing US, LLC were terminated pursuant to Pretrial Order # 79 entered in MDL 2187. (MDL 2187, Pretrial Order No. 79.)

**RESPONSE: Undisputed.**

42. Plaintiffs' claims against Sofradim Production SAS, and Analytic Biosurgical Solutions were voluntarily dismissed. (ECF 27, 51.)

**RESPONSE: Undisputed.**

43. In their Short Form Complaint, Plaintiffs asserted the following claims based on corresponding counts in the Master Complaint: Negligence (Count I), Strict Liability – Design Defect (Count II), Strict Liability – Manufacturing Defect (Count III), Strict Liability – Failure to Warn (Count IV), Breach of Express Warranty (Count V), Breach of Implied Warranty (Count VI), Loss of Consortium (Count VII), and Punitive Damages (Count VIII). (Ex. A, SFC, ¶ 14; Ex. B, MC.)

**RESPONSE: Undisputed.**

44. Mrs. Wheeler did not assert a claim for lost profits, and never disclosed in her Plaintiff Fact Sheet, written discovery responses, or her deposition testimony that she was pursuing such claim. (See generally Wheeler Dep.; PFS; Pl.'s Resp. to Def.'s Interrog. No. 4, December 6, 2019, attached hereto as Exhibit R.)

> **RESPONSE: Disputed. Mrs. Wheeler answered "yes" to the question "are you making a claim for lost wages or lost earning capacity?" (PFS, Dkt. No. 137-4, at § II.8) Further, the Plaintiff Fact Sheet states "[i]n filling out this form, the terms 'You' or 'Your' refer to the person who received pelvic mesh product(s) manufactured or sold by C. R. Bard and who is identified in Question I.1 (a) below" (PFS, Dkt. No. 137-4, at 2.)**

45. Plaintiff's alleged injuries include: "Chronic pelvic and vaginal pain, dyspareunia, pain during orgasm, inability to sit for prolonged periods of time, inability to lift heavy objects, hip pain, unable to swim or go horseback riding; unable to have proper pelvic exam and vaginal sex is impossible." (Ex. D, PFS, II.6(e); Ex. E, Wheeler Dep., 93:5-20, 95:19-96:5.)

> **RESPONSE: Undisputed.**

46. Plaintiffs conceded they will not pursue any causes of action for strict liability manufacturing defect (Count III), breach of implied or express warranties (Counts V and VI), and "a claim for Mr. Wheeler's Lost Profits." (ECF 93, Plaintiffs' Memorandum in Opposition to Bard's Motion for Summary Judgment, Nov. 15, 2019, filed in Bard MDL).

> **RESPONSE: Undisputed. However, Plaintiffs note that they are pursuing a claim for lost profits on behalf of Mrs. Wheeler, as further discussed in their Memorandum.**

47. Plaintiffs designated Dr. Bruce Rosenzweig, M.D. and Colleen M. Fitzgerald, M.D. to offer causation opinions relating to the alleged injuries sustained by Mrs. Wheeler. (Plaintiff's Designation and Disclosure of General and Case-Specific Expert Witnesses, August 19, 2019, attached hereto as Exhibit S.)

**RESPONSE: Undisputed.**

48. Dr. Feinstein testified that it was not his opinion, and that he was not going to testify in this case, that Bard's Avaulta caused or contributed to any of Mrs. Wheeler's alleged injuries. (Ex. F, Feinstein Dep., 161:16-162:6).

**RESPONSE: Undisputed.**

49. Plaintiff underwent four procedures to revise, trim and remove her mesh, on June 18, 2010, September 13, 2010, October 27, 2010, and March 2, 2011, respectively. (Ex. D, PFS, § II.5; PFS, Ex. B.)

**RESPONSE: Undisputed.**

50. On December 4, 2014, Plaintiff was implanted with another mesh sling, a TVT Exact manufactured by Ethicon, which remained implanted in Plaintiff as of the time of her deposition on July 11, 2019. (Ex. E, Wheeler Dep., 22:12-17; 88:7-11; 102:13-17.)

**RESPONSE: Undisputed.**

## PLAINTIFF WHEELER'S RULE 56.1 STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

### I.   Plaintiff's discovery of her claims against Bard

51. Plaintiff did not begin to suspect that her injuries were caused by the defective Bard Avaulta Solo device until June 2010. (*See* Affidavit of Christine Wheeler, Nov. 15, 2019, ¶¶ 3-4, attached hereto as Exhibit 1.) During a June 8, 2010, visit, Dr. Feinstein first informed Mrs. Wheeler that he might need to remove the mesh that he had implanted in November 2009. (*See id.*; *see also* Exhibit 4, p. 16 of PDF, June 8, 2010 note (with "excise tape" handwritten on note)).

52. Before June 2010, Plaintiff's physician, Dr. Feinstein, told her that her symptoms were due to healing slowly from her November 2009 implant surgery. (*Id.* at ¶ 3; *see also* Christine Wheeler Dep., Dkt. No. 137-5, at 96:19-21; Douglas Wheeler Dep., Dkt. No. 85-9, at 36:24-37:4; 40:9-14).

16

53. Referring to the FDA Black Box warning noted in the informed consent form, Mrs. Wheeler explicitly testified in her deposition that she "[doesn't] even know what a black box is," and she "didn't even know that was in here [the informed consent form]." (*see* Christine Wheeler Dep., Dkt. No. 137-5, at 69:9-17.)

## II.     Bard's failure to warn of the Avaulta's dangerous propensities

54. Dr. Bruce Rosenzweig, an expert witness for the Plaintiffs, opines that there is substantial evidence that the Bard Avaulta device is associated with numerous adverse events, of which Bard failed to warn implanting physicians, including: "permanent, lifelong and debilitating pelvic pain, lifelong sexual complications and dysfunction, lifelong risk of multiple surgeries, need for removal of the device, difficulty removing the device, lifelong risk of erosions, chronic and delayed urinary problems, and the risk of serious complications and effect on a patient's quality of life" and the fact that "mesh can degrade and shrink; there is a lifelong risk of contraction; and it was never meant to be used inside the human body." (*See* Rosenzweig Case-Specific Report, attached hereto as Exhibit 2, at p. 34.)

55. Moreover, Dr. Rosenzweig opines that Bard failed to warn of the frequency, severity, and nature of the mesh contraction, and of deformation, fraying, cording and roping/curling of the mesh and attempted to downplay the risks by stating the risks are those "typically associated with surgically implantable materials." (*Id.*).

56. Dr. Feinstein is an experienced surgeon who was familiar with Bard products and was paid by Bard to serve as a preceptor to train and educate other physicians on surgical technique related to implantation of Bard transvaginal mesh devices. (Feinstein Dep., Dkt. No. 137-6, at 51:24-52:15; 52:22-53:12). In his practice, he saw instances where Bard Avaulta mesh shrank excessively. (*Id.* at 80:19-24).

57. At the time Dr. Feinstein implanted the Bard Avaulta device in Mrs. Wheeler in November 2009, he saw no indication that the mesh was folded, bunched or improperly placed at the time the procedure was completed. (*Id.* at 48:25-49:8). Dr. Feinstein does not recall that he deviated in any

17

way from the Bard Instructions For Use when he implanted the device in Mrs. Wheeler. (*Id.* at 46:9-14).

58. Dr. Feinstein, testified that he relied on Bard to give him accurate and adequate safety information about its transvaginal mesh devices, including potential adverse events and Bard's own safety experience with these devices. (*See* Feinstein Dep., Dkt. No. 137-6, at 27:15-22; 28:14-29:12).

59. Dr. Feinstein testified that Bard never warned him, in its Instructions For Use or elsewhere, that the Avaulta solo device: had small pores (*id.* at 32:19-23); that it would shrink inside of a woman's body (*Id.* at 33:15-20); that the mesh would fold or wrinkle inside of a woman's body (*id.* at 33:22-34:1); that the mesh would deform or rope or curl inside a woman's body (*id.* at 34:3-7); that the device was made from non-medical grade polypropylene (*id.* at 34:9-15); that the manufacturer of the polypropylene material from which the mesh was made had warned Bard to never use that particular material for implants intended for permanent placement in the human body (*id.* at 34:17-25); that the mesh could shrink and contract as much as 30-50% inside of a woman's body (*id.* at 35:2-8); that the device caused chronic or permanent dyspareunia (*id.* at 35:17-22); that the mesh would degrade inside of a woman's body (*id.* at 35:25-36:1); that the mesh would form a rigid scar plate inside of a woman's body (*id.* at 36:6-12); that the mesh could never be fully and safely removed from a woman's body if complications arose (*id.* at 36:14-20); that Bard was aware of a high failure rate associated with the device (*id.* at 36:22-37:2); that the foreign body response associated with the device was permanent or chronic in nature (*id.* at 37:10-15); that the device could cause permanent vaginal pain, permanent pelvic pain and permanent groin pain (*id.* at 37:17-22); that the device could affect a woman's ability to walk or to sit without pain (*id.* at 37:25-38:5); that the device had the potential to fray or rope after implantation (*id.* at 38:7-12); or, that the mesh had a unique combination of small pores and heavyweight characteristics that posed unique risks. (*Id.* at 38:20-25).

60. Dr. Feinstein testified unambiguously that if Bard was aware of any of these things prior to November 2009, he would have expected Bard to have communicated that information to him

and, in turn, he would have incorporated that information into his decision making and would have passed that information along to his patients, including Mrs. Wheeler, in an informed consent conversation. (*Id.* at 39:2-25, 41:2-9).

61. Had Dr. Feinstein been warned of these risks, he also would have considered using alternative surgical or medical devices, as opposed to the Bard Avaulta Solo device. (*Id.* at 40:16-25).

62. If a patient, such as Christine Wheeler, would have determined that she did not want to proceed with a Bard transvaginal mesh device implantation after receiving such information, Dr. Feinstein would have honored and respected that decision. (*Id.* at 41:11-19).

63. Dr. Feinstein relied on the safety information that Bard provided him in its Instructions For Use, and he relied on it to be accurate and complete. (*Id.* at 47:9-19).

64. Dr. Feinstein testified unambiguously that the location of Mrs. Wheeler's postoperative pain corresponded exactly with a portion of the Avaulta implant, and that is what he sought to address in his revision surgery. (*Id.* at 179:8-16).

### III. Mrs. Wheeler's claims and financial loss

65. Mrs. Wheeler stated in her Plaintiff Fact Sheet that she would seek damages for "lost wages and earning capacity." (PFS, Dkt. No. 137-4, at § II.8). The Plaintiff Fact Sheet later listed that Mr. Wheeler would also seek damages for "lost wages and earning capacity." (*Id.*)

66. Both Mr. and Mrs. Wheeler testified that Mrs. Wheeler is an owner of First Community Insurance, and that she essentially managed the entire office at the time of her surgeries. (Doug Wheeler Dep., Dkt. No. 85-9 at 66:11-12); (Christine Wheeler Dep., Dkt. No. 137-5 at 20:16-17.) Mr. Wheeler further described how the lost profits of First Community would be calculated, which is supported by the tax and employment records. (Doug Wheeler Dep., Dkt. No. 85-9 at 61:6-64:11.) Defense counsel failed to ask to Mrs. Wheeler questions about whether she claimed an interest in the lost profits of First Community. (*See generally* Christine Wheeler Dep., Dkt. No. 137-5.)

19

67. Mrs. Wheeler testified that "95 percent" of the time during which she was unable to work for health reasons stemmed from her mesh-related surgeries. (Christine Wheeler Dep., Dkt. No. 137-5 at 24:4-13.) She also testified as follows regarding her inability to work:

> … [T]here are many days where Dougie [Doug Wheeler] would put me in the vehicle and drive me here [to work] just [so] I was here. So I might be here and sometimes I was not mentally prepared to be here because I was on lots of medicine back then. It wouldn't really allow me to think. And so -- but mostly, he wanted to make sure I was here where he could watch me or see me or – because I was -- I've been depressed from time to time. Sometimes I was here, but I didn't do anything. I was just here.

(*Id.* at 106:19-107:3).

### IV.    Bard's scheme to acquire raw materials for its devices, despite warnings

68. Bard used Marlex polypropylene material that was manufactured by Chevron Phillips in its pelvic mesh devices, including the Avaulta devices. (Roger Darois Dep., June 19, 2013 ("Darois 2013 Dep."), attached as Exhibit 6, at 35:13-37:23, 49:1-5; *see also* Roger Darois Dep., Dec. 19, 2012, attached as Exhibit 7 ("Darois 2012 Dep."), at 9:23-10:6 (establishing that Mr. Darois has been Bard's vice president of research and development and its vice president of research and advanced technologies during the relevant time frame)).

69. Eventually, Chevron Phillips became concerned about Bard's use of its material in medical implants, so Bard obtained the necessary materials from third parties, and Bard took steps to conceal from Chevron Phillips that Bard was using Chevon Phillips' materials in Bard's mesh products. (*Id.* at 35:13-36:4, 49:16-50:8).

70. The Material Safety Data Sheet ("MSDS") for the polypropylene supplied by Chevon Phillips contains the following language: "MEDICAL APPLICATION CAUTION: **Do not use** this Chevron Phillips Chemical Company LP material **in medical applications** involving permanent implantation in the human body or permanent contact with internal body fluids or tissues." (Material Safety Data Sheet, attached as Exhibit 8, at p. 1 (emphasis added); s*ee also* Darois 2013 Dep., Ex. 6, at 53:6-54:1 (Darois confirming that he became aware of this

information in 2007), 120:9-25 (confirming that this version matched prior version of the MSDS for materials used in Bard products)).

71. Because Chevron Phillips was concerned about the use of its polypropylene as a medical implant, Bard hid its use of the product for this purpose. (Darois e-mail to Blank, March 25, 2004, attached as Exhibit 9, at AVA2E8262834; *see also* Darois 2013 Dep., Ex. 6, at 72:23-74:19 (discussing the e-mail)). In 2004, Mr. Darois wrote in an internal e-mail that Bard would be acquiring polypropylene monofilament from third parties who purchase the resin from directly from manufacturers. (*Id.*). He cautioned: "Please do NOT mention Davol's name[1] in any discussions with these manufacturers. In fact, I would advise purchasing the resin through a third party, not the resin supplier to avoid a supply issue once the medical application is discovered." (*Id.*)

72. Bard took these actions because it was concerned that Chevron Phillips would stop supplying polypropylene to Bard if it knew that Bard was using the polypropylene in permanent medical implants. (Darois trial testimony, *Cisson v. Bard, Inc.*, 2:11-CV-00195 (S.D. W. Va.), August 7, 2013, attached as Exhibit 10, at 69:11-70:4).

73. When Bard's third-party supplier of polypropylene monofilament, Shakespeare, learned of the warning in the MSDS, it stopped supplying Bard with the material for its medical devices, even though Bard had offered indemnification. (Jim Brann e-mail to Roger Darois, Nov. 27, 2007, attached as Exhibit 11; *see also* Darois trial testimony, Ex. 10, at 65:1-67:4).

74. John Weiland, the president and COO of Bard, was aware that one of Bard's suppliers was unwilling to provide product due to the MSDS warning, as evidenced by an e-mail from Darois to Weiland on April 15, 2008, discussing that issue. (Darois e-mail to Weiland, April 15, 2008, attached as Exhibit 12; *see also* Weiland Dep., Dec. 2, 2015, attached as Exhibit 13, at 7:12-19 (titles), 70:16-71:15 (acknowledging that he has no reason to believe that he did not receive the e-mail)).

---

[1] Davol is a division of Bard. Mr. Darois was vice president of research and advanced technologies for Davol. (Darois 2012 Dep., Ex. 7, at 9:18-10:1).

75. Fifteen days later, on April 30, 2008, COO Weiland agreed by e-mail to indemnify its third-party supplier of the materials for the mesh. (Weiland e-mail to Jarden executives, April 30, 2008, attached as Exhibit 14). Weiland acknowledged passing on the indemnification language, drafted by Bard's legal department, to Jarden, which is the parent company of Shakespeare. (Weiland Dep., Ex. 13, at 100:4-101:16; Darois 2013 Dep., Ex. 6, at 99:10-23 (referencing Jarden as Shakespeare's parent company)).

76. Frank Zakrezewski, the corporate representative witness for Chevron Phillips, when asked about the statements in the Material Safety Data Sheets that the company provides, testified: "I view it as a warning. It should be taken seriously." (Zakrezewski Dep., March 7, 2014, attached as Exhibit 15, at 204:22-205:5).

**V. Bard's failure to establish the safety of Avaulta products before marketing them**

77. In a 2002 provisional patent application filed by Bard executives, they told the U.S. Government as follows about the problems with Bard's mesh products:

> Although some doctors are satisfied with the results that they have achieved using synthetic mesh sling kits, other doctors prefer not to use the synthetic materials due to the materials' higher potential for complications such as the occurrence of infection or foreign body reaction around the mesh, or urethral or vaginal wall erosion due to the mesh. In some cases of erosion, mesh has been observed to unravel, creating a sharp "finishing line" effect, which can slice through the patient's tissue. This is not a concern with natural fibrous materials such as autologous, allograft, or xenograft tissues.

(Provisional U.S. Patent Application of Douglas G. Evans and Kenneth Butcher, attached as Exhibit 16, at pp. 2-3). Mr. Evans, one of the co-authors, acknowledged in deposition testimony that the application was "a Bard patent application." (Evans Dep., Aug. 17, 2012, attached as Exhibit 17, at 114:8-121:9).

78. Despite this knowledge of potential complications, Bard did not conduct any human tests before placing the Avaulta product line onto the market, and did not conduct any animal tests involving the process surgeons would use to place the device. (Robert Orr[2] Dep., July 23, 2012 (Cisson trial cuts), attached as Exhibit 18, at 37:02-38:12).

---

[2] Robert Orr was a Bard program manager. (*Id.* at 12:08-17).

79. There was discussion at Bard that the company should conduct clinical trials before launching the product, but the plan for trials was scrapped for what Program Manager Robert Orr described as "various reasons that I'm not specifically aware of." (*Id.* at 38:13-19, 39:14-19).

80. One of those "reasons" not to conduct clinical trials was to save money. Melissa Johnson, a senior product manager, stated in an internal e-mail in 2010 that "although Marketing has always felt that an investment in clinical data is crucial, at BUD [Bard Urological Division] that budget item was always the first to be cut when we had to reduce expenses." (Johnson-Pagotto e-mail exchange of Feb. 16-19, 2010, attached as Exhibit 19). Johnson was responding to an e-mail from sales territory manager John Pagotto stating: "So, we have a product out since June of 07 and only one paper [with clinical data] to hand out. Is that what we are saying?" (*Id.*; *see also* Melissa Johnson Dep., Jan. 29, 2013, attached as Exhibit 20, at 76:22-78:22 (discussing the e-mail exchange and stating that another three-year study that showed an increased erosion risk was never approved for dissemination to Bard's sales staff)).

81. Bard routinely released products onto the market without data to support their safety and efficacy. A November 2006 report to Mark Downey, who was president of the Bard Urological Division, stated: "We as a division need to step it up on these department. We **always release products with no data**." (Jason Christian memo to Mark Downey, Nov. 4, 2006, attached as Exhibit 21, at AVA2E1262456 (emphasis added); *see also* Mark Downey Dep., June 21, 2013, attached as Exhibit 22, at 18:17-21).[3]

82. In discussing a potential study of "pressures seen by the pelvic floor in the worst case," Claire Gloeckner, a biomechanics engineer/scientist for Bard, stated that it would be an important study for all of Bard's pelvic floor and sling implants. (Gloeckner-Thomas e-mail exchange, Oct. 17, 2008, attached as Exhibit 23, AVA2E1277747 (emphasis added); *see also* Gloeckner Dep., March 1, 2013, attached as Exhibit 24, at 99:20-102:18 (discussing e-mails and

---

[3] The same memo noted comments from physicians, stating that at least one had commented that "there will be a class action law suit against the medical companies regarding this device." (*Id.* at AVA2E1262455).

stating that "I love to see clinical data"). She added: "And should have been done before, **but that's par for the course**." (*Id*.).[4]

83. Jim Ross, M.D., was a gynecological surgeon and Bard consultant. (Orr Dep., Ex. 18, at 21:4-17). Dr. Ross testified that as early as 2002 or 2003 he was trying to get Bard to do clinical studies on its mesh products, but those studies never happened. (Ross Dep., May 10, 2012, attached as Exhibit 25, at 119:9-120:3). Dr. Ross designed a study to put certain Bard mesh products into sheep, as a precursor to studying them in women, telling Bard that "[a]nimal and human data will strengthen this treatment," but Bard rejected the study. (*Id*. at 145:8-146:14; *see also id*. at 46:16-25, 47:20-48:08 (discussing how Dr. Ross wanted to conduct randomized controlled human trials before marketing the Avaulta Solo and Avaulta Plus products, but Bard did not approve the studies)).

84. Bard engaged in a project beginning in 2005 to improve its Avaulta kits to treat prolapse. (BUD PROJECT 03-4661 Abstract, Nov. 3, 2006, attached as Exhibit 26, at p. 1). Among the "Technology Challenges" listed on a Bard internal document discussing this project are: "**No expertise in mesh development**"; No facility for mesh design"; and "Limited R&D testing facilities for mesh." (*Id*. at p. 10, AVA2E0001683 (emphasis added); *see also* Downey Dep., Ex. 22, at 61:2-8 (explaining that the document was an abstract for Bard's "Summit" project, to create "the next generation of Avaulta products," the Avaulta Plus and Avaulta Solo)).

85. It should have been obvious to Bard that its surgical mesh products, including the Avaulta line, would be dangerous. Mr. Orr commented as follows in an internal Bard e-mail in 2011:

> I have discussed with our technical and clinical experts your question of pore size and other attributes of surgical mesh products which are used in the repair of pelvic organ prolapse (POP). It is our belief that until fairly recently (~2008) the available surgical mesh products used for POP repair may have been over engineered with regard to excess strength and minimal pore size when used in the pelvic floor. This shouldn't be surprising since the mesh products originally adopted for pelvic floor repair were designed (and cleared) for more general surgical uses such as hernia repair, suture line reinforcement, muscle flap reinforcement, gastric banding, etc.

---

[4] *See also id.* at 24:4-7 (discussing Gloeckner's title).

(Orr-Robirds e-mail exchange, April 26, 2011, attached as Exhibit 27, at AVA2E0864857).

86. Bard's approach was to make others prove that its devices were unsafe or inadequate. Gary Teague was a "high-level person at Bard" who was responsible for developing the teaching program for Bard's medical device unit. (Ross Dep., Ex. 25, at 14:16-15:4). When Dr. Ross wrote to Teague: "I think we say with porcine side wall attachment is key and with Avaulta the arms replace this necessity. **Prove us wrong!**" (Teague-Ross e-mail exchange, Oct. 4, 2005, attached as Exhibit 28, at p. 2 (emphasis added)), Teague responded: "Agreed." (*Id.* at p. 1).

87. The FDA in January 2012 insisted that clinical trials be done on the Avaulta products, to look at both the safety and the efficacy of the products, but Bard decided not to do the studies, and instead decided to remove the Avaulta products from the market. (Ross Dep., June 14, 2012, attached as Exhibit 29, at 277:11-278:16; *see also* Brendan Hammons e-mail to several recipients, Jan. 23, 2013, attached as Exhibit 30, at AVA2E5058501).

88. Dr. Brian Raybon, an expert witness for the Plaintiffs, opines that Bard failed to warn physicians and potential users about many of the dangers associated with the Avaulta device, including the failure to warn that the polypropylene being used was not approved for medical implants; that the pores in the Avaulta mesh were not large enough for proper tissue integration; that the mesh had nearly twice the density of the maximum safe density; that the small pore size in the mesh results in rigid scar plate formation; that the mesh would shrink as much as 30-50% after implantation; that Bard had conducted only limited animal studies, which failed to establish the product's safety in humans; that the uncovered, flat arms of the Avaulta products would cause tissue damage as they were pulled through the smaller, rounder trocar tunnel, causing the mesh to saw through tissue; that the use of trocars inserted blindly presented the unnecessary risk of nerve damage and tissue trauma; and that it is extremely difficult to remove the Avaulta products once they are implanted. Thus, "Bard's failure to provide adequate and complete information to doctors prevented doctors and patients from reaching fully informed and educated decisions about whether to use the Avaulta products." (Rule 26 Expert Report of Brian Raybon, M.D., attached as Exhibit 31, at pp. 7-15).

## VI.     Mrs. Wheeler's mesh related injuries

89. Mrs. Wheeler has suffered numerous injuries due to the mesh, including but not limited to: "mesh erosion, chronic vaginal pain, chronic pelvic pain, chronic dyspareunia, pelvic floor myofascial pain, pelvic floor muscle dysfunction, bladder tenderness, right pubic ramus pain, chronic right labial pain, right sciatic pain, right hip pain, low back pain, posterior right buttock pain, SI joint pain (sacroiliac joint pain), and vaginal tenderness." (Rosenzweig Report, Exhibit 2, at p. 30.) Dr. Rosenzweig opines that these injuries were caused by: "(1) degradation of the mesh; (2) chronic foreign body reaction; (3) [mesh that was] never meant to be implanted inside the human body (4) infections and bio-films; (5) deformation, fraying, roping, cording and curling of the mesh; (6) loss of pore size with tension; (7) fibrotic bridging leading to scar plate formation and mesh encapsulation; and (8) shrinkage/contraction of the encapsulated mesh." (*Id.* at 29.)

90. When asked if he had ever observed any sort of fraying or roping in the Bard Avaulta device, Dr. Feinstein responded: "This one in particular." (Feinstein Dep., Dkt. No. 137-6, at 83:11-13).


Dated: July 24, 2020                          Respectfully submitted,

/s/ _Jonathan P. Kieffer_____
Thomas P. Cartmell
Jeffrey M. Kuntz
Jonathan P. Kieffer
Wagstaff & Cartmell, LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
816-701-1103
jpkieffer@wcllp.com
tcartmell@wcllp.com

*Counsel for Plaintiffs Christine Wheeler*
*And Douglas Wheeler*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document on July 24, 2020, using the Court's ECF electronic filing system, thereby serving notice of the filing upon all counsel of record.

/s/ _Jonathan P. Kieffer_____

**Attorney for Plaintiffs**